UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.  2:11-CR-299** |
| v. | * | SECTION: HH |
| **KAREN PARKER**<br>a/k/a Karen Parker Broussard | * | |
| | * * * | |

## FACTUAL BASIS

Should this matter have proceeded to trial, the Government would have proven, through the introduction of competent testimony and admissible evidence, the following facts, beyond a reasonable doubt, to support the allegations in the Superseding Bill of Information now pending against the defendant:

*Background Information*

Beginning in 1992, the defendant, **KAREN PARKER, a/k/a Karen Parker Broussard** ("defendant" or "**PARKER**") began working as an administrative assistant for the Jefferson Parish Council.  On or about July 31, 2003, **PARKER** resigned from her position as an administrative assistant for Jefferson Parish Councilman Aaron F. Broussard ("Broussard") and began working for Broussard's campaign for Jefferson Parish President.  On or about October 4, 2003, Broussard was elected Parish President of Jefferson Parish.  Approximately four years later, on or about October

EXHIBIT 6

20, 2007, Broussard was re-elected by the voters of Jefferson Parish. On or about May 29, 2004, **PARKER** and Broussard were married. Approximately three years prior to May 29, 2004, **PARKER** and Broussard had a romantic relationship.

At all times relevant to this case, Thomas G. Wilkinson, a/k/a Tom Wilkinson ("Wilkinson"), was the Parish Attorney for Jefferson Parish and in that position had supervisory authority over the Jefferson Parish Attorney's Office, the authority to approve the hiring of new employees, and the authority to approve pay raises for Parish Attorney's Office employees.

Jefferson Parish utilized Iberia Bank, formerly Omni Bank, for Automated Clearing House transactions (payroll) who transmitted, via wire, these payroll transactions that crossed state lines before the payroll funds were deposited into the recipient (employee) bank account. **PARKER** established direct deposit with the Jefferson Parish Employees Credit Union (JPEFCU) and her salary while she was employed at Jefferson Parish, as set forth below from 2004 through 2010, was deposited into her JPEFCU accounts.

The Jefferson Parish Attorney's Office is a local government agency of Jefferson Parish. It received federal assistance in excess of $10,000.00 during each of the one year periods beginning on January 1st and ending December 31st for the years 2004, 2005, 2006, 2007, 2008, 2009, and 2010.

### *Karen Parker Becomes a "Paralegal Supervisor" at Jefferson Parish*

After his election on October 4, 2003, but prior to him taking office as the Jefferson Parish President, Broussard met with at least two Jefferson Parish officials to discuss **PARKER**'s anticipated employment with the Parish under the Broussard administration. The parties to that decision were either current or future high-ranking Jefferson Parish officials who used their influence

and positions in Parish government to make hiring decisions that were contrary to the best interests of the citizens of Jefferson Parish.  After those discussions, it was understood by the parties that **PARKER** would be hired as a "Paralegal Supervisor" under the purview of the Parish Attorney's Office in Jefferson Parish.  Broussard specifically wanted to have other Parish officials, including Wilkinson, be the individuals who hired **PARKER,** because he knew that once he took over the position of Parish President, he could not hire **PARKER,** and there would be increased scrutiny as a result of their romantic relationship.

All parties to the decision to hire **PARKER** – Broussard, Wilkinson, and others – knew that **PARKER** was not qualified, trained, or certified as a Paralegal Supervisor.  Despite this, on or about October 28, 2003, defendant **PARKER** was given the position of Paralegal Supervisor in the Jefferson Parish Attorney's Office.  Her starting salary was approximately $48,000.00, which was higher than the salary range allowed for under the Executive Pay Plan for Jefferson Parish.

Additionally, on or about October 28, 2003, Wilkinson approved the rescission/cancellation of **PARKER's** July 31, 2003 resignation from Jefferson Parish employment, which allowed her to collect additional money and salary in the form of longevity pay, tenure awards, health insurance benefits, and annual leave.  Wilkinson also approved the placing of **PARKER** on leave without pay for the time period August 1, 2003, through October 31, 2003, thereby eliminating any break in her employment with Jefferson Parish.

