CANADA                                          YAR No. 353654

PROVINCE OF NOVA SCOTIA


<u>IN THE SUPREME COURT OF NOVA SCOTIA</u>


TROUT POINT LODGE LIMITED, VAUGHN PERRET AND
CHARLES LEARY

PLAINTIFFS


– VERSUS –

DOUG K. HANDSHOE AND JANE DOE
([ANNEMARIEBOUDREAUX@YAHOO.COM](mailto:ANNEMARIEBOUDREAUX@YAHOO.COM))


DEFENDANTS

_____

<u>DECISION</u>

_____

HEARD BEFORE:   The Honourable Justice Suzanne
                Hood

COUNSEL:        Dr. Charles Leary Self-Represented
                as Agent and Officer of Trout
                Point Lodge Limited

PLACE:          Yarmouth JC1, Yarmouth, N.S.

DATE HEARD:     February 1, 2012

<u>INDEX</u>
<u>TROUT POINT LODGE V. HANDSHOE</u>
<u>FEBRUARY 1, 2012</u>

Oral Decision   ..................................... 3

<u>EXHIBITS</u>

<u>EXHIBIT   DESCRIPTION ------------------------PAGE</u>

None

1       <u>FEBRUARY 1, 2012 AT 10:23 A.M.</u>
2

3       <u>THE COURT:</u>    We  begin  by  saying  that
4   because  I  am  giving  this  decision  orally  I
5   reserve  the  right,  should  it  be  required  to  be
6   reduced  to  writing,  to  edit  but  not  of  course
7   change the substance of it.

8       Trout  Point  Lodge,  Charles  Leary  and  Vaughn
9   Perret  have  obtained  default  judgment  against
10   Doug  Handshoe  in  an  action  filed  in  August  2011
11   and  amended  in  September  2011  for  defamation,
12   invasion  of  privacy,  injurious  falsehood,
13   intentional  interference  with  contractual
14   relations,  intentional  interference  with  economic
15   relations,  intentional  infliction  of  emotional
16   and  mental  distress  and  assault.    Default
17   judgment  was  entered  on  December  12,  2011  with
18   damages to be assessed.

19       The  plaintiffs  move  for  an  assessment  of
20   damages  on  January  12th,  2012.    Mr.  Handshoe  was
21   given  notice  of  a  hearing  for  the  assessment  of
22   damages.

1      The plaintiffs have provided a copy of a
2  FedEx tracking slip showing delivery to Mr.
3  Handshoe's home in Mississippi.   It notes the
4  materials were left at the house.   Efforts were
5  also made according to the testimony of Mr. Leary
6  to fax the documents to Mr. Handshoe's fax number
7  but the transmission was not complete as the fax
8  appeared to have been disconnected.    These
9  materials appear also to have been sent by email
10  and these documents are at Tab 3 to the materials
11  presented in evidence by Mr. Leary at the
12  hearing.   It appears from Mr. Handshoe's blog
13  that he had knowledge of the hearing since he
14  referred to receiving, "nastygrams," from Mr.
15  Leary and Mr. Perret in a blog dated January
16  17th, 2012.   Mr. Handshoe did not appear or
17  participate in the assessment of damages.
18      Default judgment is conclusive of a claim
19  set out in the statement of claim and that's in
20  the authority for that, among others, is E. Sands
21  and Associates versus Dextras Engineering.    The

1    amended statement of claim sets out in detail the

2    claims against Mr. Handshoe which are now to be

3    treated by this court as proven.    The statement

4    of claim lists many examples of the defamatory

5    comments made by Mr. Handshoe, below is a brief

6    summary of them.    The defamatory comments

7    originated with a news story which was published

8    in the Times-Picayune newspaper in Louisiana

9    about Jefferson Parish President Aaron Broussard

10   being involved in a political corruption scandal.

11   The plaintiffs were erroneously identified as

12   being connected with Mr. Broussard in a business

13   venture and Mr. Broussard was named in error as

14   owning Trout Point Lodge.    The allegations

15   against him are kickback schemes, money

16   laundering and fraud while in his office as

17   Parish President.

18       The defamatory comments later included

19   claims that Trout Point Lodge, Mr. Leary and Mr.

20   Perret had misled ACOA and that Mr. Leary

21   committed perjury in litigation with ACOA.    The

1   defamation continued with statements that Trout
2   Point Lodge was losing business or going bankrupt
3   because of the investigation of Mr. Broussard and
4   his inability to continue to support it.    Also
5   there were claims that Charles Leary and Vaughn
6   Perret had been involved in a series of
7   businesses which failed and are con men.    The
8   statements also contained anti-gay rhetoric and
9   homophobic comments.

10      After the original story was retracted by
11   the Louisiana newspaper that published it Mr.
12   Handshoe made statements that Mr. Leary and Mr.
13   Perret had improperly influenced it to retract
14   the story.   He also said that Mr. Leary and Mr.
15   Perret were improperly using the legal system by
16   commencing the defamation action.    Individual
17   plaintiffs have filed affidavits and in his
18   affidavit Mr. Leary has related incidents
19   affecting him and Trout Point Lodge.   He said in
20   that affidavit in Paragraph 26,

21
22              "Due to the publications on

```
1              Slabbed and by Mr. Handshoe
2              elsewhere on the internet I
3              have a very real fear that
4              anyone      performing      due
5              diligence on us as business
6              people or innkeepers will
7              discover      and      believe
8              Handshoe's publications."
9

10     He also said in Paragraph 27,

11
12              "I  felt  embarrassed  in  my
13              local community.  Mr. Perret
14              and I have at times, changes
15              our usual shopping patterns in
16              Yarmouth in order to avoid
17              persons  we  consider  friends
18              who may have read the Slabbed
19              publications."
20

21     He  also  testified  about  the  stress  of  the

22     defamation  on  him  in  Paragraph  30  of  the

23     affidavit where he said,

24
25              "In April 2011 at the time when
26              Handshoe's  publication  about  us
27              became threatening and homophobic I
28              experienced tightened shoulder and
29              neck  muscles,  sleeplessness  and
30              developed a severe outbreak of fever
31              blisters for which I had to take
32              Zovirax,  and  antiviral  medication.
33              Previously I always slept very well
34              never waking up early.  Since April
35              2011  I  have  experienced  regular
36              sleeplessness particularly waking up
```

1          early in the morning worrying about
2          Slabbed and its effect on our
3          business."
4

5     His affidavit concluded with Paragraph 39 where

6     Mr. Leary says,

7
8          "I'm seriously concerned about
9          Slabbed hurting the Lodge's business
10         which Mr. Perret and I rely on as
11         our primary source of income. In
12         2011 occupancy rates at Trout Point
13         were three percent lower than in
14         2010. This represents a value of at
15         least $15,000."
16

17     Mr. Leary testified in court as well and his

18     evidence was about since the Notice of Action was

19     served and about the effect of the words of the

20     defendant on him and Trout Point Lodge.    Mr.

