UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DANIEL G. ABEL | * | NO.: 2:13-CV-00088 |
| | * | |
| VERSUS | * | DIVERSITY OF CITIZENSHIP |
| | * | |
| DOUGLAS K. HANDSHOE, ANNE-MARIE | * | JUDGE: SUSIE MORGAN |
| VANDENWEGHE A/K/A BOUDREAUX, | * | |
| & ABC INSURANCE Cos | * | MAGISTRATE: ALMA CHASEZ |
| | * | |
| | * | JURY TRIAL - DEFAMATION |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

ABEL'S OPPOSITION TO 971 MOTION TO STRIKE,
AND RE-URGED REQUEST FOR ART. 971[D] DISCOVERY

In the Order of 29 March 2013 [Rec. d. 29] Judge Morgan identified three issues that

plaintiff and defendants must address. The parties must also address Art. 971 D discovery.

Handshoe must present prima facie proof to the Court that his postings are protected under the

provisions of Art. 971. If he does, Abel must show that he can bring facts and evidence to trial in

order to sustain a favorable judgment. But Abel already has. Three Courts and three private

parties have been brought the facts and each has found Handshoe's statements to be defamatory.

1)      Handshoe must make a prima facie showing that Plaintiff has filed a SLAPP suit.

To make a prima facie showing Handshoe must establish that Abel is a public official [or private

person] actually involved in the public issue that is the subject matter of the alleged SLAPP suit.

Fabricated conclusions and allegations cannot be used to bootstrap a private person into a public

issue making him a public figure, as Handshoe would do with Abel. Handshoe must also prove

that the comments he made specifically addressed Abel's actual involvement in the public issue,

and identify what that public issue was.

2)      Handshoe must prove that each action written about involves a public issue from

which the SLAPP suit arose or that the SLAPP suit was meant to quash. As well, Handshoe must prove that each person written about had a real and provable involvement in that public issues. If Handshoe can prove that [1] Abel was a public figure or private person [2] actually engaged in the public issue itself and Handshoe's defamatory writings involved those matters only that concerned the public issue, then the burden would shift to Abel to "demonstrate a probability of success on his or her own claim." Henry, 566 F.3d at 181. Handshoe must also show that Slabbed is a public forum.

3)      If Handshoe succeeds in shifting the burden, Abel "must state and substantiate a legally sufficient claim ... This is done through a prima facie showing of facts sufficient to sustain a favorable judgment." Chief Judge Louis Guirola of the United States District Court for the Southern District of Mississippi, as well as Nova Scotia Supreme Court Justices Muise and Hood have already found and ruled that Handshoe [and Slabbed] conducted a campaign of defamation and hate speech against Abel and his business partners [Exhibits: A, B, & C – attached].

Three judges have found and included in each of their orders that Handshoe has conducted a defamation campaign against Abel and many others, the "probability of his [Abel success [and convincing a jury] on his own claim, is certain. Abel can and will "produce evidence of sufficient quality and quantity to demonstrate that he will be able to meet his burden of proof at trial."

Handshoe has published and recently continues to publish and re-publish hundred which provide and abundant quantity of evidence to be considered by the jury. The language, tenor, vulgarity, suggested intent, and focus of the written statements will provide quality of the

evidence as each article, text, video, and other publication shall speak for itself.

4)    Art. 971 D Discovery Needed—To Analyze Handshoe's Prima Facie Burden

In order to determine whether the Court will permit discovery, Abel must respond to Handshoe's motion to strike and setting forth the standard that Handshoe must meet, Abel must articulate the standard that Handshoe must meet to establish a prima facie case, and how Art. 971 D discovery will assist Abel in meeting this burden. Abel, although a private person, shall address the standard one must meet to succeed on a defamation claim as a private individual and as a public figure and why discovery is necessary in each of these contexts.

Abel is not a public figure. He has never been a public figure and denies this allegation.

Handshoe repeatedly argues that Abel is a public figure and therefore must meet the constitutional standard and prove that Handshoe acted with actual malice. While Handshoe's language and vitriol is probative of his malice itself, Handshoe's argument is self-defeating. More significantly it is contrary to the longstanding constitutional doctrines established by the Supreme Court which not only allows but requires discovery in instances such as this which is now before the Court.

To deny discovery allowed by Article 971[D] when the Defendant Handshoe has conducted a campaign of per se defamation would be contrary to the principles established by the United States Supreme Court in Herbert [Herbert v. Lando (441 US 153 - Supreme Court 1979)]. Like Herbert in that case, Abel must be able to inquire into Handshoe's actual investigation of crimes and criminal acts that Handshoe has and continues to allege against Abel, but Abel must also be allowed to inquire into the subjective mind of Handshoe to make a showing of actual malice, no matter by what standard—especially since counsel for Handshoe now claims

Page 3 of  55

that the actual malice standard should apply. This information cannot be placed beyond Abel's

reach as he has a constitutional right to direct evidence which could prove intentional or reckless

falsehood of Handshoe's defamatory claims. The United States Supreme Court has been clear in

establishing and expanding upon that right.

In his Opposition Abel has shown why it would be contrary to the principles established

by the United States Supreme Court in Herbert [Herbert v. Lando (441 US 153 - Supreme Court

1979)] to deny his request for discovery of Handshoe and Vandenweghe under Art. 971 [D] as

set forth in Handshoe's Reply in the record of this matter.

Discovery is also needed because in defamation cases the court is allowed to infer from

circumstantial evidence that Handshoe fabricated at least some of his defamatory allegations in

his "campaign to damage" or that they are so inherently unprobable that only a reckless man

would have put them in circulation (Curtis Publishing v. Butts; **St. Amant v. Thompson, 390**

**U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968))**  Each publication of a distinct libel

gives rise to its own cause of action.

Actual malice can be established "[t]hrough the defendant's own actions or statements, the

dubious nature of his sources, [and] the inherent improbability of the story [among] other

circumstantial evidence[.**]" Liberty Lobby, Inc. v. Dow Jones & Co., 838 F.2d 1287,**

**1293 (D.C.Cir. 1988);** *see* **Clyburn v. News World Communications, Inc., 903 F.2d**

**29, 33 (D.C.Cir.1990) (proof of actual malice "may take the form of circumstantial**

**evidence, such as the existence of `obvious reasons to doubt the veracity of the**

**informant or the accuracy of his reports'").** *But see* **St. Amant v. Thompson, 390**

**U.S. 727, 732-33, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)("Failure to investigate does**

not *in itself* establish bad faith." (emphasis added)). **Celle v. Filipino Reporter Enters., Inc., 209 F.3d 163, 177 (2d Cir.2000)**

### History and Confirmation of Handshoe's Practice of Defamation

**Handshoe Thrice Found Guilty of Defamation**

Three Courts and three private parties have been brought the facts and each has found Handshoe's statements to be defamatory.

A.    **Nova Scotia Supreme Court Justice Pierre Léon Muise** found that Handshoe has "posted information that is prima facie defamatory" [EDLA / 13-cv-88, Rec. d. 21-2, page 28, ll. 15-17 —Attached]. Nova Scotia Supreme Court Justice Muise held that Handshoe's "comments are meant to be defamatory and insulting. I will not reproduce them here. It is the type of expression that engenders harmful results such as discrimination and hatred. It is not the type of free expression that deserved protection and fostering" [EDLA / 13-cv-88, Rec. d. 21-2, page 29, ll. 10-16 —Attached]. [Exhibit A].

B.    **Federal Judge Louis Guirola**, Jr. held that:

> The time line is not entirely clear from the record, but it appears that after Plaintiffs demanded the retraction from the Times-Picayune, the "Slabbed" blog was taken offline by the Times-Picayune's corporate parent, Advance Publications. Handshoe, apparently in reaction to his blog being taken offline, then began an internet campaign to damage Perret and Leary. Handshoe has published numerous entries on "Slabbed" about Plaintiffs, many of which may be characterized as derogatory, mean spirited, sexist and homophobic. Handshoe has continued to use his reporting on "Slabbed" as a platform

from which to allege a connection between Broussard's crimes and Trout Point Lodge. Among other things, Handshoe has accused Perret and Leary of being involved in a scheme in which Broussard used a Canadian company to launder money proceeds of illegal activities in Jefferson Parish.

Although Judge Guirola found that the SPEECH Act precluded him from allowing enforcement of Trout Point, Leary, and Perret's Nova Scotia judgment in Mississippi, the court was using a Mississippi definition of defamation, which requires proof of falsity even for statements that are defamatory per se. Louisiana law is distinguishable as falsity is presumed for allegations that are defamatory per se. Judge Guirola also denied Handshoe's motion for an appeal bond, and found that there was no suggestion that the appeal of his decision was frivolous, being a case of first impression. [Exhibit J & K]

C.   **Nova Scotia Supreme Court Justice Hood** (Trout Point Lodge Ltd. v. Handshoe, 2012 NSSC 245) found again and again in her decision that Handshoe had defamed Abel's business partners and his business with the same allegations targeted against Abel at issue here. [Exhibit B & C]

For instance:

[85]     The defendant has persisted in his statements that Trout Point Lodge is somewhat connected to the Jefferson Parish corruption scandal and has benefitted financially from funds illegally obtained.  The defendant knows that the original story linking Mr. Broussard with Trout Point Lodge has been retracted and an apology published. In the face of this, the defamatory comments continued.  Mr. Handshoe has refused to apologize

or retract and, in fact, has republished the original statements and says they are true.

[86]     In addition, he has alleged that the business is on the verge of bankruptcy and has received funds in Canada improperly.  All this has been done through the Internet, which has the potential to reach untold numbers of potential guests of Trout Point Lodge throughout the world. The defamation has gone on now for two years and there is no indication that the defendant intends to stop. The defendant's conduct throughout has been to attempt to destroy the reputation of the business.

Although this was a default judgment, Nova Scotia law required Justice Hood to make findings based on evidence in order to award aggravated and punitive damages. *Townhouses of Hogg's Hollow Inc. v. Jenkins, 2007 CanLII 6250 (ON SC)* summarizes Canadian law on damages assessment involving a default defamation fact pattern:

[12]     Where words are defamatory, damages are presumed and are awarded at large: *Hill v. Church of Scientology of Toronto*, 1995 CanLII 59 (SCC), [1995] 2 S.C.R. 1130 at para. 164 [*Hill*].  In the case of default libel proceedings, facts going to the extent of damages must be proved by the plaintiff: *Umlauf*, *supra* at para. 9.