Wilkinson approved the decision to hire **PARKER** as a Paralegal Supervisor, approved her salary, rescinded her resignation, and approved her leave without pay status when he executed **PARKER's** Parish of Jefferson, Department of Human Resources Request to Fill a Vacant Job form on October 28, 2003.

EXHIBIT 6

According to the job description of Paralegal Supervisor, the essential functions of that position require that the "[i]ndividual conducts basic legal research, interviews witnesses, meets with inter-governmental personnel and members of the public, gathers evidence to formulate the Parish's position on Parish or other matters. Individual prepares legal documents including pleadings, wills, contracts, leases, property descriptions and legal opinions setting forth the Parish's position on Parish and other matters. Individual supervises and coordinates the activities of various support staff." The Paralegal Supervisor position is an unclassified position and, therefore, applicants are not required to take a civil service examination nor are unclassified employees subject to the same annual Employment Performance Evaluation process that classified employees are required to undergo. Moreover, the Jefferson Parish job description for the position of Parish Attorney's Office Paralegal Supervisor required Paralegal Supervisors to have completed paralegal training and certification.

Despite being given the position of a Paralegal Supervisor, **PARKER** was neither trained as a paralegal or a paralegal supervisor, nor did she possess the required paralegal certification. Moreover, as noted above, the parties who helped place her as a Paralegal Supervisor, including Broussard, Wilkinson, and others, knew she did not possess the required paralegal certification and that she was not trained as a paralegal.

During the period of time **PARKER** was assigned to work at the Parish Attorney's Office as a "Paralegal Supervisor," from approximately October 2003 through March 2004, **PARKER** did no work as a Paralegal Supervisor, nor did she perform any paralegal work. During this period of time, Broussard and Wilkinson were likewise aware that **PARKER** did no work as Paralegal Supervisor and the little work she did perform was not paralegal or paralegal supervisory work.

EXHIBIT 6

### *Karen Parker Gets Moved to ID Management Department*

On or about March 8, 2004, Wilkinson approved the transfer of defendant **PARKER** to work for ID Management which was located at the East Bank Regional Library. ID Management is the department responsible for issuing access badges to Jefferson Parish employees. Jefferson Parish determined that the Parish only requires one employee to hold the position of ID/Security System Coordinator. Despite her transfer to the East Bank Regional Library, **PARKER** retained her position and higher salary of Paralegal Supervisor until her dismissal on or about February 5, 2010.

As with her work at the Parish Attorney's Office, during the time period she worked at the East Bank Regional Library, **PARKER** did not perform any of the duties of, and did no work as, a Paralegal Supervisor while assigned to ID Management at the East Bank Regional Library. Likewise, Broussard and Wilkinson were aware, during this same period of time, that **PARKER** did not perform the duties of, and did no work as, a Paralegal Supervisor while assigned to the ID Management department. Moreover, both Broussard and Wilkinson had first-hand knowledge that **PARKER** did not appear at times at the location she was assigned (East Bank Regional Library) to work.

### *Karen Parker's Salary at Jefferson Parish*

Beginning in 2003, as noted above, **PARKER** was given an annual salary of approximately $48,000 as a Paralegal Supervisor, which was higher than the salary range allowed for under the Executive Pay Plan for Jefferson Parish. This salary range was approved and known by Wilkinson, as the Parish Attorney, and Broussard, as **PARKER**'s romantic interest. In 2004, 2007, and twice in 2008, **PARKER** was approved for Annual Evaluation Pay Raises by Wilkinson. These pay raises were approved by Wilkinson and known by Broussard despite the fact that both Wilkinson and

EXHIBIT 6

Broussard knew **PARKER** was not performing any of the essential functions for the position of Paralegal Supervisor and, indeed, **PARKER** was not qualified for, and did no work as, a Paralegal Supervisor. From approximately 2004 through 2009, Wilkinson authorized pay raises for **PARKER** from approximately $46,439.99 to approximately $63,898.36, knowing that these raises would additionally result in increased retirement benefits to the defendant, **PARKER**. In total, from 2004 through 2010, **PARKER** was paid approximately $323,308.13 in Jefferson Parish taxpayer funds for her salary.