21     Perret also filed an affidavit in which he stated

22     the effects of the defamation on him.    He said in

23     his affidavit in Paragraphs 9 and 10,

24
25         "Mr.        Handshoe's      internet
26         publications have added a great deal
27         of stress to our lives including the
28         physical manifestations.    I felt
29         genuinely afraid of his published
30         threats and of the existence of the
31         Slabbed Nation and members of that

1          group being in Nova Scotia.  I now
2          keep my doors locked at night
3          whereas previously I never feared
4          for my safety in my own home."

5

6    He says in his affidavit at Paragraph 11,

7

8          "I have told my personal physicians
9          in Spain and Nova Scotia about
10        stress and sleeplessness related to
11        the Handshoe publications.  My
12        physician Dr. Fernandez Negrara had
13        prescribed medication to help me
14        sleep after the Slabbed publications
15        commenced and to help control my
16        anxiety.  I have also experienced
17        embarrassment, humiliation and
18        irritability.  It was hard to get
19        through work in 2011 knowing that
20        nearly every day a new source of
21        embarrassment and business
22        disruption might be published by
23        Handshoe.  I've been embarrassed
24        that friends and acquaintances in
25        Yarmouth might confront me about the
26        Slabbed allegations.  I could never
27        be sure that members of the local
28        community might secretly harbour a
29        belief in the truth of the blogs
30        allegations."

31

32   In Paragraph 13 he says,

33

34        "Mr. Handshoe has also made
35        publications about my mother stating
36        that I "split" and left her with a
37        surrogate son in Louisiana.  I was
38        traumatized by his suggestions that

1        I had somewhat neglected or abused
2        my mother."
3

4    Mr. Perret also testified briefly, he said he had

5    lost his appetite in the last two weeks as a

6    result of the material which has been published

7    by Mr. Handshoe and the volume of it.   In

8    addition, materials were submitted to the court

9    which were testified to by Charles Leary.  These

10    included defamatory comments made after the

11    Louisiana newspaper printed a retraction of the

12    story.  They include references to a cover-up of

13    a crime and dirty secrets April 20th, 2011 that

14    Charles Leary and Vaughn Perret and others were

15    "bag holders" for Aaron Broussard and the

16    purported owners of Trout Point Lodge.  That same

17    blog referred to the fleecing of investors in

18    Trout Point Lodge by Mr. Broussard and his close

19    connection to Mr. Leary and Mr. Perret.  It also

20    refers to Charles Leary as a liar and a perjurer

21    in the litigation with ACOA.   And that blog was

22    April 26, 2011.

1       On August 15th, 2011 the blog refers to "a

2    Trout Point Lodge Jefferson Parish political

3    corruption scandal update" linking Trout Point

4    Lodge with the corruption scandal involving Aaron

5    Broussard. In that same blog he refers to Charles

6    Leary and Vaughn Perret in the context of "by

7    reporter, get a good story."

8       On August 16th his blog said that he was

9    meticulously laying down "the trail of scams and

10    political corruption that leads to Nova Scotia

11    and Trout Point Lodge."

12       After being served with a Notice of Action

13    further defamatory comments were made.  On August

14    18th he wrote,

15

16          "First class bitches, common thugs

17          or just plain old morons."

18

19    He also refers to the "elite fraternity of crooks

20    and miscreants" who have sued him.  On August

21    24th, 2011 he referred to "political wrongdoing

22    involving Leary and Perret in Canada and it had

23    nothing to do with Broussard per se."

1    He continues to make accusations of fraud

2    against them and in bilking local contractors.

3    He refers to "the chances Trout Point Lodge will

4    be bankrupt within a year" and he said that on

5    August 30th, 2011.  In the same blog he refers to

6    the "nefarious practices" of Charles Leary and

7    Vaughn Perret.  He refers to them being involved

8    in money laundering.  He calls them "grifters"

9    and "grafters."  He accuses them of fabricating

10   positive reviews of Trout Point Lodge.

11   Ultimately he links them with organized crime.

12   These types of comments continued throughout

13   2011 and further defamatory comments were made

14   earlier this month, January 2012, when the Notice

15   of Assessment of Damages was served on him.  I

16   mentioned a few additional postings as follows.

17   There's a posting from September 14th, 2011,

18
19                "I'll add here, in case it is not
20                self-evident that I bill complete
21                dossiers on all the players in this
22                social group and I intend through
23                time to roll out each and every one
24                in excruciating detail as long as
25                the lawsuit in Canada is an

1          outstanding issue for Slabbed.  The
2          reason for this is that this band of
3          gay men act as a unit that will also
4          scatter like cockroaches when the
5          heat is applied."
6

7     In January of 2012 the blog says,

8
9          "Some of those names of the property
10         owners at Trout Point have well
11         documented connections to organized
12         crime here in the U.S.  From my
13         standpoint flushing all this out
14         only gets better from here."
15

16    Another blog from September 14th, 2011, sorry,

17    no, that's the same one.  A blog from January

18    29th of 2012,

19
20         "When I'm done even Perret's niece
21         who filed an affidavit in that Fox 8
22         case will understand her uncle is a
23         grifting scumbag pussy."
24

25    And on January 26, 2012 the blog says, "He,"

26    meaning Daquila (sp), "also has enough stroke to

27    tell Charles and Vaughn what to do at Broussard's

28    request."

29         There are many, many more blogs which

30    contained defamatory materials such as this which

1    are included in the materials filed with the

2    Court on January 30th.

3         Turning to the hearing, a comprehensive

4    brief was filed with the Court with many case

5    authorities.  Mr. Leary made an oral submissions

6    to the Court outlining the principles the Court

7    should consider in deciding the quantum of

8    damages for defamation, aggravated damages and

9    punitive damages.  In addition he referred to a

10   recent Ontario Court of Appeal decision with

11   respect to invasion of privacy which is also

12   claimed by the individual plaintiffs.

13        In questioning by the Court, Mr. Leary said

14   that the plaintiffs' other claims are subsumed in

15   the Claim of Defamation, that is the claims were

16   intentional interference with economic relations

17   for intentional interference with contractual

18   relations and injurious falsehood.

19        Mr. Leary submits that the invasion of

20   privacy, assault and intentional infliction of

21   emotional and mental distress stand alone and

1    individual plaintiffs seek damages for these

2    separate from the defamation in related claims.

3         The plaintiffs seek damages of $250,000 for

4    each of the three plaintiffs.  Aggravated damages

5    for each individual plaintiff as well as punitive

6    damages.  They say that their original demand of

7    aggravated damages of $300,000 each should be

8    increased because the amount was requested before

9    the recent defamatory remarks which have

10   continued since default judgment was entered and

11   in particular since Mr. Handshoe was given notice

12   of the assessment of damages.  He said they would

13   seek special damages for loss of business but it

14   is too difficult to prove although he believes

15   they have lost business because of the

16   defamation.

17        In addition, the individual plaintiffs, as

18   I've said, seek damages for invasion of privacy.

19   In the Jones Decision the Ontario Court of Appeal

20   said that the range for such damages is up to

21   $20,000.  In that case the Court of Appeal

1    awarded damages in the amount of $10,000.   The
2    plaintiffs here say that the extent of the
3    invasion of privacy in that case was less than is
4    the case here.      plaintiffs also seek an
5    injunction preventing further defamatory comments
6    and a mandatory injunction seeking to have the
7    existing comments removed.