This is not dissimilar to United States law: "A default judgment is a judgment on the merits that conclusively establishes the defendant's liability. But it does not establish the amount of damages." *See* **United States v. Shipco Gen., 814 F.2d 1011, 1014 (5th Cir. 1987)** (citing **TWA v. Hughes,449 F.2d 51, 70 (2nd Cir. 1971)**), *rev'd on other grounds,* **409 U.S. 363 (1973)**.

**Three Public Retractions and Disavowals of False Statements**

**A.   Times Picayune**

On January 16, 2010:

The Times-Picayune published an unprecedented retraction with bold face headline, front page, above the fold [Exhibit G]:

> The Times-Picayune has published a variety of stories in print and online since Jan. 6 about an ethics complaint against former Jefferson Parish President Aaron Broussard claiming that he owns a Nova Scotia vacation lodge that he rented to parish contractors. The newspaper retracts publication identifying Aaron Broussard as having an ownership interest in Trout Point Lodge; asserting Trout Point Lodge was rented to Jefferson Parish contractors; indicating that Roy D'Aquila has any part in Trout Point Lodge ownership or management; indicating that Kempt Wilderness Lodge Services has any ownership or management relationship with Trout Point Lodge; and identifying a photo of the lodge online as "Broussard-lodge.jpg." The Times-Picayune apologizes for publishing this material.

On April 7, 2011, nola.com published another retraction:

> **Retraction-Trout Point Lodge**
>
> In January 2010, The Times-Picayune published several articles that mentioned Trout Point Lodge and its business dealings while discussing Jefferson Parish politics and the scandal in the administration of former Parish President Aaron Broussard. The newspaper retracts publication implying that Trout Point Lodge was involved in the scandal.
>
> The newspaper believes there is no basis for making any implication that Trout Point

Lodge, Limited or its owners, Daniel Abel, Vaughn Perret, or Charles Leary, were involved in any wrongdoing and, indeed, never intended to make any such implication. The Metropolitan Crime Commission complaint to the Louisiana Ethics Board about Broussard's vacation property in Nova Scotia in fact did not name or implicate any of them. The Times-Picayune apologizes for errors in its reporting regarding Trout Point Lodge and its owners.

B. **Fox8 News** on February 17, 2012, broadcast the following 4 separate times:

In January of 2010, Fox 8 News reported a story on whether contractors with Jefferson Parish ever vacationed at former Parish President Aaron Broussard's investment properties in Nova Scotia, Canada. In the story, we showed video of Trout Point Lodge from its web site while reporting that Broussard owned investment properties nearby. Broussard's properties are not part of Trout Point Lodge. Fox 8 News regrets any implication that Trout Point Lodge was associated with a Metropolitan Crime Commission complaint associated with the Broussard scandal.

C. **Concrete Busters Retraction Entered Into Record by Judge Guirola**

Counsel for Concrete Busters who had copied defamatory states from slabbed and Handshoe, have admitted such, provided a letter of retraction which Judge Guirola had filed in the record the Mississippi Federal Speech Act action, and shall amend the complaint to exclude the defamatory, false allegations from their amended complaint. Counsel put the Hon. Judge Louis Guirola, Jr. on notice of the fraud visited upon his Court and he entered the Concrete Busters retraction and counsel letter into the record of his matter as well [Exhibit E].

**Defamatory Publications Must Be Read in Series and Context**

Handshoe repeatedly asserts that the multitude of publications about and/or referring to Abel are merely rhetorical hyperbole, harsh criticism, do not refer to him, or are protected opinion. This argument goes to how the defamatory utterances precisely specified by Abel in his pleadings should be read by the court. Abel could not re-create the context and series of articles (or blog posts) about him, or the photographs or depictions of him, in his pleading. Defendant makes numerous assertions about opinion, and asserts in blanket fashion that opinion is protected speech, however opinions can assert facts, and fact when viewed in context, can be defamatory.

> the Supreme Court decided **Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990),** in which the Court clarified that the *Gertz* dicta "was[not] intended to create a wholesale defamation exemption for anything that might be labeled `opinion.'" *Id.* at 18, 110 S.Ct. 2695. An unsupported opinion that implies defamatory facts, like "`[i]n my opinion Jones is a liar,' can cause as much damage to reputation" and may be just as actionable "as the statement, `Jones is a liar.'" *Id.* at 19, 110 S.Ct. 2695. Thus, the *Milkovich* Court declined to create "an artificial dichotomy between `opinion' and fact." *Id.*

*Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180 (4th Cir. 1998).

In Milkovich, supra, the dissenting justice summarized the law:

> Among the circumstances to be scrutinized by a court in ascertaining whether a statement purports to state or imply "actual facts about an individual," as shown by the Court's analysis of the statements at issue here, see *ante,* at 22, and n. 9, are the same indicia that lower courts have been relying on for the past decade or so to distinguish between

statements of fact and statements of opinion: the type of language used, the meaning of

the statement **in context**, whether the statement **is verifiable**, and the broader social

circumstances in which the statement was made. (emphasis added)

It must therefore be remembered that when defamatory publications are multiple in nature, or

are contained in a series, then the entire context—including the entire series of articles (or blog

posts) if there is a series—must be given consideration by the trier of fact. The defamatory

allegations must be read in context. As Judge Starr noted in Ollman v. Evans, commenting on the

allegedly defamatory allegation in *Gertz v Robert Welch* that Gertz was a "communist:"

The terms used in *Gertz,* however, carry the strong flavor that the person so described is

subject to Communist Party discipline. That imputation was strongly reinforced by the

false allegation that Gertz was an official of an organization that advocated forcible

seizure of the government as well as **by the context in which these charges were made:**

**a series of articles**, of which that on Gertz was one, that claimed there was "a nationwide

conspiracy to discredit local law enforcement agencies and create in their stead a national

police force capable of supporting a Communist dictatorship." **418 U.S. at 325, 94 S.Ct.**

**at 3000**.

This is akin to Handshoe's allegations that there is a Jefferson Parish conspiracy, of which

Abel is an integral part, to steal and launder public monies, and to silence investigation and

public comment on those criminal illegalities.

It is only in the entire context that analysis of Handshoe's purportedly immune "expression of

opinion" can properly be conducted. The United States Supreme Court has rejected the notion

that there is a wholesale defamation exemption for anything that might be labeled opinion, noting

that expressions of opinion may often imply an assertion of objective fact.(**Milkovich v. Lorain Journal Co., 497 U.S. 1, 18, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1 (1990)**).

Judge Starr in Olmann v. Evans summarized what have become known as the Ollman factors in defamatory analysis:

> First, we will analyze the common usage or meaning of the specific language of the challenged statement itself. Our analysis of the specific language under scrutiny will be aimed at determining whether the statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous. *See* **Buckley v. Littell, 539 F.2d 882, 895 (2d Cir.1976),***cert. denied,* **429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977)**. Readers are, in our judgment, considerably less likely to infer facts from an indefinite or ambiguous statement than one with a commonly understood meaning. Second, we will consider the statement's verifiability — is the statement capable of being objectively characterized as true or false? *See, e.g.,* **Hotchner v. Castillo-Puche, supra, 551 F.2d at 913**. Insofar as a statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content. And, in the setting of litigation, the trier of fact obliged in a defamation action to assess the truth of an unverifiable statement will have considerable difficulty returning a verdict based upon anything but speculation. Third, moving from the challenged language itself, we will consider the full context of the statement — the entire article or column, for example — inasmuch as other, unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content. *See* **Greenbelt**

**Cooperative Publishing Association v. Bresler, supra, 398 U.S. at 13-14, 90 S.Ct. at 1541**; *cf. Restatement (Second) of Torts* § 563. Finally, we will consider the broader context or setting in which the statement appears. Different types of writing have, as we shall more fully see, widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion. *See* **Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin, supra, 418 U.S. at 286, 94 S.Ct. at 2782**.

## I.  HANDSHOE'S BURDEN & PRIMA FACIE SHOWING

The court must conduct a two-part inquiry. Initially, the moving party must make a *prima facie* showing that the suit against him arises from an act in furtherance of his rights of petition or free speech. The burden then shifts to the plaintiff to demonstrate a probability that he will prevail on his claim. To establish a probability of prevailing on his claim, a plaintiff must state and substantiate a legally sufficient claim. This is done through a *prima facie* showing of facts sufficient to sustain a favorable judgment, *Thomas v. City of Monroe Louisiana,* 36,526 (La.App.2d Cir.12/18/02), 833 So.2d 1282.

1)     Handshoe must make a prima facie showing that Plaintiff has filed a SLAPP suit. To make a prima facie showing Handshoe must establish that Abel is a public official [or private person] actually involved in the public issue that is the subject matter of the alleged SLAPP suit. Fabricated conclusions and allegations cannot be used to bootstrap a private person into a public issue making him a public figure, as Handshoe would do with Abel.

2)      Handshoe must prove that each action written about involves a public issue from which the SLAPP suit arose or that the SLAPP suit was meant to quash. As well, Handshoe must prove that each person written about had a real and provable involvement in that public issues. Handshoe must thus show that the comments he made specifically addressed Abel's actual involvement in the public issue, and identify what that public issue was.

3)      Handshoe must show that Slabbed is actually a "public forum."

If Handshoe can prove that [1] Abel was a public figure or private person [2] actually engaged in the public issue itself and [3] Handshoe's defamatory writings involved those matters only that concerned the public issue, then the burden would shift to Abel to "demonstrate a probability of success on his or her own claim." Henry, 566 F.3d at 181. In addition, Slabbed would have to be shown by Handshoe to be an open forum for discussion of public issues, not a controlled context for private vendetta and vitriol.

**Slabbed is Not a Public Forum**

As noted in Thomas, supra, the first test is "whether [Handshoe] established that the claim against him arises from some act of his in furtherance of his right of free speech in connection with a public issue as defined by the article. Satisfaction of this burden does not require the defendant to point out deficiencies in the plaintiff's defamation claim or establish that there are no issues of fact as when a motion for summary judgment is made. Rather, the defendant must show that his actions involved the type of participation in matters of public interest which Article 971 is intended to protect."(emphasis added). Moreover, according to 971 itself the statement published "in connection with an issue of public interest must be made "in a place open to the public or a public forum." (emphasis added).