### *Tom Wilkinson Benefits from Hiring Karen Parker*

In turn, after the hiring of **PARKER** as a "Paralegal Supervisor" in Jefferson Parish in October 2003, Broussard retained Wilkinson as the Parish Attorney in December 2003. As **PARKER**'s salary was annually being raised, by Wilkinson, Broussard, as Parish President, was approving annual pay increases for Wilkinson. From approximately 2004 through 2009, Broussard authorized pay increases for Wilkinson.

### *False Statements by Broussard*

In an effort to conceal the scheme and artifice noted above involving, among others, Broussard, from approximately 2005 through approximately 2010, repeatedly made false representations about **PARKER**'s occupation on multiple documents, including official U.S. government documents, such as tax returns, mortgage applications, and on sworn personal financial disclosure statements. In particular, on these documents, Broussard repeatedly represented that **PARKER** was a Paralegal or a Paralegal Supervisor when, as set forth above, **PARKER** was not qualified, trained, or certified as a Paralegal and, in fact, **PARKER** did no work as a Paralegal or as a Paralegal Supervisor in Jefferson Parish.

EXHIBIT 6

*Broussard Uses His Public Office for Private Gain*

Additionally, from approximately 2004 through 2010, Broussard received monies, totaling hundreds of thousands of dollars, that were characterized as, among other things, "retainers," "consulting fees" or "finder's fees" with various contractors and vendors, all of whom were doing business with Jefferson Parish during the period of time Broussard was the President of Jefferson Parish. Moreover, Broussard was a majority owner in a holding company which owned an investment property in Canada. Broussard received income from this Canadian property. This property was partially funded by individuals and/or entities who were contractors and/or vendors doing business with Jefferson Parish during the period of time Broussard was the Jefferson Parish President.

*Misprison of a Felony Regarding Theft Concerning Programs Receiving Federal Funds*

As set forth above, **PARKER**, Broussard, and Wilkinson knew, from approximately 2004 through 2010, that she was not qualified, trained, or certified to be a Paralegal Supervisor in Jefferson Parish and did not do any work as a Paralegal Supervisor in Jefferson Parish. In hiring, retaining, and paying **PARKER** as a Paralegal Supervisor, Broussard and Wilkinson intentionally stole or committed theft with Jefferson Parish taxpayer funds. Though **PARKER** was aware that she was stealing or committing theft of property valued at $5,000 or more which was owned by or under the care, custody, and control of the Parish of Jefferson (because she did not perform any work as a Paralegal Supervisor), **PARKER** did not report this crime to federal authorities and, indeed, concealed this crime from the authorities by, among other things, continuing to accept her salary and/or salary increases on an annual basis, and signing various forms, including official U.S.

EXHIBIT 6

governmental forms and personal disclosure forms, falsely representing her as a Paralegal Supervisor.

### *Limited Nature of Factual Basis*

This proffer of evidence is not intended to constitute a complete statement of all facts known by **PARKER** and described by **PARKER** to the government, but rather is a minimum statement of facts intended to prove the necessary factual predicate for her guilty plea. The limited purpose of this factual basis is to demonstrate that there exists a sufficient legal basis for **PARKER's** plea of guilty to the charged offense.

Various records, including bank statements, financial statements, mortgage statements, employment-related documents, forms (including tax records and disclosure forms) and other records, would be introduced to prove the facts as set forth above. Testimonial evidence, including testimony from representatives of the Federal Bureau of Investigation, Internal Revenue Service, as well as other witnesses, would also be admitted to prove the facts set forth above.

_____    _____
BRIAN M. KLEBBA                              Date
Assistant United States Attorney
New York Bar Roll No. 2938728

_____    _____
MATTHEW S. CHESTER                           Date
Assistant United States Attorney
Texas Bar No. 24045650

_____    _____
KAREN PARKER                                 Date
Defendant

_____    _____
DAVID COURCELLE                              Date
Counsel for Defendant
Louisiana Bar Roll No. 23696

EXHIBIT 6