8         The leading case on defamation in Canada is
9    the Supreme Court of Canada Decision is Hill v.
10    Church of Scientology of Toronto.   In that case
11    Justice Cory writing for the majority referred to
12    the fact that the defamatory comments were
13    published on the local television news, reported
14    in the Globe and Mail and reported on by CBC.   He
15    referred to the audience numbers of those media
16    outlets and said that the audience for the local
17    T.V. station was approximately 132,000.   The
18    Globe circulation that day was 108,000 and the
19    CBC broadcast was seen by approximately 118,000.
20    He refers to that in Paragraph 26 of the
21    decision.

1          He said in Paragraph 108, and I quote,

2

3              "False   allegations   can   so   very
4              quickly   and   completely   destroy   a
5              good   reputation.    A   reputation
6              tarnished by libel can seldom regain
7              its former lustre."

8

9      And he said with respect to defamatory statements

10     in Paragraph 166,

11

12             "A   defamatory   statement   can   seep
13             into    the    crevices    of    the
14             subconscious   and   lurk   there,   ever
15             ready to spring forth and spread its
16             cancerous   evil.    The   unfortunate
17             impression left by a libel may last
18             a lifetime.   Seldom does a defamed
19             person   have   the   opportunity   of
20             replying and correcting the record
21             in a manner that will truly remedy
22             the situation."

23

24     Justice  Cory  later  said  in  Paragraph  178  with

25     respect to Mr. Hill,

26

27             "He   would   never   know   who,   as   a
28             result  of  the  libellous  statement,
29             had some lingering suspicion that he
30             was guilty of misconduct which was
31             criminal in nature.   He would never
32             know who might have believed that he
33             was a person without integrity who
34             would    act    criminally    in    the
35             performance of his duties as a Crown

1  counsel.  He would never be certain
2  who would accept the allegation that
3  he was guilty of a criminal breach
4  of trust which was the essential
5  thrust of the libel."
6

7  In considering whether the jury award of damages

8  was appropriate, the Court quote from Gatley on

9  libel and slander in Paragraph 182.  In that text

10  the author states,

11
12  "The amount of damages is peculiarly
13  the province of the jury who in
14  assessing them will naturally be
15  governed by all the circumstances of
16  the particular case.  They're
17  entitled to take into their
18  consideration the conduct of the
19  plaintiff, his position in standing,
20  the nature of the libel, the mode
21  and extent of publication, the
22  absence or refusal of any retraction
23  or apology and 'the whole conduct of
24  the defendant from the time the
25  libel was published down to the very
26  moment of their verdict.  They may
27  take into consideration the conduct
28  of the defendant before action,
29  after action and in court on the
30  trial of the action.'  And also it
31  is submitted that the conduct of his
32  counsel who cannot shelter his
33  client by taking responsibility for
34  the conduct of the case.  They
35  should also allow 'for the sad truth
36  that no apology, retraction or
37  withdrawal can ever be guaranteed

1      completely to undo the harm it has
2      done or the hurt it has caused.'
3      They should also take into account
4      the evidence led in aggravation or
5      litigation of the damages."
6

7  The Court then said in Paragraph 184,

8
9      "In considering and applying the
10     factors pertaining to general
11     damages in this case it will be
12     remembered that the reports in the
13     press were widely circulated and the
14     television broadcast had a wide
15     coverage.  The setting and the
16     persons involved gave the coverage
17     an air of credibility and
18     significance that must have
19     influenced all who saw and read the
20     accounts.  The insidious harm of the
21     orchestrated libel was indeed spread
22     widely throughout the community."
23

24   In considering the issue of aggravated damages

25  Justice Cory again quoted from Gatley in

26  Paragraph 183.

27
28     "The conduct of the defendant, his
29     conduct of the case and his state of
30     mind are thus all matters which the
31     plaintiff may rely on his
32     aggravating the damages."
33

34     "Moreover it is very well
35     established that in cases where the

1     damages are at large the jury or the
2     judge, if the award is left to him,
3     can take into account the motives
4     and conduct of the defendant where
5     they aggravate the injury done to
6     the plaintiff. There may
7     malevolence or spite or the manner
8     of committing the wrong may be such
9     as to injure the plaintiffs' proper
10    feelings of dignity and pride.
11    These are matters which the jury can
12    take into account in assessing the
13    appropriate compensation."
14

15    "In awarding aggravated damages the
16    natural indignation of the Court at
17    the injury inflicted on the
18    plaintiff is a perfectly legitimate
19    motive in making it generous rather
20    than a more moderate award to
21    provide an adequate solution. That
22    is because the injury to the
23    plaintiff is actually greater and as
24    a result of the conduct, exciting
25    the indignation, demands a more
26    generous solatium."
27

28    The Court then referred to the aggravating

29    circumstances in that case at Paragraph 185.

30
31    "The misconduct of the Appellants
32    continued after the first
33    publication. Prior to the
34    commencement of the hearing of the
35    contempt motion before Justice
36    Cromarty, Scientology was aware that
37    the allegations it was making
38    against Casey Hill were false. Yet

1                        it persisted with the contempt
2                        hearings as did Morris Manning.  At
3                        the conclusion of the contempt
4                        hearing both appellants were aware
5                        of the falsity of the allegations.
6                        Nevertheless when the libel action
7                        was instituted the defensive
8                        justification was put forward by
9                        both of them.  The statement of
10                     defense alleging justification or
11                     truth of the allegation was open for
12                     all the public to see.  Despite
13                     their knowledge of its falsity the
14                     appellants continued to publish the
15                     libel."
16

17      Finally the manner in which Hill was crossed

18    examined by the Appellant coupled with the manner

19    in which they presented their position to the

20    jury in light of their knowledge of the falsity

21    of their allegations are further aggravating

22    factors to be taken into account.

23          Justice Cory dealt with the issue of

24    aggravated damages in Paragraphs 188 and 189.

25
26                     "Aggravated damages may be awarded
27                   in circumstances where the
28                   defendant's conduct has been
29                   particularly high handed or
30                   oppressive thereby increasing the
31                   plaintiffs' humiliation and anxiety
32                   arising from the libellous
33                   statement."