A "forum" is defined by the Merriam Webster online dictionary as:

> *1. a* **:** the marketplace or public place of an ancient Roman city forming the center of judicial and public business
>
> *b* **:** a public meeting place for open discussion
>
> *c* **:** a medium (as a newspaper or online service) of open discussion or expression of ideas
>
> 2 **:** a judicial body or assembly **: <u>COURT</u>**
>
> 3 *a* **:** a public meeting or lecture involving audience discussion
>
> *b* **:** a program (as on radio or television) involving discussion of a problem usually by several authorities

Abel suggests that the plain meaning of Article 971 is that "Slabbed" must be a place for "open discussion or expression of ideas" by the public or that it be a place "open to the public," and that there is no showing or even suggestion of such in the record or defendant's pleadings. In fact, Handshoe has admitted on numerous occasions that he selectively controls—or keeps in the "moderation queue"--people who want access to Slabbed's comment section:

> I will not have posters making the same point over and over. Get a new line of attack Mr. Stupid and I'll let you out of moderation. **Doug Handshoe**
>
> . . .
>
> Mr. Stupid: Being in moderation for you northerners is akin to being in the penalty box in hockey. **Anne-Marie Vandenweghe (as "unslabbed).**
>
> (sequential comments on Slabbed, June 23, 2010)

Abel suggests it is a reasonable inference that Handshoe publishes specific comments to further his agenda of private vendetta and defamation. His publications therefore prima facie do not meet the burden imposed by Article 971 that he be speaking in a "public forum."

### Handshoe's Attacks on Abel Are Not Matters of Public Interest

Beyond the public forum issue, the history here points up at least two important factors in considering Handshoe's burden. First, courts in both Canada and Mississippi have found based on evidence that the Defendant is on a campaign to damage based on a private dispute involving Abel among others. This vendetta began in earnest when Handshoe (mistakenly) blamed Plaintiff and his business partners (whom Handshoe refers to as "the girls," "the goatherders," and "the cockroaches"), for removing his web site from service in April, 2011. Actually, it was the New York law firm representing Advance Publications, owner of the Times-Picayune, that contacted Handshoe's web host with a copyright (DMCA) take down notice as part of actions taken during the publication of a full retraction of Times-Picayune articles Handshoe was continuing to illegally republish *in their entirety* on Slabbed. Upon receipt of Advance's notice, the web host (GoDaddy), on its own initiative, decided not to simply remove the infringing material, but rather to to cease service to Handshoe entirely. Handshoe immediately characterized this as a conspiracy to deprive him of his free speech rights (apparently not considering the role copyright has to play in protecting free speech) by the "powers that be."

Second, any brief mention of Abel and his business Trout Point Lodge in connection with the Broussard scandal occurred through a misidentification made in early January, 2010, when news media published the conclusory allegation that Trout Point Lodge was Aaron Broussard's Nova Scotia property, and the subject of a complaint by the Metropolitan Crime Commission (MCC)

to the Louisiana Ethics Administration. This complaint was illegally leaked to the New Orleans media, and under criminal penalty the information contained in the complaint was to have remained confidential. This erroneous identification of Trout Point Lodge was retracted in full four times by two distinct media outlets, with the Times-Picayune admitting that the MCC complaint never even referred to Trout Point Lodge or Abel. In yet, in the face of the retractions, Handshoe continued his defamations into 2013, which evidences actual malice according to decisions by the 5th Circuit Court of Appeal (Zerangue v. TSP Newspapers).

### Handshoe Bootstraps Public Interest and Public Figure

The timing of (now fully retracted) media reports mentioning Abel in the context of the Broussard scandal are important because Handshoe is guilty not only of using Article 971 for a personal vendetta, he is also using the power of the Internet and blogging software to bootstrap himself into a defence. What's more, Handshoe's allegations have gone well beyond linking Plaintiff to Broussard, and have intentionally strayed into other areas, including impugning Abel in his profession, attacking Cerro Coyote, and linking Abel with criminal racketeering and money laundering in the context of the now-defunct federal River Birch landfill investigation. There is simply no public interest here that Handshoe has not first himself created via Slabbed. Plaintiff alleges Handshoe's multiple publications and campaign of defamation involve defamation *per se*. Plaintiff has searched in vain for Louisiana case law that addresses defamation per se in the context of Article 971. However, California appeal courts have addressed this issue.

Louisiana courts have turned to California case law due to the fact that Article 971 is virtually identical to that state's anti-SLAPP statute (*Thomas v. City of Monroe Louisiana,* 36,526

(La.App.2d Cir.12/18/02), 833 So.2d 1282; Baxter v. Scott, 847 So. 2d 225 - La: Court of

Appeals, 2nd Circuit 2003). Handshoe also cites California law in his brief to the court.

Plaintiff has no quarrel with Handshoe's right to free speech on matters truly of public

importance or public issues. However, Handshoe cannot create the public issue by blogging

about it, and then use that as justification for his defamatory publications.

> Hutchinson's activities and public profile are much like those of countless members of his
>
> profession. His published writings reach a relatively small category of professionals
>
> concerned with research in human behavior. To the extent the subject of his published
>
> writings became a matter of controversy, it was a consequence of the Golden Fleece
>
> Award. **<u>Clearly, those charged with defamation cannot, by their own conduct, create</u>**
>
> **<u>their own defense by making the claimant a public figure</u>**. See *Wolston* v. *Reader's*
>
> *Digest Assn., Inc., post,* at 167-168. (Hutchinson v. Proxmire, U.S. Supreme Court)

This bootstrapping involving public figure status is also applicable to the concept of "public

interest" in Article 971.

Other than other blogs in the "blogosphere" republishing Handshoe's defamatory words, no

media entity has published one word on Abel or his businesses within the context of the

corruption scandal in the Broussard administration or the criminal probe of the River Birch

landfill. In the absence of such evidence, there is no "public interest" in Abel or his private small

businesses. Even had media published on Abel, that would not be enough to enmesh him in the

public controversy. Nor are allegations made by Handshoe alone that Abel was part of an

organized mafia sufficient.

The California Court of Appeal (**Alvarez v. Petersen, Cal: Court of Appeal, 4th Appellate Dist., 2nd Div. 2012)** has recently found:

> In addition to categorizing anti-SLAPP cases, courts have relied upon certain "guiding principles" gleaned from case law interpreting "public interest" for purposes of the anti-SLAPP statute. (See, e.g., **Hailstone v. Martinez, supra, 169 Cal.App.4th at p. 736**.) "For example, `public interest' is not mere curiosity. Further, the matter should be something of concern to a substantial number of people. Accordingly, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. Additionally, there should be a degree of closeness between the challenged statements and the asserted public interest. The assertion of a broad and amorphous public interest is not sufficient. Moreover, the focus of the speaker's conduct should be the public interest, not a private controversy. Finally, a defendant charged with defamation cannot, through his or her own conduct, create a defense by making the claimant a public figure. Otherwise private information is not turned into a matter of public interest simply by its communication to a large number of people." (*Ibid.,* citing **Weinberg v. Feisel (2003) 110 Cal.App.4th 1122, 1132-1133**.)

Handshoe uses long-ago fully retracted innuendo published by the Times-Picayune as a basis for saying that Abel and his business Trout Point Lodge is involved in these public issues. However, there are at least two problems with this assertion. First, Handshoe omits the information and fails to inform the court about the Times-Picayune retractions. There were in fact a correction followed by a full retraction and apology published in January, 2010, within days of the offending and factually erroneous publications by the newspaper. This was followed

in April, 2011, with another clear and specific retraction and apology. The Plaintiffs submits that the January, 2010 front-page, above-the-fold retraction, published with a bold-faced headline is unprecedented for a major daily newspaper. Notably, a defamation defendant continuing to publish retracted material as true is a clear-cut indication of actual malice, as is continuing to publish a defamatory allegation when the underlying source has changed its story, according to the 5th Circuit Court of Appeal. Handshoe was publishing with actual malice, thus defeating any "public interest."

In **Weinberg v. Feisel, 2 Cal. Rptr. 3d 385 - Cal: Court of Appeal, 3rd Appellate Dist. 2003**, the California Court of Appeal summarized: "Among other things, defendant claims that the causes of action against him "arise from [his] discussion of criminal activity, which is `an issue of public interest' under the [anti-SLAPP] statute."" Admittedly, this was an accusation of theft made by a collector published amongst a limited group of other collectors, however the California court's findings are completely relevant here.

> causes of action arising out of false allegations of criminal conduct, made under
> circumstances like those alleged in this case, are not subject to the anti-SLAPP statute.
> Otherwise, wrongful accusations of criminal conduct, which are among the most clear
> and egregious types of defamatory statements, automatically would be accorded the most
> stringent protections provided by law, without regard to the circumstances in which they
> were made—a result that would be inconsistent with the purpose of the anti-SLAPP
> statute and would unduly undermine the protection accorded by paragraph 1 of Civil
> Code section 46, which includes as slander any false and unprivileged communication
> charging a person with a crime, and the California rule that false accusations of crime are

libel per se (Civ.Code, § 45a; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 482, p. 566).

Because defendant failed to demonstrate that the challenged causes of action arose from protected activity, the trial court properly denied defendant's special motion to strike.

Indeed, in the instant case, should this special motion to strike be allowed to proceed, it would undermine Louisiana Civil Code 2315, Louisiana law of defamation per se, and the civil implications of Louisiana criminal code **§40.3. Cyberstalking** that makes it a crime to "electronically communicate to another and to knowingly make any false statement concerning death, injury, illness, disfigurement, indecent conduct, or criminal conduct of the person electronically mailed or of any member of the person's family or household with the intent to threaten, terrify, or harass."

The Times-Picayune at the time of its erroneous publication was a full-blown daily newspapers with several trained investigative reporters (including Paul Rioux, Richard Rainey, and Drew Broach) whose sole focus was uncovering corruption in Jefferson Parish. Handshoe's repeated assertions that Abel and his partners somehow coerced or strong-armed the Times-Picayune into retracting as part of a grand conspiracy is farcical, but still defamatory based on the impression given to an average reader. The newspaper has in three years not once again mentioned Abel in the context of the Jefferson Parish controversies, and neither has any other media outlet. Only Handshoe or those republishing his words has.