1

2          The   nature   of   these   damages   was   aptly

3     described  by  Justice  Robins  in  Walker  v.  CFTO

4     Limited in these words,

5

6              "Where  the  defendant  is  guilty  of
7              insulting,   high  handed,   spiteful,
8              malicious   or   oppressive   conduct
9              which  increase  the  mental  distress
10             the   humiliation   and   indignation,
11             anxiety,  grief,  fear  and  the  like,
12             suffered   by   the   plaintiff   as   a
13             result  of  being  defamed,   the
14             plaintiff  may  be  entitled  to  what
15             has  come  to  be  known  as  aggravated
16             damages.   These  damages  take  into
17             account  the  additional  harm  caused
18             to  the  plaintiffs'  feeling  by  the
19             defendant's  outrageous  and  malicious
20             conduct.   Like  general  or  special
21             damages  they  are  compensatory  in
22             nature.   Their  assessment  requires
23             consideration  by  the  jury  of  the
24             entire  conduct  of  the  defendant  part
25             of  the  publication  of  the  libel  and
26             continuing  through  to  the  conclusion
27             of  the  trial.   They  represent  the
28             expression  of  natural  indignation  of
29             right-thinking  people  arising  from
30             the   malicious   conduct   of   the
31             defendant."
32

33    In  Paragraph  191  Justice  Cory  considered  the

34    factors  in  that  case  that  warranted  an  award  of

35    aggravated  damages.      There  are  a  number  of

1    factors that a jury may properly take into
2    account in assessing aggravated damages. For
3    example, was there a withdrawal of the libellous
4    statement made by the defendants and an apology
5    tendered. If there was this may go far to
6    establishing that there was no malicious conduct
7    on the part of the defendant warranting an award
8    of aggravated damages. The jury may also
9    consider whether there was a repetition of the
10   libel, conduct that was calculated to deter the
11   plaintiff from proceeding with the libel action,
12   a prolonged and hostile examination of the
13   plaintiff or plea of justification which the
14   defendant knew was bound to fail. The general
15   manner in which the defendant presented its case
16   is also relevant. Further it is appropriate for
17   a jury to consider the conduct of the defendant
18   at the time of the publication of the libel. For
19   example was it clearly aimed at obtaining the
20   widest possible publicity in circumstances that
21   were the most adverse possible to the plaintiff.

1       The Supreme Court of Canada also considered

2  the issue of punitive damages beginning at

3  Paragraph 196 where the Court said,

4
5           "Punitive damages may be awarded in
6           the situation where the defendant's
7           conduct is so malicious, oppressive
8           and high handed that it offends…"
9

10      — missing a page.  Can we just, we'll just go

11  off the record for a moment, I have to find the

12  rest of that quote.

13
14              [RECESS 10:47 — 10:48 A.M.]
15

16      THE COURT:     The Supreme Court of Canada

17  dealt with the issue of punitive damages

18  beginning at Paragraph 196, where the Court said,

19

20           "Punitive damages may be awarded in
21           situations where the defendant's
22           misconduct is so malicious,
23           oppressive and high handed that it
24           offends the Court's sense of
25           decency."
26

27      Punitive damages bear no relation to what

28  the plaintiff should receive by way of

1    compensation.   Their aim is not to compensate the

2    plaintiff but rather to punish the defendant.   It

3    is the means by which the jury or Judge expresses

4    its outrage at the egregious conduct of the

5    defendant.   They are in the nature of a fine

6    which is meant to act as a deterrent to the

7    defendant and to others from acting in this

8    manner.   It is important to emphasize that

9    punitive damages should only be awarded in those

10    circumstances where the combined award of general

11    and aggravated damages would be insufficient to

12    achieve the goal of punishment and deterrents.

13        One of the important factors for the Court

14    was set out in Paragraph 202,

15

16            "During the appeal it was conceded
17            and the evidence and events
18            confirmed that in all likelihood no
19            amount of general or aggravated
20            damages would have deterred
21            Scientology.   Clearly then this was
22            an appropriate case for an award of
23            punitive damages."
24

25        It is important that each case of

1   defamation must be looked at on its own facts and
2   the awards given in other decisions are therefore
3   not of much assistance.

4        The Supreme Court of Canada acknowledged
5   this in the Hill Decision in Paragraph 187.
6   Barrick Gold is a decision of the Ontario Court
7   of Appeal dealing with defamation in the internet
8   context.   Justice Blair said in Paragraph 28
9   about internet defamation,

10
11              "Is there something about defamation
12              on the internet, cyber libel as it's
13              sometimes called, that distinguishes
14              it for purposes of damages from
15              defamation in another medium?   My
16              response to that question is yes."
17

18   He referred to the principles set out in Hill and
19   then in Paragraph 30 quoted from an Australian
20   decision the quote, "Ambiguity, universality and
21   utility," of the internet.   He continued in
22   Paragraph 31,

23
24              "Thus of the criteria mentioned
25              above, the mode and extent of
26              publication is particularly relevant
27              in the internet context, and must be

_____

1    considered carefully.  Communication
2    via the internet is instantaneous,
3    seamless, interactive, blunt,
4    borderless and far reaching.  It is
5    also impersonal and the anonymous
6    nature of such communication has
7    made itself create a greater risk
8    that the defamatory remarks are
9    believed."
10

11  He then said in Paragraph 34,

12
13    "Internet defamation is
14    distinguished from its less
15    pervasive cousins in terms of its
16    potential to damage the reputation
17    of individuals in corporations by
18    the features described above
19    especially its interactive nature,
20    its potential for being taken at
21    face value and its absolute and
22    immediate worldwide ubiquity and
23    accessibility.  The mode and extent
24    of publication is therefore
25    particularly significant
26    consideration in assessing damages
27    in internet defamation cases."
28

29   In Barrick Gold an injunction was issued.

30  Justice Blair said in Paragraph 75,

31
32    "A highly transmissible nature of
33    the tortious misconduct at issue
34    here is a factor to be addressed in
35    considering whether a permanent
36    injunction should be granted.  The
37    courts are faced with a dilemma.  On

1          the one hand they can throw up their
2          collective hands in despair taking
3          the view that enforcement against
4          such (inaudible due to mumbling…)
5          transmissions around the world is
6          ineffective and concluding therefore
7          that only the jurisdiction where the
8          originator of the communication may
9          happen to be found can enjoin the
10         offending conduct.  On the other
11         hand they can at least protect
12         against the impugned conduct in
13         their own jurisdiction."
14

15   In this respect I agree with the following

16   observation of Justice Kirby in Dow Jones,

17
18         "Any suggestion that there can be no
19         effective remedy for the tort of
20         defamation or other civil wrongs
21         committed by the use of the internet
22         or such wrongs must simply be
23         tolerated as the price to be paid
24         for the advantages of the medium is
25         self-evidently unacceptable."
26

27   A permanent injunction was granted and the Court

28   said in Paragraph 78,

29         "I would set aside the decision of
30         the motions judge in this regard and
31         grant a permanent injunction as
32         requested restraining the defendants
33         from disseminating, posting on the
34         internet or publishing further
35         defamatory statements concerning
36         Barrick or its officers, directors

1      or employees."
2

3      In Astley v. Verdun The Ontario Supreme
4      Court of Justice, Superior Court of Justice cited
5      Barrick Gold and ordered an injunction and a
6      mandatory injunction against the defendant.  In
7      that case the defendant stated that in spite of
8      jury verdict against him he would continue to
9      "disparage and discredit the reputation of the
10     plaintiff," quoting from Paragraph 16.