Second, Handshoe has now publicly connected Abel to the now-abandoned federal criminal probe of the River Birch Landfill. No one has ever connected Abel or Trout Point Lodge to River Birch except Handshoe and those republishing his words. Moreover, that federal investigation

investigation was put to an abrupt end by the Public Integrity Division of the Justice Department, including concerns about evidentiary irregularities, which some informed sources have publicly claimed involved tampering with evidence. Handshoe has no factual foundation for connecting Abel to River Birch; but as the Broussard controversy faded, Handshoe had to find some context for continuing his vendetta and defamatory campaign—he simply chose River Birch to do so, making unsupported conceptual segueways (sp?) into new defamatory material.

In short, there is no public controversy into which Abel fits that is not the bootstrapping creation of Handshoe using the powerful medium of the Internet and what appears at first glance to be a "legitimate" blog. Slabbed is all the more dangerous and injurious for its false facade.

### Abel Has Right to Speech and Petition on Public Issue

In fact, it is Abel—not Handshoe—whose right to free speech and petition as addressed in Article 971 is being threatened. Abel has alleged a conspiracy or at least acts of collusion involving public officials, including the New Orleans U.S. Attorney's Office, an Assistant Jefferson Parish Attorney and former politician (Vandenweghe), blogging activities (including those uncovered involving Assistant U.S. Attorneys), the improper and perhaps criminal use of federal civil suits by persons connected to the USAO, as well as the publishing activities of Defendants Handshoe and Vandenweghe in trying to improperly or for reasons of personal gain and vendetta trying to influence public opinion in the New Orleans metro area. Even if such allegations may appear far-fetched to some (though how can anyone think anything far-fetched after the stunning revelations about Maselli Mann & Perricone), Plaintiff has a right to discovery

in the instant matter and to have his allegations about public figures[1] Handshoe and

Vandenweghe as well as the blogging scandal involving public officials aired in court.

This is even more so the case in order to discover the malice inherent in Handshoe and

Vandenweghe's activities. Though Abel in no way admits that he is a public figure, and in fact

denies this allegation, Handshoe repeatedly argues that Plainitff is a public figure and must meet

the constitutional standard of actual malice.

### Handshoe Falsification of Facts Requires 971 D Discovery

To deny discovery allowed by Article 971 when the Defendant has conducted a campaign of

per se defamation would be unjust. Abel must be able to inquire into the subjective mind of

Handshoe to make a showing of actual malice, no matter by what standard.

As the Supreme Court stated in Herbert v. Lando (441 US 153 - Supreme Court 1979):

> We are thus being asked to modify firmly established constitutional doctrine by placing
>
> beyond the plaintiff's reach a range of direct evidence relevant to proving knowing or
>
> reckless falsehood by the publisher of an alleged libel, elements that are critical to
>
> plaintiffs such as **Herbert**. The case for170*170 making this modification is by no means
>
> clear and convincing, and we decline to accept it.
>
> In the first place, it is plain enough that the suggested privilege for the editorial process
>
> would constitute a substantial interference with the ability of a defamation plaintiff to
>
> establish the ingredients of malice as required by *New York Times.* As respondents would
>
> have it, the defendant's reckless disregard of the truth, a critical element, could not be

---

[1]    Both Handshoe and Vandenweghe are limited purpose public figures and have intentionally interjected
themselves into public controversies, including the ones at issue in the instant matter. In addition, Vandenweghe was
a public official (Assistant Parish Attorney) at relevant times and her actions as Public Records Request officer for
Jefferson Parish are material facts requiring discovery.

shown by direct evidence through inquiry into the thoughts, opinions, and conclusions of the publisher, but could be proved only by objective evidence from which the ultimate fact could be inferred. It may be that plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself, but the relevance of answers to such inquiries, which the District Court recognized and the Court of Appeals did not deny, can hardly be doubted. To erect an impenetrable barrier to the plaintiff's use of such evidence on his side of the case is a matter of some substance, particularly when defendants themselves are prone to assert their good-faith belief in the truth of their publications,**[18]** and libel plaintiffs are required to prove knowing or reckless falsehood with "convincing clarity." **New York Times Co. v. Sullivan, 376 U. S., at 285-286**.

and

Permitting plaintiffs such as **Herbert** to prove their cases by direct as well as indirect evidence is consistent with the balance struck by our prior decisions. If such proof results in liability for damages which in turn discourages the publication of erroneous information known to be false or probably false, this is no more than what our cases contemplate and does not abridge either freedom of speech or of the press.

### Handshoe Is Not a Media Defendant

For the District Court in the Southern District of Mississippi in December, 2012, Handshoe was a blogger, and the Defendant neither claimed nor was given by the court status as a journalist. As a finding of fact, the district court found him to be a blogger.  "Handshoe, who is a

resident of this judicial district, owns and publishes an Internet website (or blog) entitled "Slabbed."" Handshoe cannot, when it appears convenient, suddenly claim status as media defendant, nor is he one. The Mississippi district court also found that Handshoe engaged in conduct that a reasonable person would not conclude was consistent with the role of a journalist.

Numerous Louisiana defamation cases have made clear that Louisiana courts distinguish media defendants from other kinds of defamation defendants (Sassone v. Elder). In addition, in summarizing an Article 971 special motion to strike the Louisiana 4th Circuit Court of Appeal stated: "The purpose of this statute is to review frivolous and meritless claims against the media at a very early stage in the legal proceedings." It is true that the Louisiana 2nd Circuit Court of Appeal in Baxter v. Scott, 847 So. 2d 225 - La: Court of Appeals, 2nd Circuit 2003 rejected a Plaintiff's legal argument that Article 971 applied only to media defendants, however this does not do away with the status given to media defendant by both the Louisiana and United States Supreme Courts.

Handshoe makes repeated assertions that he is a journalist. "Defendant Handshoe is a journalist who regularly breaks news and comments on Jefferson Parish public affairs on his blog." In the absence of any case law showing that self-proclaimed investigative bloggers should be treated as media defendants, the court has no basis to do so in this case.


## II.   ABEL'S BURDEN IF HE IS PUBLIC FIGURE DEALING WITH PUBLIC ISSUES

Should the court find that Handshoe has made a *prima facie* showing that his publications about Abel are actually on a matter of public interest, and that Slabbed is actually a public forum, Abel must demonstrate the probability of prevailing in his defamation claim.

Article 971 has a purpose distinct from that of the underlying suit. As the Ninth Circuit reasoned in addressing the appealability of a similar California statute, an anti-SLAPP motion "resolves a question separate from the merits in that it merely finds that such merits may exist, without evaluating whether the plaintiff's claim will succeed." Batzel v. Smith, 333 F.3d 1018, 1025 (9th Cir. 2003). Moreover, "[t]he purpose of an anti-SLAPP motion is to determine whether the defendant is being forced to defend against a meritless claim," not to determine whether the defendant actually committed the relevant tort. Id.

### Abel is not a Limited-purpose Public Figure & Matter is Purely Private Libel

It remains unrebutted that Abel has not once interjected himself into the controversies surrounding Aaron Broussard and/or the River Birch Landfill. Abel has never commented in published media on the guilt or innocence of Broussard, the propriety of the River Birch investigation, or any other issue whatsoever connected to these controversies. Filing civil legal actions does not constitute activity consistent with interjecting oneself into a public issue.

Abel is clearly not a general purpose public figure. Being a lawyer or an author does not make him a public figure for purposes of these controversies unless he interjected himself through his publishing activities into them. The Trout Point Lodge Cookbook (2004) is not a text addressing Jefferson Parish government or landfill contracts.  His published writings "about his times as a lawyer in the employ of prominent trial attorney Wendell Gauthier, in " Outgunned: Up Against the NRA--The First Complete Insider Account of the Battle Over Gun Control,"  Published in 2002" is obviously also not about the Jefferson Parish scandal that started in late 2009.

Handshoe argues that Abel has been involuntarily interjected into the controversies, but this argument fails as well. First, Handshoe, again, cannot bootstrap Abel into the position of being a limited purpose public figure just to serve as his own defence. Second, instances of involuntarily becoming a limited purpose public figure are very rare. For example, the facts in **Dameron v. Washington Magazine, Inc., 779 F. 2d 736 - Court of Appeals, Dist. of Columbia** are clearly distinguishable. In Dameron the defamatory allegation regarding the central and publicly controversial topic of passenger airplane crashes traceable to air traffic controller error. Plaintiff Dameron was an air traffic controller on duty at a relevant time; thus both his central role and his conduct was germane to the controversy.

> Dameron was at the center of a controversy involving the loss of many lives in a mishap involving a public carrier. At issue was the management of a program administered by the FAA, an arm of the government. Another governmental agency — the NTSB — conducted an extensive, public investigation into the events surrounding the Mt. Weather Crash. Dameron appeared at these hearings and testified for many hours about his role in the crash. The hearings, and Dameron's role in them, were widely publicized. We think that, like it or not, Dameron was embroiled in a public controversy.

The facts are clearly distinguishable here. Even if Abel actually committed crimes, even this does not make an otherwise private figure into a public figure, or a private figure's crimes into a matter of public interest:

> Petitioner's failure to appear before the grand jury and citation for contempt no doubt were "newsworthy," but the simple fact that these events attracted media attention also is not conclusive of the public-figure issue. A private individual is not automatically

transformed into a public figure just by becoming involved in or associated with a matter that attracts public

attention. To accept such reasoning would in effect re-establish the doctrine advanced by the plurality opinion in Rosenbloom v. Metromedia, Inc., 403 U. S. 29, 44 (1971), which concluded that the **New York Times** standard should extend to defamatory falsehoods relating to private persons if the statements involved matters of public or general concern. We repudiated this

proposition in **Gertz** and in **Firestone,** however, and we reject it again today. A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of **New York Times.** See Time, Inc. v. Firestone,424 U. S., at 454.


Nor do we think that petitioner engaged the attention of the public in an attempt to influence the resolution of the issues involved. Petitioner assumed no "special prominence in the resolution of public questions." See Gertz v. Robert Welch, Inc.,418 U. S., at 351.

   Wolston v. Reader's Digest Assn., Inc., 443 US 157 - Supreme Court 1979

   The Wolston court continued to find: "This reasoning leads us to reject the further contention of respondents that any person who engages in criminal conduct automatically becomes a public figure for purposes of comment on a limited range of issues relating to his conviction."