11     Justice Chapnik in that case said in
12     Paragraph 33,

13
14           "Injunctive relief is an exceptional
15           remedy that will not be imposed by
16           the Courts lightly.  I certainly
17           agree with the defendant when he
18           states that any form of prior
19           restraint on freedom of speech is
20           extremely serious and can only be
21           imposed in the clearest and rarest
22           of cases.  This however is one of
23           those cases."
24

25     He then outlined in Paragraph 34 the
26     circumstances of the case which caused him to
27     grant in injunction.  He said,

1
2           "This is so given the plaintiffs'
3           high reputation and position in the
4           business community and the wide
5           circulation of the defamatory
6           statements calculated to destroy
7           that reputation as well as the
8           strong likelihood that the
9           publishing of defamatory statements
10          against the plaintiff will continue
11          and the real possibility that the
12          plaintiff will not actually be
13          compensated by the payment of
14          damages."
15

16      A prudent injunction was granted and the Court

17      said in Paragraph 35,

18
19          "Accordingly I order a permanent
20          injunction to issue against the
21          defendant, J. Robert Verdun
22          restraining him from disseminating,
23          posting on the internet or
24          publishing in any manner whatsoever,
25          directly or indirectly, any
26          statements or comments about the
27          plaintiff Robert M. Astley."
28

29      He also granted a mandatory injunction.   He said

30      in Paragraph 36,

31
32          "There will also be a mandatory
33          injunction requiring the defendant
34          to forthwith remove his blog
35          postings dated April 29, 2011 and

1     May 2nd, 2011 from the internet and
2     any similar postings that refer to
3     the plaintiff directly or
4     indirectly."
5

6        In Mina Mar Group v. Divine Justice Perell

7     also quoted Barrick Gold.    He granted an

8     injunction issuing out of an Ontario Court

9     against the defendant in New Jersey.    He simply

10    said in Paragraph 28,

11
12    "In accordance with the above
13    authorities, I also grant a
14    permanent injunction restraining the
15    defendants from disseminating,
16    posting on the internet or
17    publishing further defamatory
18    statements concerning the
19    plaintiffs."
20

21        On the issue of invasion of privacy Mr.

22    Leary provided to the Court the recent decision

23    dated January 18th of 2012 of the Ontario Court

24    of Appeal in Jones v. Tsige in which the Court

25    concluded there is, at least in Ontario, a tort

26    of invasion, intrusion into seclusion otherwise

27    called invasion of privacy which is claimed by

28    the individual plaintiffs in this matter.    The

1    facts in that case are very different from those
2    in this case.    The defendant had accused, had
3    accessed the plaintiff's personal banking
4    information on 174 occasions over a period of
5    four years.    However she did not publish or
6    distribute it but used it for her own purposes in
7    a dispute with the plaintiff's partner, the
8    former husband of the defendant.   She apologized
9    for her actions and the Court concluded she was
10   embarrassed and contrite.    The plaintiff claimed
11   $70,000 in damages for invasion of privacy and
12   exemplary damages of $20,000. The Court said the
13   range of damages for this claim is up to $20,000
14   and awarded $10,000.

15       I am satisfied that in an appropriate case
16   in Nova Scotia there can be an award for invasion
17   of privacy or as the Ontario Court of Appeal
18   called it, the intrusion upon seclusion.   I must
19   determine if in this case it is warranted
20   considering the principles set out in Jones.   In
21   Jones there was no accompanying claim for

1    defamation  as  there  was  no  publication  of

2    defamatory statements about the plaintiff.

3         In  Nitsopoulos  v.  Wong  the  action  was  for

4    deceit  and  invasion  of  privacy.   The  action

5    concerned  gaining  entry  to  the  plaintiff's  home

6    and  publishing  information  gained  while  there.

7    The  action  was  brought  outside  the  limits,  the

8    time limits for a defamation action.

9          The  facts  in  this  case  are  that  Mr.

10   Handshoe,  on  his  blog,  disclosed  Mr.  Leary's

11   business  and  home  address  and  his  location  when

12   he  was  visiting  Spain.   With  respect  to  Mr.

13   Perret,  he  said  that  he  had  abandoned  his  mother

14   when  he  left  Louisiana  for  Canada  and  Mr.  Perret

15   said he was traumatized by this statement.

16        Mr.  Handshoe  made  extremely  derogatory  and

17   homophobic  comments  of  the  most  outrageous  kind

18   about  Mr.  Leary  and  Mr.  Perret  and  their  sexual

19   orientation  including  and  posting  as  what  I  will

20   refer  to  as  doctored  photographs  of  a  sexual

21   nature depicting them.

1          Invasion of privacy in the Jones case was
2     private and personal banking information having
3     been looked at many, many times.   That sort of
4     financial and banking information is not usually
5     disclosed by people even to their closest friends
6     yet another bank employee who was not known to
7     the   plaintiff   looked   at   her   private   bank
8     information on numerous occasions.

9          In Nitsopoulos the defendant posed as a maid
10    for a Toronto cleaning service so she could write
11    a   series   of   articles   for   the   Globe   and   Mail
12    entitled "Maid for a Month."   She gained access
13    to the plaintiff's home and her experiences are
14    profiled in the second of these articles.   The
15    article published private details about the life
16    of the plaintiffs that she gained while in their
17    home.   The plaintiffs alleged that they would not
18    have permitted the reporter into their home had
19    she not fraudulently misrepresented herself to
20    them.   They claimed that they suffered harm to
21    their dignity, interests and personal autonomy,

1   their personal and home security and their mental

2   wellbeing.   The Court refused to grant summary

3   judgment to the defendants which they had sought

4   on the basis that there was no cause of action

5   for invasion of privacy.

6        In the Jones case the Ontario Court of

7   Appeal dealt with the issue of whether Ontario

8   law recognized a cause of action for invasion of

9   privacy.   Justice Sharpe writing for the Court

10  said in Paragraph 15,

11
12        "Aspects of privacy have long been
13        protected by causes of action such
14        as breach of confidence, defamation,
15        breach of copyright, nuisance, and
16        various property rights.   Although
17        the individual's privacy interest is
18        a fundamental value underlying such
19        claims, the recognition of a
20        distinct right of action for breach
21        of privacy remains uncertain."
22

23        Justice Sharpe referred to an article by

24  William L. Prosser entitled Privacy which was

25  published in the California Law Review 383.   He

26  said there were four torts which were quoted in

27  Paragraph 18;

1

2    1.        Intrusion   upon   the   plaintiff's
3    seclusion   or   solitude,   or   into   his   private
4    affairs;

5    2.        Public   disclosure   of   embarrassing
6    private facts about the plaintiff;

7    3.        Publicity which places the plaintiff
8    in a false light in the public eye;

9    4.        Appropriation,   for   the   defendant's
10   advantage, of the plaintiff's name or likeness.