   The U.S. Supreme Court has also observed that being a subject of media attention does not make on a public figure:

   Petitioner's failure to appear before the grand jury and citation for contempt no doubt

were "newsworthy," but the simple fact that these events attracted media attention also is not conclusive of the public-figure issue. A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. To accept such reasoning would in effect re-establish the doctrine advanced by the plurality opinion in **Rosenbloom v. Metromedia, Inc., 403 U. S. 29, 44 (1971),** which concluded that the *New York Times* standard should extend to defamatory falsehoods relating to private persons if the statements involved matters of public or general concern. We repudiated this proposition in *Gertz* and in *Firestone,* however, and we reject it again today. A libel defendant must show more than mere newsworthiness to 168*168 justify application of the demanding burden of *New York Times.* See **Time, Inc. v. Firestone, 424 U. S., at 454**.

### Defamation *Per Se* in Louisiana Law

Abel contends that all of Handshoe's defamatory publications are defamatory of him *per se*. Handshoe fails to distinguish defamation per se from defamation per quod, which predictably benefits his legal argument since then all of Handshoe's multiple publications would be held to the minimal standard and the court would ignore the properly pleaded allegations of the Plaintiff.

As the Louisiana Supreme Court found in Costello v. Hardy:

In Louisiana, **defamatory** words have traditionally been classified into two categories: those that are **defamatory per se** and those that are susceptible of a **defamatory** meaning. **[10] Lemeshewsky v. Dumaine, 464 So.2d 973, 975 (La.App. 4 Cir.1985)**. Words which expressly or implicitly accuse another of criminal conduct, or

which by their very nature tend to injure one's personal or professional reputation, even

without considering extrinsic facts or surrounding circumstances, are considered

**defamatory per se**. *Kosmitis,* 28,585 at 4, **685 So.2d at 1180**;**Lemeshewsky, 464 So.2d**

**at 975**; 12 CRAWFORD, LOUISIANA CIVIL LAW TREATISE: TORT LAW § 17.8 at

315. When a plaintiff proves publication of words that are **defamatory per se**, the

elements of falsity and malice (or fault) are presumed, but may be rebutted by the

defendant. *Kosmitis,* 28,585 at 4, **685 So.2d at 1180**. The element of injury may also be

presumed. *Id.*YPERLINK"http://scholar.google.es/scholar_case?case=961491580427452

3857&q=defamatory+per+se&hl=en&as_sdt=4,19,340,341,342"\l"[11]"[11]


   Handshoe has accused Abel of criminal conduct, and also acts that "by their very nature tend

to injure one's personal or professional reputation." The court in Elmers v. Coplin discussed what

kinds of publications can be defamatory per se:

   Words are **defamatory** when they have a tendency to deprive a person of the benefits of

   public confidence or injure him in his occupation or have a natural tendency to injure the

   person's reputation. When the words themselves have those results, even without

   considering extrinsic facts and surrounding circumstances, they

   are **defamatory per se**. **Cashio v. Holt, 425** 177*177 **So.2d 820 (La.App. 5th**

   **Cir.1982)**; **Makofsky v. Cunningham, 576 F.2d 1223 (5th Cir. 1978)**. Words which

   impute a crime to another are **defamatory per se**. **Cangelosi v. Schwegmann Bros.**

   **Etc., supra**. So are words that tend to adversely affect the person's business or

   profession. **Wiel v. Israel, 42 La.Ann. 955, 8 So. 826 (1890)**. When words themselves

have a natural tendency to injure a person and his occupation or to injure his reputation,

even without considering extrinsic facts or surrounding circumstances, they

are **defamatory per se**. **<u>Lemeshewsky v. Dumaine, 464 So.2d 973 (La.App. 4th</u>**

**<u>Cir.1985)</u>**.

The remarks contained in the letter from Coplin to the National Conference were

**defamatory per se**. The letter accused Marx Elmer and Albert Elmer with furnishing data

which was false and misleading and which was utilized in the sales presentation to

defraud the purchasers. It accused Marx Elmer of purposefully failing to disclose

difficulties in connection with the proposed sale. The letter accused Marx Elmer of using

corporate funds for his personal use and charging them as business expenses, with

secreting financial information, and with misrepresenting financial information so as to

induce the purchase by Coplin's clients. The letter states that Marx Elmer's legal

qualifications are severely impugned by his lack of business integrity and expresses the

opinion that he is not of good moral character and that his legal qualifications are of a low

nature. The letter seriously attacks the moral character of Marx Elmer and his legal

qualifications and his lack of moral turpitude and character. The opinion is expressed that

he should be disbarred for his acts and conduct. Marx Elmer was specifically accused of

fraud and deception and a cover up.

In Kosmitis v. Bailey, the court found for the Plaintiff lawyer on the defendant's summary

judgment motion, regarding statements published limitedly regarding her professional conduct:

Whether or not one or more of Bailey's statements to Mary and Cheryl Williams may be

construed as **defamatory per se**, we have no difficulty concluding that the various statements emphasized above are objectively capable of having a **defamatory** meaning. Bailey's statements were made within the context of being communicated by a fellow lawyer to a client who had had professional dealings with Kosmitis in a pending case, and who perhaps would consider having future dealings with her as well. In this context, Bailey's statement that he "fired" Kosmitis for "misconduct," coupled with his unequivocal assertions that she "is not capable of handling" the client's case because "she is not a real lawyer," but merely a "gopher" who simply "answered the phone" for Bailey, may objectively be regarded as having been designed to lower Kosmitis in the estimation of her clients, whether past or future. See and compare *Lemeshewsky, Freeman* and *Zellinger,* all cited *supra.*

As to Bailey's alleged statements to clients, the elements of *publication* and ***defamatory meaning*** are sufficiently established for purposes of determining the propriety of summary judgment.

Assuming without deciding that none of Bailey's statements may be considered **defamatory per se**, and thus that no other elements of defamation may be presumed, we cannot agree with Bailey's contention that the element of *injury* is negated by Kosmitis's stipulation of no lost income and by her witnesses, Mary and Cheryl Williams, having said that Bailey's statements did not adversely affect their opinion of Kosmitis. The element of *injury* may consist entirely of mental anxiety and suffering subjectively experienced by the plaintiff, even in the face of 1187*1187 positive testimony by one or

Page 32 of 55

more third parties that their opinion of the plaintiff or her reputation was not diminished by the defendant's remarks. See *Firestone, Garrett* and *Trahan,* all cited *supra.* Kosmitis certainly has personal knowledge of the subjective damages she claims to have suffered as a result of Bailey's statements. Her availability as a trial witness satisfies the showing of evidentiary strength based on personal knowledge of the element of *injury.*

The remaining elements of Kosmitis's case—*falsity* and *malice*—and the related element of *good faith* which Bailey must show to invoke the qualified privilege of *Roberts, Wright* and *Boyd,* cited *supra,* are genuinely disputed "subjective" facts which are not capable of resolution by summary judgment under the circumstances of this case. These factual issues which are material to the defamation claim in this case cannot be resolved by affidavit, in isolation from the separate but factually connected breach of contract claim which is not a part of the summary judgment motion. Resolution of these factual issues, for either or both claims, will depend heavily on the trier of fact's credibility assessments, particularly of the litigant-witnesses.

Such "subjective" facts are arguably involved in all cases asserting defamation claims and qualified privilege defenses, including cases where summary judgment was upheld, such as *Sassone, Wright* and *Zellinger.* The decision whether such factual issues are "genuinely disputed," however, must be made on a case by case basis, according to the circumstances and the content of each particular record.

Handshoe also incorrectly attempts to constitutionalize the issue of state law per se defamation and asserts in this context that "the U.S. Supreme Court has required that the plaintiff

bear the burden of showing falsity, as well as fault, before recovering damages." Handshoe's

footnote is to <u>Philadelphia Newspapers v. Hepps</u>, which Handshoe misleading fails to note has

found: "We also have no occasion to consider the quantity of proof of falsity that a private-figure

plaintiff must present to recover damages. Nor need we consider what standards would apply if

the plaintiff sues a nonmedia defendant, see **Hutchinson v. Proxmire, 443 U. S. 111, 133, n. 16**

**(1979),**" In Hutchinson, supra, the court noted that "Neither the District Court nor the Court of

Appeals considered whether the *New York Times* standard can apply to an individual defendant

rather than to a media defendant," and that "This Court has never decided the question; our

conclusion that Hutchinson is not a public figure makes it unnecessary to do so in this case."

### Single Publication Rule

Defendant Handshoe makes several arguments regarding prescription on his Internet

publications. First, Defendant  posits a date of February 4, 2012 as the ultimate date of actionable

defamatory publication within the defamatory Internet campaign he conducted. Plaintiff is at a

loss to understand this date, as the original complaint was filed on January xx, 2013.

Defendant next appears to point to a single defamatory publication on April 11, 2011, that is

now purportedly prescribed, however there is no identification of this publication.

Defendant makes related assertions regarding the "single publication rule," a legal concept

defined in the Restatement (Second) of Torts, and refined for the Internet age in subsequent

defamation law.

Defendant states:

> The **"single publication rule"** is a theory in defamation law which states that when an
>
> allegedly defamatory statement is published in a new format, such as when a hardcover

book is republished in paperback form, it is considered "republished" and the statute of limitations begins to run from the date of republication.97 That is not the case here, as the post remained "published" since its original publication date of April 11, 2011. The fact that a publisher continues to make allegedly defamatory material available does not create a situation involving republication.98 "Likewise, the continued availability of an article on a website should not result in republication, despite the website's ability to remove it."99 Following Firth v. State, a New York State Court decision which held that every "hit" an article receives does not constitute republication, and applying the single publication rule to Internet postings,100 every Court which has addressed the issue "has followed suit."101

Handshoe's multiple assertions require unpacking: "The fact that a publisher continues to make allegedly defamatory material available does not create a situation involving republication."

Defendant's counsel was aware of case law directly contradicting this bald-faced assertion and completely failed to bring it to the court's attention. The District Court for the Western District of Kentucky summary from 2009 is worth quoting at length, as it made an observation about hyperlinks:

However, the critical feature of republication is, again, that the original text of the article was changed or the contents of the article presented directly to a new audience. That did not occur here. Rather, the hyperlink is simply a new means for accessing the referenced article. Making access to the referenced article easier does not appear to warrant a

different conclusion from the analysis of a basic reference.