11

12   He said the most relevant of these is the
13   intrusion   upon   seclusion   and   he   quoted   in
14   Paragraph   19   its   definition   from   Restatement,
15   second restatement of torts as follows,

16
17            "One   who   intentionally   intrudes,
18            physically   or   otherwise,   upon   the
19            seclusion of another or his private
20            affairs   or   concerns,   is   subject   to
21            liability to the other for invasion
22            of   his   privacy,   if   the   invasion
23            would   be   highly   offensive   to   a
24            reasonable person."
25

26   He continued in Paragraph 20,

1
2          "The   comment   section   of   the
3          Restatement   elaborates   this
4          proposition and explains that the
5          tort  includes  physical  intrusions
6          into   private   places   as   well   as
7          listening   or   looking,   with   or
8          without  mechanical  aids,  into  the
9          plaintiff's   private   affairs.   Of
10         particular  relevance  to  this  appeal,
11         is  the  observation  that  other  non-
12         physical  forms  of  investigation  or
13         examination  into  private  concerns
14         may  be  actionable.  These  include
15         opening private and personal mail or
16         examining  a  private  bank  account,
17         even  though  there  is  no  publication
18         or  other  use  of  any  kind  of  the
19         information obtained."
20

21    The   decisions   he   then   (inaudible   due   to

22    mumbling…)deal  largely  with  the  collection  of

23    personal   data.    Chartered  jurisprudence  dealing

24    with  privacy  has  focussed  on  search  and  seizure

25    in  the  criminal  law  context.

26         Justice   Sharpe   said   in   Paragraph   41   that

27    there  are  three  distinct  privacy  interests,   the

28    third  being  a  relevant  one  in  Jones.   That  is  the

29    informational   privacy.    He   quoted   from   the

30    Decision  of  the  Queen  v.  Tessling  in  Paragraph  41

31    where  the  Supreme  Court  of  Canada  said,

1

2  "Beyond our bodies and the places
3  where we live and work, however,
4  lies the thorny question of how much
5  information about ourselves and
6  activities we are entitled to shield
7  from the curious eyes of the state.
8  This includes commercial information
9  locked in a safe kept in a
10  restaurant owned by the accused.
11  Informational privacy has been
12  defined as 'the claim of
13  individuals, groups, or institutions
14  to determine for themselves when,
15  how, and to what extent information
16  about them is communicated to
17  others.' Its protection is
18  predicated on the assumption that
19  all information about a person is,
20  in a fundamental way, his own for
21  him to communicate or retain as he
22  sees fit."
23

24  In Paragraph 44 he referred to the Universal

25  Declaration of Human Rights which provides,

26
27  "No one shall be subjected to
28  arbitrary interference with his
29  privacy, home or correspondence and
30  proclaims that everyone has the
31  right to the protection of the law
32  against such interference or
33  attacks."
34

35  Justice Sharpe said in Paragraph 45,

36

1                "While the Charter does not apply to
2                common law disputes between private
3                individuals, the Supreme Court has
4                acted on several occasions to
5                develop the common law in a manner
6                consistent with Charter values."

7

8

9    Justice Sharpe then reviewed privacy legislation

10   in Canada and the development of privacy law in

11   other jurisdictions.   He then said in Paragraph

12   67,

13

14               "For over one hundred years,
15               technological change has motivated
16               the legal protection of the
17               individual's right to privacy. In
18               modern times, the pace of
19               technological change has accelerated
20               exponentially. Legal scholars such
21               as Peter Burns have written of 'the
22               pressing need to preserve privacy
23               which is being threatened by science
24               and technology to the point of
25               surrender.' The internet and digital
26               technology have brought an enormous
27               change in the way we communicate and
28               in our capacity to capture, store
29               and retrieve information. As the
30               facts of this case indicate,
31               routinely kept electronic data bases
32               render our most personal financial
33               information vulnerable. Sensitive
34               information as to our health is
35               similarly available, as are records
36               of the books we have borrowed or
37               bought, the movies we have rented or
38               downloaded, where we have shopped,

1             where  we  have  travelled,  and  the
2             nature of our communications by cell
3             phone, e-mail or text message".
4

5       He then deals with law as it applied to the

6   case before the Court.  He said in Paragraph 71,

7

8             "The  key  features  of  this  cause  of
9             action  are,  first,  that  the
10           defendant's  conduct  must  be
11           intentional, within which I would
12           include reckless; second that the
13           defendant must have invaded, without
14           lawful  justification,  the
15           plaintiff's  private  affairs  or
16           concerns;  and  third,  that  a
17           reasonable person would regard the
18           invasion as highly offensive causing
19           distress,  humiliation  or  anguish.
20           However,  proof  of  harm  to  a
21           recognized economic interest is not
22           an element of the cause of action. I
23           return  below  to  the  question  of
24           damages,  but  state  here  that  I
25           believe it important to emphasize
26           that given the intangible nature of
27           the interest protected, damages for
28           intrusion  upon  seclusion  will
29           ordinarily be measured by a modest
30           conventional sum. "
31

32   He continued in Paragraph 72,

33
34             "These elements make it clear that
35           recognizing  this  cause  of  action
36           will  not  open  the  floodgates.  A

```
1        claim for intrusion upon seclusion
2        will arise only for deliberate and
3        significant invasions of personal
4        privacy. Claims from individuals who
5        are sensitive or unusually concerned
6        about their privacy are excluded: it
7        is only intrusions into matters such
8        as one's financial or health
9        records, sexual practices and
10       orientation, employment, diary or
11       private correspondence that, viewed
12       objectively on the reasonable person
13       standard, can be described as highly
14       offensive."
15
```

16    He then referred to the competing claims of

17    freedom of expression and freedom of the press.

18    He said in Paragraph 73,

```
19
20       "Suffice it to say, no right to
21       privacy can be absolute and many
22       claims for the protection of privacy
23       will have to be reconciled with, or
24       even yield to, such competing
25       claims."
26
```

27    In Paragraph 87 Justice Sharpe set out the

28    considerations in determining damages where an

29    intrusion on seclusion has been found to exist.

30    In Jones there was no issue about freedom of

31    expression or freedom of the press.   The Ontario

32    Court of Appeal therefore did not have to

1    consider the balance to be struck between those

2    rights and privacy rights.

3        Justice Sharpe specifically mentioned

4    intrusion into matters involving a person's

5    sexual practices and orientation as being

6    possible subjects for a claim of intrusion upon

7    seclusion.  However he said these intrusions must

8    be viewed objectively and be viewed as highly

9    offensive.  Weight against this is freedom of

10   persons to express their opinions.

11       Certainly the comments made by Mr. Handshoe

12   deal with Mr. Leary's and Mr. Perret's sexual

13   orientation.  They're anti-gay and homophobic,

14   they were very upsetting to both as were the

15   doctored up photographs, they're highly

16   offensive.  However the issue of weighing the

17   effect of the intrusion on seclusion against the

18   issue of freedom of expression was not argued

19   before me.  In such circumstances I conclude this

20   is not an appropriate case for the award of

21   damages for intrusion of seclusion.

1          In this regard I note as well the comments

2     of Justice Cory in Hill where he said with

3     respect to defamation,

4
5              "Reputation is intimately related to
6              the right to privacy which has been
7              accorded constitutional protection."
8

9          This passage was also quoted by Justice

10    Sharpe in Paragraph 43 of the Jones decision.

11         Because this is also a defamation action I

12    conclude this is a further reason to leave the

13    issue of a cause of action for intrusion on

14    seclusion for another day in another proceeding.