The Western District of Kentucky has considered republication on the **internet**. In **Davis v. Mitan, 347 B.R. 607 (W.D.Ky. 2006)(Davis II)**, Judge Coffman stated,

> The mere act of editing a website to add unrelated content does not constitute republication of unrelated defamatory material that is posted on the same website. Similarly, mere technical changes to a website, such as changing the way an item of information is accessed, is not republication. These rules are consistent with a public policy that encourages the free transmission of information and ideas. In contrast, <u>where substantive material is added to a website, and that material is related to defamatory material that is already posted, a republication has occurred.</u>

*Id.* at 611-12. The Court then applied these principles to the facts of the case and found republication. The defendants maintained a website relating to Kenneth Mitan and his family. In a separate 2003 action, the Western District of Kentucky dismissed libel claims related to the website as barred by the statute of limitations. **Mitan v. Davis, 243 F.Supp.2d 719 (W.D.Ky.2003)(Davis I)**. "After the order of dismissal, the [plaintiffs] updated their website, adding "Breaking News!" and "Update!" sections. These sections list <u>additional nefarious activities in which Kenneth and, by reference, his family are alleged to have participated.</u>"YPERLINK"http://scholar.google.es/scholar_case?case=6487181898410304822&q=defamation+"new+edition"+Internet+"single+publication"&hl=en&as_sdt=1ffff fffffffffffffffffffffffffffffe000000000000000000000001ffffffecffff87fe3ffffff00000ffffffffffffe

04"\l"[6]"[6] **Davis II, 347 B.R. at 610**. Based on these new sections, the Bankruptcy

Court had found republication of defamatory material about Kenneth and his family. On

review, the District Court found that because the "new material on the [plaintiffs']

website *contained substantive information* related to Kenneth and, by reference, to the

[entire] family," the website was republished and the plaintiffs could maintain

their **defamation** suit. *Id.* at 612 (emphasis added). The critical element for republication

in *Davis II* was the fact that new substantive information was added to the actual webpage

defaming the plaintiffs. Thus, the facts of *Davis II* closely resemble the traditional notion

of republication where the defendant edits and republishes the defamatory material or

places it in a new form.

Not only was this same principle upheld three years later by the court in **Salyer v. Southern**

**Poverty Law Center, Inc., 701 F. Supp. 2d 912 - Dist. Court, WD Kentucky 2009**, it has also

been cited favorably by two federal Circuit Courts of Appeal. That is, "because the "new material

on the [plaintiffs'] website *contained substantive information* related to [Plaintiff] and, by

reference, to the [entire] family," the website was republished and the plaintiffs could maintain

their defamation suit."

Handshoe's counsel was aware of strong common law findings contrary to his client's

position, yet failed to bring them into his argument, refute them, or call the court's attention to

them. The 3rd Circuit has found in a case cited by counsel for Defendant (IN RE

PHILADELPHIA NEWSPAPERS, LLC, Court of Appeals, 3rd Circuit 2012):

courts addressing the doctrine in the context of **Internet** publications generally

distinguish between linking, adding unrelated content, or making technical changes to an

already published website (which they hold is not republication), and **adding substantive material related to the allegedly defamatory material to an already published website (which they hold is republication)**. *See* **Davis, 347 B.R. At 611-12**. (emphasis added)

The 9th Circuit Court of Appeal—arguably the circuit that had confronted more Internet-related defamation cases than any other circuit due to its jurisdiction over Silicon Valley, has *twice* drawn the same distinction regarding the single publication rule as the Kentucky district and bankruptcy courts.

In *Oja v. United States Army Corps* of *Engineers,* we rejected a plaintiff's argument that a defendant continuously republished information by hosting the information on a website. 440 F.3d 1122, 1132 (9th Cir.2006). One reason, we explained, was that the website host "did not modify the substance of the published information following the initial posting of the private information." *Id.* In a footnote, we cautioned that "[o]f course, **substantive changes or updates to previously hosted content that are not `merely technical' may sufficiently modify the content such that it is properly considered a new publication**." *Id.* at 1132 n. 14 (citing **In re Davis, 334 B.R. 874 (Bankr.W.D.Ky.2005)**). The case we cited in support held that the **defendants republished defamatory material when they added substantive information regarding the plaintiffs to their website**. **In re Davis, 334 B.R. at 884,** *aff'd in* 1083*1083 *relevant part,***Davis v. Mitan, 347 B.R. 607, 612 (W.D.Ky.2006)**.

Even if the Single Publication Rule did not apply given the facts of the instant case—which it does—it would apply due to the repeated and continuous nature of Defendant Handshoe

publishing intentionally and malicious injurious falsehoods about Plaintiff. As the Court observed:

> Thermal Design argues for application of the "single publication rule," pursuant to which a person has only a single cause of action for defamation that is "founded upon any single publication or exhibition or utterance, such as any one edition of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture." **Hukic v. Aurora Loan Servs., 588 F.3d 420, 436 (7th Cir. 2009)** (citing Illinois' Uniform Single Publication Act). Whether the single publication rule applies in Wisconsin appears to be an open question. **Ladd v. Uecker, 780 N.W.2d 216, 220 (Wis. Ct. App. 2010)**. Even if it does, the rule cannot help Thermal Design because Guardian claims repeated instances of defamation over an extended period of time. "The single publication rule `does not address the issue of repeated publications of the same libelous matter over a substantial period of time.' Rather, the single publication rule applies where the same aggregate communication is heard at the same time by two or more persons." *Medifast, Inc. v. Minkow,* No. 10-CV-382 JLS (BGS), 2011 WL 1157625, at *11 (S.D. Cal. Mar. 29, 2011) (citing **Christoff v. Nestle USA, Inc., 213 P. 3d 132, 140 (Cal. 2009)** and **Shively v. Bozanich, 80 P. 3d 676, 686 (Cal. 2003)**). In other words, repeated instances of defamation can lead to multiple causes of action, even if the content is generally the same. **Salyer v. S. Poverty Law Ctr., Inc., 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009)** (republication "provides the plaintiff with a remedy where the defendant edits and retransmits the defamatory material, or distributes the defamatory material for a second time with the goal of reaching a new

audience"). (emphasis added)

That is, application of the Single Publication Rule can occur by at least two factual patterns: 1. alteration of the substantive material regarding the plaintiff on a web site such as slabbed.org, ie. Republication; or 2. repeated publications of the same defamatory material over a substantial period of time, regardless of whether it is on the Internet or not. In either case, Handshoe's argument regarding prescription fails, and the defamatory words alleged by Abel remain injurious and actionable.

### Intentional Fabrication of Defamatory Facts, Intentional Misrepresentation of Underlying Sources to Defame, and Continuing to Publish Retracted Defamatory Statements Evidences Not Only Defamation, but also Actual Malice

Evidence of Handshoe's lack of any tendency for veracity as well as his conspicuous tendency to misrepresent and deliberately alter the words of underlying sources is plain in Abel's pleadings and now in the district court record. See **Masson v. New Yorker Magazine, Inc.,501 U.S. 496, 517, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991)** (deliberate alteration of a statement resulting in a material change in the meaning conveyed by the statement is proof of reckless disregard); **Cantrell v. Forest City Publishing Co.,419 U.S. 245, 253, 95 S.Ct. 465, 470-71, 42 L.Ed.2d 419 (1974)** (where reporter fabricated and imagined false facts for purposes of bolstering theme of feature article, jury was "plainly justified" in finding that reporter portrayed the Cantrells in a false light through knowing or reckless untruth); **Carson v. Allied News Company, 529 F.2d 206, 213 (7th Cir.1976)** (defendants, in fabricating and imagining facts, necessarily entertained serious doubts as to the truth of the statements and had a high degree of awareness of their probable falsity). As each defamatory publication gave rise to a distinct cause of action, Abel has demonstraed, on the balance of probabilities, that Handshoe will be found guilty of defamation in Louisiana based on this

unrebutted evidence of defamations published with actual malice.

In many cases, a court can infer from lack of evidence demonstrating that the defendant did not simply fabricate his defamatory facts out of thin air to find defamation  and malice.

The  courts  have  upheld  findings  of  actual  malice  when  a  defendant  failed  to investigate a story weakened by inherent improbability, internal inconsistency, or apparently reliable contrary information. **Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)**; **McHale v. Lake Charles American Press, 390 So.2d 556, 566 (La.App.3d Cir.1980),** *cert. denied,* **452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)**. A verdict for the plaintiff has been upheld when a reporter's own notes showed that she was aware of facts contradicting her story. **Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc., 708 F.2d 944, 950 (5th Cir.1983)**. Similarly, plaintiffs have prevailed after demonstrating that the author of a story knew facts disproving it (**McHale, 390 So.2d at 561**), or that the supposed source of the story disclaimed giving the information (**Batson v. Time, Inc., 298 So.2d 100 (La.App. 1st Cir.),** *writ denied,* **299 So.2d 803 (La.1974)**). When the only "source" of a story did not contain the statements supposedly derived from it, the courts have inferred that defendant recklessly fabricated the story. **Carson, 529 F.2d 206**. Refusal to retract an exposed error tends to support a finding of actual malice. **Golden Bear Distributing Systems,708 F.2d at 950**. Conversely, a readiness to retract tends to negate  "actual  malice."**Hoffman  v.  Washington  Post,  433  F.Supp.  600,  605 (D.D.C.1977),** *aff'd,* **578 F.2d 442 (D.C.Cir.1978)**.

**Zerangue v. TSP Newspaper favorably cited Carson v. Allied News Co.**, 529 F. 2D 206 - Court of Appeals, 7th Circuit 1976. This court used its inherent power to infer from evidence or

**lack of evidence** to find malice in the tabloid National Insider's article & headline:

> Nothing in the present record, which consists of the pleadings, depositions and affidavits, lends any support whatsoever, or even relates to, the published statements alleging or implying that Holland broke up Carson's prior marriage. At this stage of the proceedings, it can only be concluded that those statements are a sheer fabrication by the defendants, which St. Amant poses as an express example of actual malice.

The Carson court found: "The defendants in fabricating and imagining "facts" necessarily entertained serious doubts as to the truth of the statements and had a high degree of awareness of their probable falsity."