15         Now turning to the damage award with respect

16    to Trout Point Lodge.  With respect to the

17    corporate plaintiff it is clear that a

18    corporation can be defamed.  Damages were awarded

19    to the Barrick Gold Corporation and to Dover

20    Investments Limited.  In the latter decision the

21    Court set out the principles in awarding damages

22    to a corporate plaintiff.

23         The Court said in Paragraph 19,

1
2          "Damages for a corporate plaintiff
3          are to compensate for the harm to
4          its goodwill and business
5          reputation. The factors to be
6          considered in assessing damages
7          include the defendant's conduct, his
8          position and standing, the nature of
9          the defamation, the absence of an
10         apology or refusal to apologize and
11         his conduct throughout up to and
12         including at trial. In addition to
13         general damages for defamation a
14         corporate plaintiff may be entitled
15         to special damages for specific
16         economic loss. In addition general
17         damages for defamation in
18         exceptional cases a corporate
19         plaintiff may be entitled to an
20         award of punitive damages for
21         malicious, oppressive and high-
22         handed conduct. Punitive damages
23         are intended to punish a defendant
24         rather than compensate a plaintiff.
25         Compensatory damages of substantial
26         may also be considered punishment
27         and should be taken into account
28         when determining whether an award of
29         punitive damages is warranted."
30

31  Trout Point Lodge has been stated to have been

32  funded by money illegally obtained through Mr.

33  Broussard and through the dishonest actions of

34  Mr. Leary and Mr. Perret and getting money from

35  ACOA and other investors. It has been said to be

36  on the verge of bankruptcy. These are things

1    which would cause potential guests to decide not
2    to come to Trout Point Lodge.

3        The defamation in my view has harmed the
4    goodwill of the business and its business
5    reputation.  It casts an unfavorable light on the
6    business which has otherwise received extremely
7    positive reviews in the Globe and Mail, the
8    National Post, US Today and the National
9    Geographic Traveler to mention just a few.

10       It has also been commended by well-known
11   publications such as Four Doors Guide to Atlantic
12   Canada and Forbes Traveller to name a few.

13       It has also been recognized as a Top 10
14   finalist in the National Geographic Society's
15   2009 Geo-tourism challenge.   Some of this
16   information is included at Tab 5 of the evidence
17   submitted at the hearing.

18                   Mr. Leary points out in Paragraph 8
19                   of his affidavit, "In addition to
20                   its membership and prestigious hotel
21                   and restaurant association Relais
22                   and Chateaux Trout Point has always
23                   maintained a four and one half star
24                   rating from Canada Select.  It's the
25                   only hotel in Atlantic Canada

1            inspected and recommended by Conde
2            Nast Johansens Guide and earned a
3            five green key rating from the hotel
4            association of Canada."
5

6         The defendant is persistent in his

7  statements that Trout Point Lodge is somehow

8  connected to the Jefferson Parish corruption

9  scandal and has benefitted financially from funds

10 illegally obtained.  The defendant knows that the

11 original story linking Mr. Broussard with Trout

12 Point Lodge has been retracted and an apology

13 published.  In the face of this the defamatory

14 comments continued.

15        Mr. Handshoe had refused to apologize or

16 retract and in fact has republished the original

17 statements and says they are true.  In addition

18 he has alleged that the business is on the verge

19 of bankruptcy and has received funds improperly.

20        All this has been done through the internet

21 which has the potential to reach untold numbers

22 of potential guests of Trout Point Lodge

23 throughout the world.

1    The defamation has gone on now for two years

2    and there is no indication that the defendant

3    intends to stop.    The defendant's conduct

4    throughout has been to attempt to destroy the

5    reputation of the business.

6    In my view it may be very difficult to

7    change the perception of Trout Point Lodge caused

8    by the defamation and its reputation as a world

9    class resort has been damaged.

10    I conclude that the appropriate award of

11    damages for the defamation of Trout Point Lodge

12    is $75,000.

13    The individual plaintiffs have been called

14    dishonest, part of money laundering scheme

15    involving Mr. Broussard and part of a political

16    corruption scandal involving Mr. Broussard which

17    is now the subject of FBI investigation.

18    They are said to have lied and misled ACOA

19    and the Court in the ACOA action. Mr. Leary has

20    said to have perjured himself in that litigation.

21    They are said to have misused the justice system

1    in Nova Scotia for their own purposes.  They are
2    referred to as participating in nefarious schemes
3    being  bag  holders  for  Mr.  Broussard,  being
4    unsuccessful businessmen who have had a series of
5    failed businesses and being conmen.

6        Mr. Leary has said they have changed their
7    patterns of running errands to avoid running into
8    people  who  may  ask  them  about  the  internet
9    information  published  about  them.   They  are
10   embarrassed and stressed by the defamation.

11       To  paraphrase  the  Supreme  Court  of  Canada
12   decision in Hill,

13
14           "They will never know who, as a
15           result of the defamation, still has
16           a lingering suspicion that they are
17           dishonest, schemers and con men and
18           were involved with Aaron Broussard
19           in the political corruption of which
20           he is accused.  They will never know
21           who might believe that they are
22           without integrity and were involved
23           in criminal activity."
24

25       These  unfounded  statements  about  the
26   character, business dealings and financial acumen
27   of  these  businessmen  merit  an  award  of  damages

1    for each in the amount of $100,000.

2         Aggravated damages are beyond the damages

3    already awarded which are given when the injury

4    to a plaintiff are aggravated.   As Gatley on

5    libel and slander described it, they reflect a

6    natural indignation of the Court of the injury

7    inflicted.   As Justice Cory said in Hill they

8    take into account the additional harm caused to

9    the plaintiff's feelings by the defendant's

10   outrageous and malicious conduct.

11        Justice Cory in Hill considered the factors

12   in that case which the Court believed made such

13   an award by the jury in that case a reasonable

14   one.

15        I conclude that the following factors in

16   this case call for such an award here.   The

17   original story was retracted by the Times-

18   Picayune in New Orleans, nevertheless Mr.

19   Handshoe continued to spread the defamation.   He

20   then came up with additional statements

21   concerning events in Nova Scotia which defamed

1    the defendants beyond the original defamation.

2    He commented on other business ventures of the

3    plaintiffs and other legal matters in which they

4    were involved misrepresenting facts and attacking

5    the reputations with statements that they were

6    dishonest, fraudsters and liars.   The widespread

7    defamatory continued to the date of this hearing

8    in a meeting well suited to spreading the

9    defamation far and wide to a vast number of

10   internet users.

11        Furthermore there was conduct by the

12   defendant in trying to stop the plaintiffs from

13   continuing their action against him.   He

14   threatened to release dossiers of information he

15   had about the plaintiffs and other unnamed people

16   unless the action was discontinued.   All of this

17   is outrageous conduct in the face of true facts

18   about the plaintiffs.

19        Malice is an essential element of an award

20   of aggravated damages and in this case malice is

21   alleged in the statement of claim in Paragraph 93

1      and other places and is therefore deemed admitted

2      by virtue of the default judgment.