### Abel's Claim By Claim Review

A review of the claims made in the complaint, stating how in each case Abel has established on the balance of probabilities—based on the law and evidence referenced above—that Handshoe has defamed him, at least once, but in reality multiple times, and that he has done so with actual malice with allegations that are defamatory per se under Louisiana law.

**Paragraph 22:** This defamatory allegation must be read in context, as part of the blog series. Handshoe had repeatedly accused Abel and his business associates of a coverup of illicit activity. The defendant created an innuendo of "cover-up," mystery, and grandiosity to events surrounding retractions published by the Times-Picayune newspaper as well as the plaintiff's business activities. For example, on April 27, 2011, the defendant wrote: "And then one week and a day ago things changed with this Trout Point thing rearing its ugly head." On April 20, 2011, the defendant wrote: "It's never 'the crime' but the coverup that often reports on Trout Point Lodge." On April 18, 2011, the defendant published that the Times Picayune tried to shut us down." In

another "comment" blog post, the defendant published:

> Left with little choice I agreed to delete the content on Slabbed.org so I can get control of my blog back. I will not be deleting the content here and in fact we're going to examine not only the retracted story in detail but the players involved including Danny Abel, Charles Leary, Vaughn Peret and their Trout Point Lodge. . . . The Times Picayune rolled over and played dead on this. We're not.

Handshoe continued: "if the T-P wants a war I gotta be able to fight it without worrying if my web host will pull the rug out from under me." On April 28, 2011, Handshoe published: "Bit by bit and slice by slice I'm determined to reveal the truth behind Trout Point. Rich Rainey would have but his employer is a pussy." On June 21, 2011 Handshoe published the further threatening headline: "Trout Point here we come. ..."

In other words, the defendant fabricated the innuendo that there was a grandiose coverup involving the plaintiffs, a major daily newspaper, and its law firm, which consisted of "a war" against the defendant and the silencing of investigative reporter Richard Rainey, among others. The defendant created the innuendo that the plaintiff was involved with "the powers that be" in an effort to "gag" the defendants' publications.

In addition, in January, 2013, Aaron Broussard was a confessed felon for crimes including bribery. Handshoe had been publishing for months that Broussard was involved in the funnelling of kickbacks and money laundering in Nova Scotia. In this context, to any reasonable reader in southwest Louisiana, stating that Abel and Broussard had business interests together was

therefore defamatory of Abel, who in fact never had collective business interests with Broussard in Nova Scotia. This remains unrebutted, and the court can infer that Handshoe fabricated this allegation.

Viewed in this context, the allegation quoted in paragraph 22 is defamatory per se. In addition, the use of the word "payola" connotes an illicit or unethical activity, which for an attorney would be damaging to his reputation as an honest person and officer of the court. The online Free Dictionary defines payola as "**1.** Bribery of an influential person in exchange for the promotion of a product or service, such that of disc jockeys for the promotion of records. **2.** A bribe or a number of bribes given to an influential person in exchange for a promotion of a product or service:*"I do not mean to imply that most Wall Street analysts typically receive payola for touting particular stocks"(Burton G. Malkiel)."* The Merriam-Webster Online Dictionary states payola is: *":* undercover or indirect payment (as to a disc jockey) for a commercial favor (as for promoting a particular recording)." In this instance, Handshoe was referring to a positive article by the Globe & Mail newspaper about Trout Point Lodge, in which the reporter acknowledged in print that his stay was provided at no cost by the Lodge (accessible at http://www.theglobeandmail.com/life/travel/destinations/on-night-safari-in-nova-scotia/article592101/). This was therefore not "payola," which involves bribery or an "undercover or indirect payment." Complimentary stays for media are standard practice in the accommodation industry.

**Paragraph 24**: Even if one accepts Handshoe's argument that calling Abel a "shithouse lawyer" is mere opinion, with no assertion of fact underlying it (which Plaintiff does not accept), the statement that Abel would never have succeeded as a lawyer without Wendell Gauthier and

Aaron Broussard is defamatory *per se*, robbing Abel of his personal reputation as a lawyer who built his own successful career. This implies that Abel had no skill or acumen himself as a lawyer, and that his status was merely the result of connections, including with a confessed felon and corrupt politician.

**Paragraph 26**: The Plaintiff reasserts the same argument as regarding paragraph 22. The publication clearly refers to him because he is repeatedly referred to by Handshoe as a "goat herder" based on his previous ownership of Chicory Farms. Handshoe also juxtaposed a photograph of Abel with this defamatory blog post, making it about him for purposes of the "of and referring to" element of defamation (cf. Peck v. Tribune Co., 214 U.S. 185, 29 S. Ct. 554, 53 L. Ed. 960 (1909); Franklin Prescriptions, Inc. v. New York Times Co., 424 F.3d 336 (3d Cir. 2005); Crump v. Beckley Newspapers, Inc., 320 S.E.2d 70 (W. Va. 1983)).

In addition, Abel does not agree that to refer to him as a "grifter" is not defamatory per se. *Russo v. Conde Nast Publications*, 806 F. Supp. 603 (E.D. La. 1992), cited by Handshoe, is distinguishable on the facts. As that court itself noted, "As to the slang term 'grifter', it unquestionably has a wide variety of connotations which largely depend on the context of the terms usage." Given the context, in which Handshoe has repeatedly accused Abel and his business associates of money laundering, funnelling kickbacks, and defrauding investors, reference to Abel as someone engaged in grifting is an accusation of criminal activity, in the line of "swindler" and "dishonest person" as found by the Russo court. Abel is not an insurance salesman on the fringes of society wrapped up in the controversy regarding Clay Shaw and the assassination of a U.S. president, as was Russo.

**Regarding paragraph 28**, publishing the WVUE retraction in the context described above is

the same as stating that Abel illegally coerced the retraction from Louisiana Media Company as part of a coverup of criminal conduct. This is defamatory per se.

   **Regarding paragraph 29**, this statement is not opinion. It is a statement of fact, that is that Chicory Farms—of which Abel was a managing principal—had fleeced the U.S. government. Handshoe may have the opinion that all competitive federal research grants are inappropriate or a waste of government money, however stating that Abel's business in particular fleeced the government is to state a fact capable of defamatory meaning. The Merriam-Webster online dictionary in this context defines to fleece as "to strip of money or property by fraud or extortion." This makes the factual assertion that grants received by Chicory Farm were procured by fraud, a federal crime. This is defamatory per se. The awarding of a federal research grant is, in addition, not a matter of public interest (**Hutchinson v. Proxmire 443 u.s. 111**)

   **Paragraph 31** is a continuation of the theme of coercion of news media to perpetrate a coverup of criminal conduct. To state that attorney Abel is a libel terrorist is also defamatory per se.

   **Regarding paragraphs 33-36**, on its face this is not a statement of opinion. It is untrue that a reasonable person would not conclude that Abel and his business was involved in money laundering for Aaron Broussard. Handshoe is not a reasonable person, but a conspiracy theorist with a private vendetta. Handshoe refers to his "state of mind" and his reasonableness as probative, which is exactly why Abel needs discovery of Handshoe (cf. Herbert v. Lando, supra) if he is to be held to an actual malice standard. Indeed, it is Handshoe who has made his state of mind an issue before this court. Again, at the time of publication, Broussard had confessed to federal crimes include bribery, however no one except Handshoe has ever accused Abel of being

involved in such crimes. Both Handshoe's publication and his brief to this court rely on innuendo and guilt by association to accuse Abel of crimes. The publication does not say merely that Broussard "had more to tell," but rather that he had information to divulge to federal authorities that would implicate Abel in federal crimes. Leary and Perret advertising advice on asset protection does not implicate Abel in money laundering. It is totally unrebutted that Cerro Coyote was not Broussard's business, as claimed by Handshoe.

**Regarding 37 & 38**, as an attorney, Abel cannot ethically "contrive" conflicting legal positions to "satisfy the moment."  The Louisiana Rules of Profession Conduct state:

> Rule 3.1. Meritorious Claims and Contentions
>
> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.

This statement injures Abel in his profession. Handshoe has provided no evidence of Abel engaging in such conduct.

**Regarding 39-41**, there is no "substantial truth" to the defamatory allegations here, only absolute falsity. There is no "resort" in this context beyond the Trout Point business. Trout Point has never been mentioned as a "bribery conduit" for Broussard, and Broussard did not plead guilty to anything relating to Nova Scotia. Court filings in the Broussard criminal prosecution have never mentioned Trout Point or Abel. In fact, there were no indictments whatsoever of anyone related to Nova Scotia. Handshoe conducts a bald faced, intentional misrepresentation of an underlying source in the process of defaming Abel and his business, which is evidence of actual malice. Defendant clearly states that Trout Point was used as a bribery conduit and that

Broussard even pleaded guilty to such—if not explicitly (which Abel does not admit) then by unmistable defamatory innuendo.

   Handshoe also pretends to have insider sources confirming Abel's involvement in Broussard's made-up criminal conduct, and he links Desai and Cerro Coyote into the criminality through innuendo as well. His suggestion includes having Desai carry monies for "laundering" to Cerro Coyote in Costa Rica. Desai has never been to the Inn at Coyote Mountain (Cerro Coyote), and this remains unrebutted. In context, Handshoe weaves a story of conspiratorial innuendo involving Abel, federal crimes, Cerro Coyote, and confessed felon Broussard.

   Handshoe also omits to inform this court that the prosecutors in Broussard's case later clarified their vague allegations made in Karen Parker Broussard's Factual Basis, whose mention of Canada they later had to admit to the federal district court, had nothing whatsoever to do with Parker Broussard's guilty plea and was gratuitous. In fact, the untested allegation of the USAO was that Broussard used a *Louisiana* limited liability company to enrich himself by manipulating memberships in that LLC, all of which was alleged criminal activity occurring *in Louisiana*, not nova Scotia. It remains unrebutted that Abel had nothing to do with that Louisiana LLC.