3          I therefore award an additional $50,000 to

4      each of Mr. Leary and Mr. Perret in aggravated

5      damages to express the indignation of the court.

6          As the Supreme Court of Canada said in Hill,

7      punitive damages are not compensatory in nature

8      but are meant to punish the defendant.   There

9      must be a rational purpose in awarding punitive

10     damages.   In Hill the Supreme Court of Canada

11     considered the actions of the Church of

12     Scientology and its officers during the course of

13     the litigation and focussed on its oppressive and

14     high handed conduct and the malice of which it

15     acted throughout.

16         The defendant in this case continued his

17     defamation after the newspaper printed a

18     retraction of its story linking Trout Point

19     Lodge, Mr. Leary and Mr. Perret with Aaron

20     Broussard and the serious criminal allegations

21     against him.   He redoubled his efforts after

1    being sued and continued his defamation after
2    judgment had been entered against him.    He
3    repeated the original defamatory statements.

4        Just prior to the hearing about damages
5    there were further defamatory statements.

6        Mr. Handshoe has stated that because of
7    legislation in the United States it would be
8    impossible for the plaintiffs to recover judgment
9    against him.    This is a factor in awarding
10   punitive damages.

11       I conclude there is a rational reason for
12   awarding punitive damages in this case for the
13   defendant's egregious misconduct which offends
14   the court's sense of decency.    It is to act as a
15   deterrent not only to Mr. Handshoe but also to
16   others who might be inclined to defame someone in
17   this fashion.

18       With respect to Trout Point Lodge I conclude
19   that the defamation award itself is an
20   appropriate award to punish the defendant for his
21   defamation of the corporate plaintiff.    With

1    respect to Mr. Leary and Mr. Perret I conclude

2    that there is a need for additional punishment of

3    the defendant because the defamation of them goes

4    beyond what has been said about the company.

5        In my view the award of general and

6    aggravated damages to Charles Leary and Vaughn

7    Perret is insufficient to properly denounce the

8    actions of Mr. Handshoe and serve the goal of

9    deterrence.

10       I therefore conclude that there should be an

11   additional $25,000 awarded to each of Charles

12   Leary and Vaughn Perret as punitive damages

13   against Mr. Handshoe.

14       I'm satisfied that an injunction should

15   issue.    The principles for granting of

16   injunctions in defamation cases were set out in

17   Astley.    Barrick Gold made it clear that

18   injunctions are available in cases of defamation.

19   In Astley Justice Chapnik said in Paragraph 21,

20

21            "Permanent    injunctions   have
22            consistently been ordered after

findings of defamation where either:
(1) there is a likelihood that the
defendant will continue to publish
defamatory statements despite the
finding that he is liable to the
plaintiff for defamation; or (2)
there is a real possibility that the
plaintiff will not receive any
compensation, given that enforcement
against the defendant of any damage
award may not be possible."

Applying these factors to this case I look at the conduct of the defendant which, from the beginning, was defamatory and continued with more fervor after a retraction was printed, was published. It became stronger and more malicious and derogatory as the action was commenced and as it proceeded to this assessment of damages. There's been no retraction or apology but a continued campaign of defamation against these plaintiffs and homophobic comments about their sexual preference.

It is clear from the evidence before me that Mr. Handshoe will continue to publish the defamatory material. He says he's protected from foreign defamation judgments such as the default

1     judgment in this proceeding by legislation in the

2     United States.

3          It also may be difficult if not impossible

4     for the plaintiffs to recover on their judgment.

5     It's not known what assets Mr. Handshoe has or

6     whether enforcement in the U.S. on the monetary

7     judgment will be possible.

8          I therefore conclude that an injunction

9     should issue.  Mr. Handshoe is therefore enjoined

10    from dissemination, posting on the internet,

11    distributing or publishing in any manner

12    whatsoever, directly or indirectly statements or

13    comments about Trout Point Lodge, Charles Leary

14    and Vaughn Perret.  This includes statements or

15    comments which refer to the three plaintiffs by

16    name, depiction or description.  The mandatory

17    injunction shall also issue requiring Douglas

18    Handshoe to remove the defamatory comments,

19    statements and depictions from any internet site

20    on which he has posted them and any links to

21    those sites.

1           The plaintiffs seek solicitor client costs
2     of these proceedings.   However they have not
3     retained the services of counsel but have
4     represented themselves throughout.   It is true
5     that Vaughn Perret is a law graduate and has
6     practised law.   However he has non-practising
7     status and has never been approved to practise
8     law in Nova Scotia.   I therefore cannot conclude
9     that solicitor client costs are warranted.   That
10    is not to say that self-represented parties are
11    not entitled to their costs.   In Nova Scotia it
12    has been said that costs can be awarded to self-
13    represented parties beginning with the decision
14    in MacBeth v. Dalhousie University and more
15    recently in the Court of Appeal decision in Crewe
16    v. Crewe.

17          I've awarded the costs in the modest amount
18    of $4,000 to self-represented parties in Salman
19    v. Al-Sheik Ali.   In that case the self-
20    represented parties took part in multi-party
21    litigation and were well prepared and did not

1    cause any delays of five and one half days.

2         I conclude that in the circumstances of this

3    case there should be a modest costs award to

4    reflect the time spent on this matter by the

5    individual plaintiffs.  They brought the matter

6    on to court and obtained a default judgment.

7    They were well prepared for the one half day

8    hearing to assess damages but it was unopposed.

9         I therefore award them costs in the total

10   amount of $2,000.

11        The self-represented parties of the Salman

12   matter were also entitled their disbursements as

13   are the plaintiffs in this case.  They however

14   have not provided me with their disbursements.

15   If they wish to provide that information I will

16   consider their out of pocket costs and render a

17   further brief decision.  I should note however

18   that the final order in this matter therefore

19   cannot be issued until that is done.

20        That concludes my oral decision and I guess

21   the only question I have for the parties is do

1    you wish to make a claim for the disbursements

2    which will mean that the order can't be issued in

3    this proceeding until that's done.

4        <u>MALE VOICE:</u>    No My Lady, we would forego

5    the out of pocket costs.

6        <u>THE COURT:</u>    Thank you, so the order can

7    be issued sooner rather than later.  Thank you,

8    that concludes the matter.

9

10        <u>[END OF RECORDING 11:22 P.M.]</u>

11

12

13

14

15

16

17

18

19

20

21

22

1

2

3

4                    <u>CERTIFICATE OF COURT TRANSCRIBER</u>
5

6  I, Rita Newton, Court Transcriber, hereby certify that

7  I have transcribed the foregoing and that it is a true

8  and accurate transcript of an oral decision given in

9  the matter of Trout Point Lodge versus Douglas

10 Handshoe, taken by way of electronic recording in

11 Halifax, Nova Scotia on February 1, 2012.

12

13                    _____

14                    Rita Newton, Certificate No. 2006-56

15                    CERTIFIED COURT TRANSCRIBER,
16                    PROVINCE OF NOVA SCOTIA
17

18                    Halifax, Nova Scotia

19                    February 20, 2012