   **Regarding 42 & 43:** To be someone's law partner has a very specific meaning. The Louisiana Rules of Professional Conduct state: "Partner" denotes a member of a partnership, a shareholder in a **law firm** organized as a professional corporation, or a member of an association authorized to practice law. Daniel Abel was never Aaron Broussard's law partner. Again, this publication was made after Broussard had admitted to felonies. A reasonable reader would presume that Abel was in business with Broussard during the period he had committed federal crimes, which has

never been the case. This remains unrebutted. Handshoe's statements about lawsuits have no

substance; they are intentional distortions of the truth. Abel has never represented Leary and

Perret in any lawsuits. Neither Charles Leary nor Vaughn Perret were parties in Perret v. Phillip

Morris, 2:96-cv-02779-HGB (E.D.La. 1996) or Condolary v. Campbell, 1995 WL 555581

(E.D.La. 1995). In Leary v. Federal Fiber Mills Case No., 2:96-cv-01975-MLCF (E.D.La.1996),

according to the district court docket, Leary and Perret were represented by Steven Rando, while

Abel represented himself. To state that Abel had professional plaintiffs implies that he paid

people to fraudulent be plaintiffs in lawsuits for the purpose of financial gain. This is defamatory

per se. Read in context and as part of a series, it is a further serious injury to Abel's professional

reputation.

   **Regarding 44 & 45**: This is not a statement of opinion. It states facts. The fact that Abel had

been sued for an unpaid bill indicates a legal conflict, not that he was having money troubles.

The lawsuit resulted in a default judgment, which is not conclusive of "money troubles," which is

defamatory of Abel. This is not an issue of public concern.

   **Regarding 46-48**: There is no proof that Broussard "marketed" for Abel and Cerro Coyote.

Once again, in context, this imples that Abel and Broussard were in business together during the

period Broussard was committing felonies. There is no mystery to the fact that Abel knew

Broussard going back decades. The fact that Broussard referred his brother-in-law Carl Eberts to

an investment in tropical destination Cerro Coyote proves no business relationship between

Broussard and Abel. More importantly, it is Handshoe's statements that he had a document that

was a "smoking gun" regarding Broussard and Abel, and his direct reference to Abel as a

"perpetrator to this massive political corruption enterprise that Aaron Broussard led" that are

directly defamatory per se of Abel. Abel had no involvement whatsoever in Broussard's alleged or confessed acts of political corruption, and this fact remains unrebutted. The only person to ever make such allegations is Handshoe.

**Regarding 49 & 50**: In the context of the blog Slabbed, this headline refers to Abel, both directly and through the close association of his reputation with Trout Point Lodge. Headlines can be defamatory (**Buratt v. Capital City Press, Inc., 459 So. 2d 1268 - La: Court of Appeals, 1st Circuit 1984**). Handshoe has repeatedly referred to Abel as Broussard's business associate. The headline states facts, including that there is evidence of crimes involving Abel's business Trout Point Lodge. Again, Handshoe refers this court to his state of mind, which requires broad discovery to which Abel is entitled.  Handshoe intentionally misrepresents the Karen Parker Broussard Factual Basis referred to above.

**Regarding 51-54.** This publications contains numerous statements of fact that are not pure opinion. It makes accusations of crimes for which Handshoe had no reasonable basis to make. It represents primary sources as stating things they never say, which is proof of actual malice. Handshoe states that Abel is the "conduit" between Broussard and an illegal enterprise, used in a criminal conspiracy to enrich Broussard. No one has ever made this accusation besides Handshoe. The USAO filing never mentions Abel or Trout Point. Handshoe then creates the defamatory innuendo that Abel's is among the names of owners of this criminal enterprise redacted by prosecutors. He has no basis for making this allegation, which is false and this fact remains unrebutted. Handshoe cannot make criminal allegations against others, and then state that because his target cannot prove it false, he is allowed to make it under the auspices of "free

speech." This is not the standard. In fact, the fact known to Handshoe that federal prosecutors have never named Abel or Trout Point Lodge, or even referred to them in any way, after 3 years of criminal investigation should be sufficient basis for a reasonable person to have serious doubts that his defamatory allegations are true. What's more, these allegations by the prosecutors were not the subject of any indictments, and remain untested and unproven.

Handshoe then yet again repeats the untrue defamatory innuendo that Abel and his business partners have coerced media into silence as part of a cover up of a criminal enterprise, this time at the behest of Broussard. Handshoe admits to knowledge of media retractions concerning Abel and/or Trout Point Lodge from 2 news outlets, which provide sufficient facts for this court to conclude that he should have entertained serious doubts about the defamatory allegations of fact he was publishing about Abel. This evidences actual malice. His only explanation is that Abel is involved in a conspiracy to silence the media, and that the retractions are untrue, quite a Catch 22.

Handshoe then yet again makes the false allegation that Abel's Trout Point Lodge was used to "launder the alleged bribes that were paid to" Broussard. The USAO's filings never allege this, which is completely a figment of Handshoe's imagination.

Abel repeats his argument about "to fleece" made above, given the series and context of this publication. Handshoe refrains from informing this court and his Internet audience that any litigation with ACOA was at all times amicably settled out of court, that there were claims and counterclaims, and that the Nova Scotia Court of Appeal found for the Defendants/Plaintiffs by Counterclaim on major issues, including possible spoliation by the federal agency. ACOA settled

shortly thereafter, in the Spring of 2010. He also fails to inform this court about a retraction from Rural Delivery in 2002, or that Louisiana Media had amicably settled with Trout Point Lodge out of court at the time of this publication. Resorting to civil legal process is simply not coercion. Acts of omission in defamation are as grave as those of commission, as is misleading this court. Neither Abel nor his business associates have ever threatened journalists, which remains unrebutted. It is again not "reasonable opinion" that Abel is involved in criminal activity. "A classic example of a statement with a well-defined meaning is an accusation of a crime." (*Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984).)

**Regarding 55 & 56**: Prosecutors alleged—though lacking any indictment on this issue—that Nova Scotia Enterprises, LLC was used in criminal conduct to enrich Broussard. Notably, however, the allegation in "the Federal Government's 404(B) filing" was not "the laundering of money to Aaron Broussard." Money laundering is understood to be the conversion of ill-gotten monies into a legitimate form, which is not what prosecutors alleged—another intentional misrepresentation and twisting of facts alleged in underlying sources used by Handshoe to suit his own agenda. These allegations were widely published in the New Orleans metro area. As argued above, to state that Daniel Abel was a member of that LLC while it was engaged in criminal conduct involving Broussard is defamatory per se. Pure "conjecture" is not protected speech; when conjecture is a criminal allegation made negligently or with reckless disregard for the truth, it is defamatory.

**Regarding 57 & 58**: Abel repeats his argument about Handshoe's repeated allegation that Abel was Broussard's law partner during the time he was committing felonies. This publication

directly injures Abel's reputation as a lawyer, and accuses him of engaging in unethical legal practices.

**Regarding 59**: This publications contributes to Handshoe's defamatory innuendo that Abel was deeply involved with Broussard in wide-ranging criminality. It is a lie that Abel practiced law from Clearview Parkway before Hurricane Katrina. He never practiced law with Broussard on Clearview Parkway or elsewhere, though he was co-counsel with Broussard after Broussard left public office. Abel repeats his assertion about the use of professional plaintiffs being defamatory.

**Regarding 60:** Taken in context, this publication imputes mental instability to Abel and impugnes his personal identity. It also states that Abel has made some public comment on the Broussard controversy, which is untrue and this fact remains unrebutted; it is therefore relevant in the context of defamation.

**Regarding 61**: This is a statement of fact regarding the inevitability of Abel being questioned by federal criminal investigators, and the fact that his phone would be wire tapped. In fact, federal prosecutors had never mentioned Nova Scotia or Abel—another instance of Handshoe misrepresenting an underlying document. This is a fact.

Allegations contained in **Paragraphs 64-97** are not subject to the single publication rule, as argued above. Defendant has failed to rebut these allegations or make any prima facie case regarding them. They contains numerous criminal and ethical allegations, including but not limited to:

- fleecing a Canadian federal government agency, which was never an allegation in that

litigation, which was at all times amicably settled

- Abel's use of trickery and deceit as a lawyer

- Abel "grifting his way through life"

- taking ethical liberties as an attorney

- imputing Abel's involvement in Jefferson Parish political corruption

- homecooking and fleecing an out-of-state plaintiff

- being married to someone accused of tax violations

- stripping Americans of their constitutional rights, as an attorney

- being engaged in scams and political corruption

- coverup of illicit activity

Handshoe then attempts to skate over allegations identifying Abel as being involved in further criminal activity, including allegations that were reasonably foreseeable republications of Handshoe's words such as those contained in the lawsuit captioned Concrete Busters. This defamation extended to connecting Abel and his companies with criminal racketeering in the awarding of a garbage disposal contract. Lawyers for Concrete Busters have now retracted, and state that the source of these allegations was in fact Slabbed and Doug Handshoe.

The other statements referred to are, once again, not opinion—they are statements of fact, such as that Abel hacked Handshoe's computer, Abel violated the constitutional rights of American citizens, Abel engaged in harassment, Abel and his associates obtained court orders by

fraud—implying a conspiracy.

## Conclusion

In the Order of 29 March 2013 [Rec. d. 29] Judge Morgan identified three issues that plaintiff and defendants must address. The parties must also address Art. 971 D discovery. Handshoe must present prima facie proof to the Court that his postings are protected under the provisions of Art. 971. If he does, Abel must show that he can bring facts and evidence to trial in order to sustain a favorable judgment. But Abel already has. Three Courts and three private parties have been brought the facts and each has found Handshoe's statements to be defamatory. Handshoe has not and cannot meet his burden. As the Courts have found he is not a journalist or media source. And as Abel is not a public person and not involved in any public issue Handshoe cannot bootstrap him into either category. Even if he did, Abel has and shall prove that the statements and vitroilic attacks made on him by Handshoe and Vandenweghe are defamation per se under Louisiana Law. The Court should deny Handshoe's motion and award Abel costs and attorney fees are required under Art. 971. The Court should also order Art. 971 D discovery and let it commence immediately.

| | |
|---|---|
| Respectfully submitted, | Certificate of Service |
| s/ Daniel G. Abel | s/ Daniel G. Abel |
| Daniel G. Abel [LSB No. 8248] | I have filed this pleading through |
| 2421 Clearview Parkway | the CM/ECF program and thereby |
| Legal Department - Suite 106 | served all counsel. Vandenweghe |
| Metairie, Louisiana | shall be served according to rule. |
| Telephone: 504.284.8521 | 10 April 2013 |