CANADA                                          YAR No.  353654

PROVINCE OF NOVA SCOTIA



<u>IN THE SUPREME COURT OF NOVA SCOTIA</u>


TROUT POINT LODGE LIMITED, VAUGHN PERRET AND
CHARLES LEARY

                                          PLAINTIFFS


— VERSUS —

DOUG K. HANDSHOE AND JANE DOE
([ANNEMARIEBOUDREAUX@YAHOO.COM](mailto:ANNEMARIEBOUDREAUX@YAHOO.COM))


                                          DEFENDANTS


_____

<u>DECISION</u>
_____


HEARD BEFORE:   The Honourable Justice Suzanne
                Hood

COUNSEL:        Dr. Charles Leary Self-Represented
                as Agent and Officer of Trout
                Point Lodge Limited

PLACE:          Yarmouth JC1, Yarmouth, N.S.

DATE HEARD:     February 1, 2012

INDEX
TROUT POINT LODGE V. HANDSHOE
FEBRUARY 1, 2012

Oral Decision   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

EXHIBITS

EXHIBIT   DESCRIPTION -------------------------PAGE

None

1                    <u>FEBRUARY 1, 2012 AT 10:23 A.M.</u>
2

3            <u>THE COURT:</u>     We  begin  by  saying  that
4    because  I  am  giving  this  decision  orally  I
5    reserve  the  right,  should  it  be  required  to  be
6    reduced  to  writing,  to  edit  but  not  of  course
7    change the substance of it.
8            Trout  Point  Lodge,  Charles  Leary  and  Vaughn
9    Perret  have  obtained  default  judgment  against
10   Doug  Handshoe  in  an  action  filed  in  August  2011
11   and  amended  in  September  2011  for  defamation,
12   invasion    of    privacy,    injurious    falsehood,
13   intentional     interference     with     contractual
14   relations,  intentional  interference  with  economic
15   relations,  intentional  infliction  of  emotional
16   and   mental   distress   and   assault.      Default
17   judgment  was  entered  on  December  12,  2011  with
18   damages to be assessed.
19           The  plaintiffs  move  for  an  assessment  of
20   damages  on  January  12th,  2012.    Mr.  Handshoe  was
21   given  notice  of  a  hearing  for  the  assessment  of
22   damages.

1    The plaintiffs have provided a copy of a
2  FedEx tracking slip showing delivery to Mr.
3  Handshoe's home in Mississippi.  It notes the
4  materials were left at the house.  Efforts were
5  also made according to the testimony of Mr. Leary
6  to fax the documents to Mr. Handshoe's fax number
7  but the transmission was not complete as the fax
8  appeared to have been disconnected.  These
9  materials appear also to have been sent by email
10  and these documents are at Tab 3 to the materials
11  presented in evidence by Mr. Leary at the
12  hearing.  It appears from Mr. Handshoe's blog
13  that he had knowledge of the hearing since he
14  referred to receiving, "nastygrams," from Mr.
15  Leary and Mr. Perret in a blog dated January
16  17th, 2012.  Mr. Handshoe did not appear or
17  participate in the assessment of damages.
18    Default judgment is conclusive of a claim
19  set out in the statement of claim and that's in
20  the authority for that, among others, is E. Sands
21  and Associates versus Dextras Engineering.  The

1    amended statement of claim sets out in detail the

2    claims against Mr. Handshoe which are now to be

3    treated by this court as proven.   The statement

4    of claim lists many examples of the defamatory

5    comments made by Mr. Handshoe, below is a brief

6    summary of them.   The defamatory comments

7    originated with a news story which was published

8    in the Times-Picayune newspaper in Louisiana

9    about Jefferson Parish President Aaron Broussard

10   being involved in a political corruption scandal.

11   The plaintiffs were erroneously identified as

12   being connected with Mr. Broussard in a business

13   venture and Mr. Broussard was named in error as

14   owning Trout Point Lodge.   The allegations

15   against him are kickback schemes, money

16   laundering and fraud while in his office as

17   Parish President.

18        The defamatory comments later included

19   claims that Trout Point Lodge, Mr. Leary and Mr.

20   Perret had misled ACOA and that Mr. Leary

21   committed perjury in litigation with ACOA.   The

1    defamation continued with statements that Trout

2    Point Lodge was losing business or going bankrupt

3    because of the investigation of Mr. Broussard and

4    his inability to continue to support it.   Also

5    there were claims that Charles Leary and Vaughn

6    Perret had been involved in a series of

7    businesses which failed and are con men.   The

8    statements also contained anti-gay rhetoric and

9    homophobic comments.

10   After the original story was retracted by

11   the Louisiana newspaper that published it Mr.

12   Handshoe made statements that Mr. Leary and Mr.

13   Perret had improperly influenced it to retract

14   the story.   He also said that Mr. Leary and Mr.

15   Perret were improperly using the legal system by

16   commencing the defamation action.   Individual

17   plaintiffs have filed affidavits and in his

18   affidavit Mr. Leary has related incidents

19   affecting him and Trout Point Lodge.   He said in

20   that affidavit in Paragraph 26,

21
22   "Due to the publications on

1                        Slabbed and by Mr. Handshoe
2                        elsewhere on the internet I
3                        have a very real fear that
4                        anyone performing due
5                        diligence on us as business
6                        people or innkeepers will
7                        discover and believe
8                        Handshoe's publications."
9

10      He also said in Paragraph 27,

11
12                        "I felt embarrassed in my
13                        local community. Mr. Perret
14                        and I have at times, changes
15                        our usual shopping patterns in
16                        Yarmouth in order to avoid
17                        persons we consider friends
18                        who may have read the Slabbed
19                        publications."
20

21      He also testified about the stress of the
22      defamation on him in Paragraph 30 of the
23      affidavit where he said,

24
25                        "In April 2011 at the time when
26                        Handshoe's publication about us
27                        became threatening and homophobic I
28                        experienced tightened shoulder and
29                        neck muscles, sleeplessness and
30                        developed a severe outbreak of fever
31                        blisters for which I had to take
32                        Zovirax, and antiviral medication.
33                        Previously I always slept very well
34                        never waking up early. Since April
35                        2011 I have experienced regular
36                        sleeplessness particularly waking up

1    early in the morning worrying about
2    Slabbed and its effect on our
3    business."
4

5    His affidavit concluded with Paragraph 39 where

6    Mr. Leary says,

7
8        "I'm seriously concerned about
9        Slabbed hurting the Lodge's business
10       which Mr. Perret and I rely on as
11       our primary source of income. In
12       2011 occupancy rates at Trout Point
13       were three percent lower than in
14       2010. This represents a value of at
15       least $15,000."
16

17   Mr. Leary testified in court as well and his

18   evidence was about since the Notice of Action was

19   served and about the effect of the words of the

20   defendant on him and Trout Point Lodge. Mr.

21   Perret also filed an affidavit in which he stated

22   the effects of the defamation on him. He said in

23   his affidavit in Paragraphs 9 and 10,

24
25       "Mr. Handshoe's internet
26       publications have added a great deal
27       of stress to our lives including the
28       physical manifestations. I felt
29       genuinely afraid of his published
30       threats and of the existence of the
31       Slabbed Nation and members of that

1      group being in Nova Scotia.  I now
2      keep my doors locked at night
3      whereas previously I never feared
4      for my safety in my own home."
5

6   He says in his affidavit at Paragraph 11,

7

8      "I have told my personal physicians
9      in Spain and Nova Scotia about
10     stress and sleeplessness related to
11     the Handshoe publications.  My
12     physician Dr. Fernandez Negrara had
13     prescribed medication to help me
14     sleep after the Slabbed publications
15     commenced and to help control my
16     anxiety.  I have also experienced
17     embarrassment, humiliation and
18     irritability.  It was hard to get
19     through work in 2011 knowing that
20     nearly every day a new source of
21     embarrassment and business
22     disruption might be published by
23     Handshoe.  I've been embarrassed
24     that friends and acquaintances in
25     Yarmouth might confront me about the
26     Slabbed allegations.  I could never
27     be sure that members of the local
28     community might secretly harbour a
29     belief in the truth of the blogs
30     allegations."
31

32   In Paragraph 13 he says,

33

34     "Mr. Handshoe has also made
35     publications about my mother stating
36     that I "split" and left her with a
37     surrogate son in Louisiana.  I was
38     traumatized by his suggestions that

1          I had somewhat neglected or abused
2          my mother."
3

4     Mr. Perret also testified briefly, he said he had

5     lost his appetite in the last two weeks as a

6     result of the material which has been published

7     by Mr. Handshoe and the volume of it.    In

8     addition, materials were submitted to the court

9     which were testified to by Charles Leary.    These

10    included defamatory comments made after the

11    Louisiana newspaper printed a retraction of the

12    story.    They include references to a cover-up of

13    a crime and dirty secrets April 20th, 2011 that

14    Charles Leary and Vaughn Perret and others were

15    "bag holders" for Aaron Broussard and the

16    purported owners of Trout Point Lodge.    That same

17    blog referred to the fleecing of investors in

18    Trout Point Lodge by Mr. Broussard and his close

19    connection to Mr. Leary and Mr. Perret.    It also

20    refers to Charles Leary as a liar and a perjurer

21    in the litigation with ACOA.    And that blog was

22    April 26, 2011.

1       On August 15th, 2011 the blog refers to "a

2   Trout Point Lodge Jefferson Parish political

3   corruption scandal update" linking Trout Point

4   Lodge with the corruption scandal involving Aaron

5   Broussard. In that same blog he refers to Charles

6   Leary and Vaughn Perret in the context of "by

7   reporter, get a good story."

8       On August 16th his blog said that he was

9   meticulously laying down "the trail of scams and

10  political corruption that leads to Nova Scotia

11  and Trout Point Lodge."

12      After being served with a Notice of Action

13  further defamatory comments were made.  On August

14  18th he wrote,

15
16          "First class bitches, common thugs
17          or just plain old morons."
18

19  He also refers to the "elite fraternity of crooks

20  and miscreants" who have sued him.  On August

21  24th, 2011 he referred to "political wrongdoing

22  involving Leary and Perret in Canada and it had

23  nothing to do with Broussard per se."

1       He continues to make accusations of fraud

2   against them and in bilking local contractors.

3   He refers to "the chances Trout Point Lodge will

4   be bankrupt within a year" and he said that on

5   August 30th, 2011.  In the same blog he refers to

6   the "nefarious practices" of Charles Leary and

7   Vaughn Perret.  He refers to them being involved

8   in money laundering.  He calls them "grifters"

9   and "grafters."  He accuses them of fabricating

10  positive reviews of Trout Point Lodge.

11  Ultimately he links them with organized crime.

12      These types of comments continued throughout

13  2011 and further defamatory comments were made

14  earlier this month, January 2012, when the Notice

15  of Assessment of Damages was served on him.  I

16  mentioned a few additional postings as follows.

17  There's a posting from September 14th, 2011,

18
19          "I'll add here, in case it is not
20          self-evident that I bill complete
21          dossiers on all the players in this
22          social group and I intend through
23          time to roll out each and every one
24          in excruciating detail as long as
25          the lawsuit in Canada is an

1        outstanding issue for Slabbed.   The
2        reason for this is that this band of
3        gay men act as a unit that will also
4        scatter like cockroaches when the
5        heat is applied."
6

7    In January of 2012 the blog says,

8
9        "Some of those names of the property
10       owners at Trout Point have well
11       documented connections to organized
12       crime here in the U.S.   From my
13       standpoint flushing all this out
14       only gets better from here."
15

16   Another blog from September 14th, 2011, sorry,

17   no, that's the same one.   A blog from January

18   29th of 2012,

19
20       "When I'm done even Perret's niece
21       who filed an affidavit in that Fox 8
22       case will understand her uncle is a
23       grifting scumbag pussy."
24

25   And on January 26, 2012 the blog says, "He,"

26   meaning Daquila (sp), "also has enough stroke to

27   tell Charles and Vaughn what to do at Broussard's

28   request."

29       There are many, many more blogs which

30   contained defamatory materials such as this which

1    are included in the materials filed with the
2    Court on January 30th.

3         Turning to the hearing, a comprehensive
4    brief was filed with the Court with many case
5    authorities.  Mr. Leary made an oral submissions
6    to the Court outlining the principles the Court
7    should consider in deciding the quantum of
8    damages for defamation, aggravated damages and
9    punitive damages.  In addition he referred to a
10   recent Ontario Court of Appeal decision with
11   respect to invasion of privacy which is also
12   claimed by the individual plaintiffs.

13        In questioning by the Court, Mr. Leary said
14   that the plaintiffs' other claims are subsumed in
15   the Claim of Defamation, that is the claims were
16   intentional interference with economic relations
17   for intentional interference with contractual
18   relations and injurious falsehood.

19        Mr. Leary submits that the invasion of
20   privacy, assault and intentional infliction of
21   emotional and mental distress stand alone and

1    individual   plaintiffs   seek   damages   for   these
2    separate from the defamation in related claims.

3        The plaintiffs seek damages of $250,000 for
4    each of the three plaintiffs.  Aggravated damages
5    for each individual plaintiff as well as punitive
6    damages.   They say that their original demand of
7    aggravated  damages  of  $300,000  each  should  be
8    increased because the amount was requested before
9    the   recent   defamatory   remarks   which   have
10   continued since default judgment was entered and
11   in particular since Mr. Handshoe was given notice
12   of the assessment of damages.  He said they would
13   seek special damages for loss of business but it
14   is  too  difficult  to  prove  although  he  believes
15   they   have   lost   business   because   of   the
16   defamation.

17       In  addition,  the  individual  plaintiffs,  as
18   I've said, seek damages for invasion of privacy.
19   In the Jones Decision the Ontario Court of Appeal
20   said  that  the  range  for  such  damages  is  up  to
21   $20,000.   In   that   case   the   Court   of   Appeal

1       awarded damages in the amount of $10,000.   The
2       plaintiffs here say that the extent of the
3       invasion of privacy in that case was less than is
4       the case here.    plaintiffs also seek an
5       injunction preventing further defamatory comments
6       and a mandatory injunction seeking to have the
7       existing comments removed.
8            The leading case on defamation in Canada is
9       the Supreme Court of Canada Decision is Hill v.
10      Church of Scientology of Toronto.   In that case
11      Justice Cory writing for the majority referred to
12      the fact that the defamatory comments were
13      published on the local television news, reported
14      in the Globe and Mail and reported on by CBC.   He
15      referred to the audience numbers of those media
16      outlets and said that the audience for the local
17      T.V. station was approximately 132,000.   The
18      Globe circulation that day was 108,000 and the
19      CBC broadcast was seen by approximately 118,000.
20      He refers to that in Paragraph 26 of the
21      decision.

1        He said in Paragraph 108, and I quote,

2

3            "False allegations can so very
4            quickly and completely destroy a
5            good reputation.    A reputation
6            tarnished by libel can seldom regain
7            its former lustre."

8

9    And he said with respect to defamatory statements

10   in Paragraph 166,

11

12           "A defamatory statement can seep
13           into   the   crevices   of   the
14           subconscious and lurk there, ever
15           ready to spring forth and spread its
16           cancerous evil.    The unfortunate
17           impression left by a libel may last
18           a lifetime.   Seldom does a defamed
19           person   have   the   opportunity   of
20           replying and correcting the record
21           in a manner that will truly remedy
22           the situation."

23

24   Justice Cory later said in Paragraph 178 with

25   respect to Mr. Hill,

26

27           "He would never know who, as a
28           result of the libellous statement,
29           had some lingering suspicion that he
30           was guilty of misconduct which was
31           criminal in nature.   He would never
32           know who might have believed that he
33           was a person without integrity who
34           would    act    criminally    in    the
35           performance of his duties as a Crown

```
 1                    counsel.  He would never be certain
 2                    who would accept the allegation that
 3                    he was guilty of a criminal breach
 4                    of trust which was the essential
 5                    thrust of the libel."
 6
```

7    In considering whether the jury award of damages

8    was appropriate, the Court quote from Gatley on

9    libel and slander in Paragraph 182.  In that text

10   the author states,

```
11
12                    "The amount of damages is peculiarly
13                    the province of the jury who in
14                    assessing them will naturally be
15                    governed by all the circumstances of
16                    the  particular  case.    They're
17                    entitled   to   take   into   their
18                    consideration  the  conduct  of  the
19                    plaintiff, his position in standing,
20                    the nature of the libel, the mode
21                    and  extent  of  publication,   the
22                    absence or refusal of any retraction
23                    or apology and 'the whole conduct of
24                    the  defendant  from  the  time  the
25                    libel was published down to the very
26                    moment of their verdict.  They may
27                    take into consideration the conduct
28                    of  the  defendant  before  action,
29                    after action and in court on the
30                    trial of the action.'  And also it
31                    is submitted that the conduct of his
32                    counsel   who   cannot   shelter   his
33                    client by taking responsibility for
34                    the  conduct  of  the  case.    They
35                    should also allow 'for the sad truth
36                    that   no   apology,   retraction   or
37                    withdrawal can ever be guaranteed
```

1           completely to undo the harm it has
2           done or the hurt it has caused.'
3           They should also take into account
4           the evidence led in aggravation or
5           litigation of the damages."
6

7   The Court then said in Paragraph 184,

8
9           "In considering and applying the
10           factors pertaining to general
11           damages in this case it will be
12           remembered that the reports in the
13           press were widely circulated and the
14           television broadcast had a wide
15           coverage. The setting and the
16           persons involved gave the coverage
17           an air of credibility and
18           significance that must have
19           influenced all who saw and read the
20           accounts. The insidious harm of the
21           orchestrated libel was indeed spread
22           widely throughout the community."
23

24   In considering the issue of aggravated damages

25   Justice Cory again quoted from Gatley in

26   Paragraph 183.

27
28           "The conduct of the defendant, his
29           conduct of the case and his state of
30           mind are thus all matters which the
31           plaintiff may rely on his
32           aggravating the damages."
33

34           "Moreover it is very well
35           established that in cases where the

1    damages are at large the jury or the
2    judge, if the award is left to him,
3    can take into account the motives
4    and conduct of the defendant where
5    they aggravate the injury done to
6    the plaintiff. There may
7    malevolence or spite or the manner
8    of committing the wrong may be such
9    as to injure the plaintiffs' proper
10   feelings of dignity and pride.
11   These are matters which the jury can
12   take into account in assessing the
13   appropriate compensation."
14

15   "In awarding aggravated damages the
16   natural indignation of the Court at
17   the injury inflicted on the
18   plaintiff is a perfectly legitimate
19   motive in making it generous rather
20   than a more moderate award to
21   provide an adequate solution. That
22   is because the injury to the
23   plaintiff is actually greater and as
24   a result of the conduct, exciting
25   the indignation, demands a more
26   generous solatium."
27

28       The Court then referred to the aggravating

29   circumstances in that case at Paragraph 185.

30
31   "The misconduct of the Appellants
32   continued after the first
33   publication. Prior to the
34   commencement of the hearing of the
35   contempt motion before Justice
36   Cromarty, Scientology was aware that
37   the allegations it was making
38   against Casey Hill were false. Yet

---

1    it persisted with the contempt
2    hearings as did Morris Manning.  At
3    the conclusion of the contempt
4    hearing both appellants were aware
5    of the falsity of the allegations.
6    Nevertheless when the libel action
7    was instituted the defensive
8    justification was put forward by
9    both of them.  The statement of
10   defense alleging justification or
11   truth of the allegation was open for
12   all the public to see.  Despite
13   their knowledge of its falsity the
14   appellants continued to publish the
15   libel."
16

17   Finally the manner in which Hill was crossed

18   examined by the Appellant coupled with the manner

19   in which they presented their position to the

20   jury in light of their knowledge of the falsity

21   of their allegations are further aggravating

22   factors to be taken into account.

23           Justice Cory dealt with the issue of

24   aggravated damages in Paragraphs 188 and 189.

25
26   "Aggravated damages may be awarded
27   in circumstances where the
28   defendant's conduct has been
29   particularly high handed or
30   oppressive thereby increasing the
31   plaintiffs' humiliation and anxiety
32   arising from the libellous
33   statement."

1

2          The nature of these damages was aptly

3   described by Justice Robins in Walker v. CFTO

4   Limited in these words,

5

6              "Where the defendant is guilty of
7              insulting, high handed, spiteful,
8              malicious or oppressive conduct
9              which increase the mental distress
10             the humiliation and indignation,
11             anxiety, grief, fear and the like,
12             suffered by the plaintiff as a
13             result of being defamed, the
14             plaintiff may be entitled to what
15             has come to be known as aggravated
16             damages.  These damages take into
17             account the additional harm caused
18             to the plaintiffs' feeling by the
19             defendant's outrageous and malicious
20             conduct.  Like general or special
21             damages they are compensatory in
22             nature.  Their assessment requires
23             consideration by the jury of the
24             entire conduct of the defendant part
25             of the publication of the libel and
26             continuing through to the conclusion
27             of the trial.  They represent the
28             expression of natural indignation of
29             right-thinking people arising from
30             the malicious conduct of the
31             defendant."
32

33   In Paragraph 191 Justice Cory considered the

34   factors in that case that warranted an award of

35   aggravated damages.   There are a number of

1       factors that a jury may properly take into
2       account in assessing aggravated damages.  For
3       example, was there a withdrawal of the libellous
4       statement made by the defendants and an apology
5       tendered.  If there was this may go far to
6       establishing that there was no malicious conduct
7       on the part of the defendant warranting an award
8       of aggravated damages.  The jury may also
9       consider whether there was a repetition of the
10      libel, conduct that was calculated to deter the
11      plaintiff from proceeding with the libel action,
12      a prolonged and hostile examination of the
13      plaintiff or plea of justification which the
14      defendant knew was bound to fail.  The general
15      manner in which the defendant presented its case
16      is also relevant.  Further it is appropriate for
17      a jury to consider the conduct of the defendant
18      at the time of the publication of the libel.  For
19      example was it clearly aimed at obtaining the
20      widest possible publicity in circumstances that
21      were the most adverse possible to the plaintiff.

1        The Supreme Court of Canada also considered

2   the issue of punitive damages beginning at

3   Paragraph 196 where the Court said,

4

5            "Punitive damages may be awarded in

6            the situation where the defendant's

7            conduct is so malicious, oppressive

8            and high handed that it offends…"

9

10   — missing a page.  Can we just, we'll just go

11   off the record for a moment, I have to find the

12   rest of that quote.

13

14            [RECESS 10:47 — 10:48 A.M.]

15

16   THE COURT:      The Supreme Court of Canada

17   dealt with the issue of punitive damages

18   beginning at Paragraph 196, where the Court said,

19

20            "Punitive damages may be awarded in

21            situations where the defendant's

22            misconduct is so malicious,

23            oppressive and high handed that it

24            offends the Court's sense of

25            decency."

26

27        Punitive damages bear no relation to what

28   the plaintiff should receive by way of

1    compensation.  Their aim is not to compensate the

2    plaintiff but rather to punish the defendant.  It

3    is the means by which the jury or Judge expresses

4    its outrage at the egregious conduct of the

5    defendant.  They are in the nature of a fine

6    which is meant to act as a deterrent to the

7    defendant and to others from acting in this

8    manner.  It is important to emphasize that

9    punitive damages should only be awarded in those

10   circumstances where the combined award of general

11   and aggravated damages would be insufficient to

12   achieve the goal of punishment and deterrents.

13        One of the important factors for the Court

14   was set out in Paragraph 202,

15

16        "During the appeal it was conceded
17        and the evidence and events
18        confirmed that in all likelihood no
19        amount of general or aggravated
20        damages would have deterred
21        Scientology.  Clearly then this was
22        an appropriate case for an award of
23        punitive damages."
24

25        It is important that each case of

1   defamation must be looked at on its own facts and
2   the awards given in other decisions are therefore
3   not of much assistance.

4        The Supreme Court of Canada acknowledged
5   this in the Hill Decision in Paragraph 187.
6   Barrick Gold is a decision of the Ontario Court
7   of Appeal dealing with defamation in the internet
8   context.   Justice Blair said in Paragraph 28
9   about internet defamation,

10
11          "Is there something about defamation
12          on the internet, cyber libel as it's
13          sometimes called, that distinguishes
14          it for purposes of damages from
15          defamation in another medium?   My
16          response to that question is yes."
17

18   He referred to the principles set out in Hill and
19   then in Paragraph 30 quoted from an Australian
20   decision the quote, "Ambiguity, universality and
21   utility," of the internet.   He continued in
22   Paragraph 31,

23
24          "Thus of the criteria mentioned
25          above, the mode and extent of
26          publication is particularly relevant
27          in the internet context, and must be

1          considered carefully.  Communication
2          via the internet is instantaneous,
3          seamless,      interactive,      blunt,
4          borderless and far reaching.  It is
5          also impersonal  and  the  anonymous
6          nature of such communication has
7          made itself create a greater risk
8          that the defamatory remarks are
9          believed."
10

11     He then said in Paragraph 34,

12

13         "Internet      defamation       is
14         distinguished    from    its    less
15         pervasive cousins in terms of its
16         potential to damage the reputation
17         of individuals in corporations by
18         the    features    described    above
19         especially its interactive nature,
20         its potential for being taken at
21         face value and its absolute and
22         immediate worldwide  ubiquity  and
23         accessibility.  The mode and extent
24         of    publication    is    therefore
25         particularly          significant
26         consideration in assessing damages
27         in internet defamation cases."
28

29     In  Barrick  Gold  an  injunction  was  issued.

30     Justice Blair said in Paragraph 75,

31

32         "A highly transmissible nature of
33         the  tortious  misconduct  at  issue
34         here is a factor to be addressed in
35         considering  whether  a  permanent
36         injunction should be granted.  The
37         courts are faced with a dilemma.  On

1                the one hand they can throw up their
2                collective hands in despair taking
3                the view that enforcement against
4                such (inaudible due to mumbling…)
5                transmissions around the world is
6                ineffective and concluding therefore
7                that only the jurisdiction where the
8                originator of the communication may
9                happen to be found can enjoin the
10               offending conduct.  On the other
11               hand they can at least protect
12               against the impugned conduct in
13               their own jurisdiction."
14

15  In this respect I agree with the following

16  observation of Justice Kirby in Dow Jones,

17
18               "Any suggestion that there can be no
19               effective remedy for the tort of
20               defamation or other civil wrongs
21               committed by the use of the internet
22               or such wrongs must simply be
23               tolerated as the price to be paid
24               for the advantages of the medium is
25               self-evidently unacceptable."
26

27  A permanent injunction was granted and the Court

28  said in Paragraph 78,

29               "I would set aside the decision of
30               the motions judge in this regard and
31               grant a permanent injunction as
32               requested restraining the defendants
33               from disseminating, posting on the
34               internet or publishing further
35               defamatory statements concerning
36               Barrick or its officers, directors

1      or employees."
2

3          In Astley v. Verdun The Ontario Supreme
4      Court of Justice, Superior Court of Justice cited
5      Barrick Gold and ordered an injunction and a
6      mandatory injunction against the defendant.   In
7      that case the defendant stated that in spite of
8      jury verdict against him he would continue to
9      "disparage and discredit the reputation of the
10     plaintiff," quoting from Paragraph 16.
11         Justice Chapnik in that case said in
12     Paragraph 33,

13
14             "Injunctive relief is an exceptional
15             remedy that will not be imposed by
16             the Courts lightly.   I certainly
17             agree with the defendant when he
18             states that any form of prior
19             restraint on freedom of speech is
20             extremely serious and can only be
21             imposed in the clearest and rarest
22             of cases.   This however is one of
23             those cases."
24

25     He then outlined in Paragraph 34 the
26     circumstances of the case which caused him to
27     grant in injunction.   He said,

1
2        "This is so given the plaintiffs'
3        high reputation and position in the
4        business community and the wide
5        circulation of the defamatory
6        statements calculated to destroy
7        that reputation as well as the
8        strong likelihood that the
9        publishing of defamatory statements
10       against the plaintiff will continue
11       and the real possibility that the
12       plaintiff will not actually be
13       compensated by the payment of
14       damages."
15

16   A prudent injunction was granted and the Court

17   said in Paragraph 35,

18
19       "Accordingly I order a permanent
20       injunction to issue against the
21       defendant, J. Robert Verdun
22       restraining him from disseminating,
23       posting on the internet or
24       publishing in any manner whatsoever,
25       directly or indirectly, any
26       statements or comments about the
27       plaintiff Robert M. Astley."
28

29   He also granted a mandatory injunction.  He said

30   in Paragraph 36,

31

32       "There will also be a mandatory
33       injunction requiring the defendant
34       to forthwith remove his blog
35       postings dated April 29, 2011 and

1              May 2nd, 2011 from the internet and
2              any similar postings that refer to
3              the plaintiff directly or
4              indirectly."
5

6         In Mina Mar Group v. Divine Justice Perell
7   also quoted Barrick Gold. He granted an
8   injunction issuing out of an Ontario Court
9   against the defendant in New Jersey. He simply
10  said in Paragraph 28,

11
12             "In accordance with the above
13             authorities, I also grant a
14             permanent injunction restraining the
15             defendants from disseminating,
16             posting on the internet or
17             publishing further defamatory
18             statements concerning the
19             plaintiffs."
20

21        On the issue of invasion of privacy Mr.
22  Leary provided to the Court the recent decision
23  dated January 18th of 2012 of the Ontario Court
24  of Appeal in Jones v. Tsige in which the Court
25  concluded there is, at least in Ontario, a tort
26  of invasion, intrusion into seclusion otherwise
27  called invasion of privacy which is claimed by
28  the individual plaintiffs in this matter. The

1    facts in that case are very different from those

2    in this case.   The defendant had accused, had

3    accessed the plaintiff's personal banking

4    information on 174 occasions over a period of

5    four years.   However she did not publish or

6    distribute it but used it for her own purposes in

7    a dispute with the plaintiff's partner, the

8    former husband of the defendant.   She apologized

9    for her actions and the Court concluded she was

10   embarrassed and contrite.   The plaintiff claimed

11   $70,000 in damages for invasion of privacy and

12   exemplary damages of $20,000.  The Court said the

13   range of damages for this claim is up to $20,000

14   and awarded $10,000.

15       I am satisfied that in an appropriate case

16   in Nova Scotia there can be an award for invasion

17   of privacy or as the Ontario Court of Appeal

18   called it, the intrusion upon seclusion.   I must

19   determine if in this case it is warranted

20   considering the principles set out in Jones.   In

21   Jones there was no accompanying claim for

1    defamation   as   there   was   no   publication   of

2    defamatory statements about the plaintiff.

3         In  Nitsopoulos  v.  Wong  the  action  was  for

4    deceit   and   invasion  of  privacy.   The   action

5    concerned  gaining  entry  to  the  plaintiff's  home

6    and   publishing  information  gained  while  there.

7    The  action  was  brought  outside  the  limits,  the

8    time limits for a defamation action.

9          The   facts   in   this   case   are   that   Mr.

10   Handshoe,   on   his   blog,   disclosed   Mr.   Leary's

11   business  and  home  address  and  his  location  when

12   he   was   visiting   Spain.    With   respect   to   Mr.

13   Perret,  he  said  that  he  had  abandoned  his  mother

14   when  he  left  Louisiana  for  Canada  and  Mr.  Perret

15   said he was traumatized by this statement.

16         Mr.   Handshoe  made  extremely  derogatory  and

17   homophobic  comments  of  the  most  outrageous  kind

18   about  Mr.  Leary  and  Mr.  Perret  and  their  sexual

19   orientation  including  and  posting  as  what  I  will

20   refer   to   as   doctored   photographs   of   a   sexual

21   nature depicting them.

1           Invasion of privacy in the Jones case was
2       private and personal banking information having
3       been looked at many, many times.   That sort of
4       financial and banking information is not usually
5       disclosed by people even to their closest friends
6       yet another bank employee who was not known to
7       the   plaintiff   looked   at   her   private   bank
8       information on numerous occasions.

9           In Nitsopoulos the defendant posed as a maid
10      for a Toronto cleaning service so she could write
11      a   series   of   articles   for   the   Globe   and   Mail
12      entitled "Maid for a Month."   She gained access
13      to the plaintiff's home and her experiences are
14      profiled in the second of these articles.   The
15      article published private details about the life
16      of the plaintiffs that she gained while in their
17      home.   The plaintiffs alleged that they would not
18      have permitted the reporter into their home had
19      she not fraudulently misrepresented herself to
20      them.   They claimed that they suffered harm to
21      their dignity, interests and personal autonomy,

1   their personal and home security and their mental
2   wellbeing.    The Court refused to grant summary
3   judgment to the defendants which they had sought
4   on the basis that there was no cause of action
5   for invasion of privacy.
6        In the Jones case the Ontario Court of
7   Appeal dealt with the issue of whether Ontario
8   law recognized a cause of action for invasion of
9   privacy.    Justice Sharpe writing for the Court
10  said in Paragraph 15,

11
12              "Aspects of privacy have long been
13              protected by causes of action such
14              as breach of confidence, defamation,
15              breach of copyright, nuisance, and
16              various property rights.  Although
17              the individual's privacy interest is
18              a fundamental value underlying such
19              claims,   the   recognition   of   a
20              distinct right of action for breach
21              of privacy remains uncertain."
22

23       Justice Sharpe referred to an article by
24  William L. Prosser entitled Privacy which was
25  published in the California Law Review 383.   He
26  said there were four torts which were quoted in
27  Paragraph 18;

1

2          1.          Intrusion   upon   the   plaintiff's

3     seclusion   or   solitude,   or   into   his   private

4     affairs;

5          2.          Public   disclosure   of   embarrassing

6     private facts about the plaintiff;

7          3.          Publicity which places the plaintiff

8     in a false light in the public eye;

9          4.          Appropriation,   for   the   defendant's

10    advantage, of the plaintiff's name or likeness.

11

12         He said the most relevant of these is the

13    intrusion   upon   seclusion   and   he   quoted   in

14    Paragraph   19   its   definition   from   Restatement,

15    second restatement of torts as follows,

16
17                   "One   who   intentionally   intrudes,
18                   physically   or   otherwise,   upon   the
19                   seclusion of another or his private
20                   affairs   or   concerns,   is   subject   to
21                   liability to the other for invasion
22                   of   his   privacy,   if   the   invasion
23                   would   be   highly   offensive   to   a
24                   reasonable person."
25

26         He continued in Paragraph 20,

1
2          "The comment section of the
3          Restatement elaborates this
4          proposition and explains that the
5          tort includes physical intrusions
6          into private places as well as
7          listening or looking, with or
8          without mechanical aids, into the
9          plaintiff's private affairs. Of
10         particular relevance to this appeal,
11         is the observation that other non-
12         physical forms of investigation or
13         examination into private concerns
14         may be actionable. These include
15         opening private and personal mail or
16         examining a private bank account,
17         even though there is no publication
18         or other use of any kind of the
19         information obtained."
20

21         The decisions he then (inaudible due to

22    mumbling…)dealt largely with the collection of

23    personal data.   Chartered jurisprudence dealing

24    with privacy has focussed on search and seizure

25    in the criminal law context.

26         Justice Sharpe said in Paragraph 41 that

27    there are three distinct privacy interests, the

28    third being a relevant one in Jones.   That is the

29    informational privacy.   He quoted from the

30    Decision of the Queen v. Tessling in Paragraph 41

31    where the Supreme Court of Canada said,

1

2               "Beyond our bodies and the places
3               where we live and work, however,
4               lies the thorny question of how much
5               information about ourselves and
6               activities we are entitled to shield
7               from the curious eyes of the state.
8               This includes commercial information
9               locked in a safe kept in a
10             restaurant owned by the accused.
11             Informational privacy has been
12             defined as 'the claim of
13             individuals, groups, or institutions
14             to determine for themselves when,
15             how, and to what extent information
16             about them is communicated to
17             others.' Its protection is
18             predicated on the assumption that
19             all information about a person is,
20             in a fundamental way, his own for
21             him to communicate or retain as he
22             sees fit."

23

24    In Paragraph 44 he referred to the Universal

25    Declaration of Human Rights which provides,

26

27             "No one shall be subjected to
28             arbitrary interference with his
29             privacy, home or correspondence and
30             proclaims that everyone has the
31             right to the protection of the law
32             against such interference or
33             attacks."

34

35    Justice Sharpe said in Paragraph 45,

36

1                        "While the Charter does not apply to
2                        common law disputes between private
3                        individuals, the Supreme Court has
4                        acted on several occasions to
5                        develop the common law in a manner
6                        consistent with Charter values."
7
8
9      Justice Sharpe then reviewed privacy legislation

10    in Canada and the development of privacy law in

11    other jurisdictions.  He then said in Paragraph

12    67,

13
14                        "For over one hundred years,
15                        technological change has motivated
16                        the legal protection of the
17                        individual's right to privacy. In
18                        modern times, the pace of
19                        technological change has accelerated
20                        exponentially. Legal scholars such
21                        as Peter Burns have written of 'the
22                        pressing need to preserve privacy
23                        which is being threatened by science
24                        and technology to the point of
25                        surrender.' The internet and digital
26                        technology have brought an enormous
27                        change in the way we communicate and
28                        in our capacity to capture, store
29                        and retrieve information. As the
30                        facts of this case indicate,
31                        routinely kept electronic data bases
32                        render our most personal financial
33                        information vulnerable. Sensitive
34                        information as to our health is
35                        similarly available, as are records
36                        of the books we have borrowed or
37                        bought, the movies we have rented or
38                        downloaded, where we have shopped,

1    where we have travelled, and the
2    nature of our communications by cell
3    phone, e-mail or text message".
4

5    He then deals with law as it applied to the

6    case before the Court.  He said in Paragraph 71,

7

8    "The key features of this cause of
9    action are, first, that the
10   defendant's conduct must be
11   intentional, within which I would
12   include reckless; second that the
13   defendant must have invaded, without
14   lawful justification, the
15   plaintiff's private affairs or
16   concerns; and third, that a
17   reasonable person would regard the
18   invasion as highly offensive causing
19   distress, humiliation or anguish.
20   However, proof of harm to a
21   recognized economic interest is not
22   an element of the cause of action. I
23   return below to the question of
24   damages, but state here that I
25   believe it important to emphasize
26   that given the intangible nature of
27   the interest protected, damages for
28   intrusion upon seclusion will
29   ordinarily be measured by a modest
30   conventional sum."
31

32   He continued in Paragraph 72,

33
34   "These elements make it clear that
35   recognizing this cause of action
36   will not open the floodgates.  A

_____

1    claim for intrusion upon seclusion
2    will arise only for deliberate and
3    significant invasions of personal
4    privacy. Claims from individuals who
5    are sensitive or unusually concerned
6    about their privacy are excluded: it
7    is only intrusions into matters such
8    as one's financial or health
9    records, sexual practices and
10   orientation, employment, diary or
11   private correspondence that, viewed
12   objectively on the reasonable person
13   standard, can be described as highly
14   offensive."
15

16   He then referred to the competing claims of

17   freedom of expression and freedom of the press.

18   He said in Paragraph 73,

19
20   "Suffice it to say, no right to
21   privacy can be absolute and many
22   claims for the protection of privacy
23   will have to be reconciled with, or
24   even yield to, such competing
25   claims."
26

27   In Paragraph 87 Justice Sharpe set out the

28   considerations in determining damages where an

29   intrusion on seclusion has been found to exist.

30   In Jones there was no issue about freedom of

31   expression or freedom of the press.   The Ontario

32   Court of Appeal therefore did not have to

1    consider the balance to be struck between those
2    rights and privacy rights.

3         Justice Sharpe specifically mentioned
4    intrusion into matters involving a person's
5    sexual practices and orientation as being
6    possible subjects for a claim of intrusion upon
7    seclusion.  However he said these intrusions must
8    be viewed objectively and be viewed as highly
9    offensive.  Weight against this is freedom of
10   persons to express their opinions.

11        Certainly the comments made by Mr. Handshoe
12   deal with Mr. Leary's and Mr. Perret's sexual
13   orientation.  They're anti-gay and homophobic,
14   they were very upsetting to both as were the
15   doctored up photographs, they're highly
16   offensive.  However the issue of weighing the
17   effect of the intrusion on seclusion against the
18   issue of freedom of expression was not argued
19   before me.  In such circumstances I conclude this
20   is not an appropriate case for the award of
21   damages for intrusion of seclusion.

1        In this regard I note as well the comments

2    of Justice Cory in Hill where he said with

3    respect to defamation,

4
5                "Reputation is intimately related to
6                the right to privacy which has been
7                accorded constitutional protection."
8

9        This passage was also quoted by Justice

10   Sharpe in Paragraph 43 of the Jones decision.

11       Because this is also a defamation action I

12   conclude this is a further reason to leave the

13   issue of a cause of action for intrusion on

14   seclusion for another day in another proceeding.

15       Now turning to the damage award with respect

16   to Trout Point Lodge.   With respect to the

17   corporate plaintiff it is clear that a

18   corporation can be defamed.   Damages were awarded

19   to the Barrick Gold Corporation and to Dover

20   Investments Limited.   In the latter decision the

21   Court set out the principles in awarding damages

22   to a corporate plaintiff.

23       The Court said in Paragraph 19,

> "Damages for a corporate plaintiff
> are to compensate for the harm to
> its goodwill and business
> reputation. The factors to be
> considered in assessing damages
> include the defendant's conduct, his
> position and standing, the nature of
> the defamation, the absence of an
> apology or refusal to apologize and
> his conduct throughout up to and
> including at trial. In addition to
> general damages for defamation a
> corporate plaintiff may be entitled
> to special damages for specific
> economic loss. In addition general
> damages for defamation in
> exceptional cases a corporate
> plaintiff may be entitled to an
> award of punitive damages for
> malicious, oppressive and high-
> handed conduct. Punitive damages
> are intended to punish a defendant
> rather than compensate a plaintiff.
> Compensatory damages of substantial
> may also be considered punishment
> and should be taken into account
> when determining whether an award of
> punitive damages is warranted."

Trout Point Lodge has been stated to have been funded by money illegally obtained through Mr. Broussard and through the dishonest actions of Mr. Leary and Mr. Perret and getting money from ACOA and other investors. It has been said to be on the verge of bankruptcy. These are things

1    which would cause potential guests to decide not

2    to come to Trout Point Lodge.

3         The defamation in my view has harmed the

4    goodwill of the business and its business

5    reputation. It casts an unfavorable light on the

6    business which has otherwise received extremely

7    positive reviews in the Globe and Mail, the

8    National Post, US Today and the National

9    Geographic Traveler to mention just a few.

10        It has also been commended by well-known

11   publications such as Four Doors Guide to Atlantic

12   Canada and Forbes Traveller to name a few.

13        It has also been recognized as a Top 10

14   finalist in the National Geographic Society's

15   2009 Geo-tourism challenge. Some of this

16   information is included at Tab 5 of the evidence

17   submitted at the hearing.

18                Mr. Leary points out in Paragraph 8
19                of his affidavit, "In addition to
20                its membership and prestigious hotel
21                and restaurant association Relais
22                and Chateaux Trout Point has always
23                maintained a four and one half star
24                rating from Canada Select. It's the
25                only hotel in Atlantic Canada

1                        inspected and recommended by Conde
2                        Nast Johansens Guide and earned a
3                        five green key rating from the hotel
4                        association of Canada."
5

6        The defendant is persistent in his

7    statements that Trout Point Lodge is somehow

8    connected to the Jefferson Parish corruption

9    scandal and has benefitted financially from funds

10   illegally obtained.  The defendant knows that the

11   original story linking Mr. Broussard with Trout

12   Point Lodge has been retracted and an apology

13   published.  In the face of this the defamatory

14   comments continued.

15       Mr. Handshoe had refused to apologize or

16   retract and in fact has republished the original

17   statements and says they are true.  In addition

18   he has alleged that the business is on the verge

19   of bankruptcy and has received funds improperly.

20       All this has been done through the internet

21   which has the potential to reach untold numbers

22   of potential guests of Trout Point Lodge

23   throughout the world.

1   The defamation has gone on now for two years

2  and there is no indication that the defendant

3  intends to stop.   The defendant's conduct

4  throughout has been to attempt to destroy the

5  reputation of the business.

6   In my view it may be very difficult to

7  change the perception of Trout Point Lodge caused

8  by the defamation and its reputation as a world

9  class resort has been damaged.

10   I conclude that the appropriate award of

11  damages for the defamation of Trout Point Lodge

12  is $75,000.

13   The individual plaintiffs have been called

14  dishonest, part of money laundering scheme

15  involving Mr. Broussard and part of a political

16  corruption scandal involving Mr. Broussard which

17  is now the subject of FBI investigation.

18   They are said to have lied and misled ACOA

19  and the Court in the ACOA action. Mr. Leary has

20  said to have perjured himself in that litigation.

21  They are said to have misused the justice system

1    in Nova Scotia for their own purposes.  They are

2    referred to as participating in nefarious schemes

3    being   bag   holders   for   Mr.   Broussard,   being

4    unsuccessful businessmen who have had a series of

5    failed businesses and being conmen.

6        Mr. Leary has said they have changed their

7    patterns of running errands to avoid running into

8    people  who  may  ask  them  about  the  internet

9    information  published  about  them.   They  are

10   embarrassed and stressed by the defamation.

11       To  paraphrase  the  Supreme  Court  of  Canada

12   decision in Hill,

13
14            "They  will  never  know  who,  as  a
15            result  of  the  defamation,  still  has
16            a  lingering  suspicion  that  they  are
17            dishonest,  schemers  and  con  men  and
18            were  involved  with  Aaron  Broussard
19            in  the  political  corruption  of  which
20            he is accused.  They will never know
21            who  might  believe  that  they  are
22            without  integrity  and  were  involved
23            in criminal activity."
24

25       These   unfounded   statements   about   the

26   character, business dealings and financial acumen

27    of  these  businessmen  merit  an  award  of  damages

1    for each in the amount of $100,000.

2        Aggravated damages are beyond the damages

3    already awarded which are given when the injury

4    to a plaintiff are aggravated.   As Gatley on

5    libel and slander described it, they reflect a

6    natural indignation of the Court of the injury

7    inflicted.   As Justice Cory said in Hill they

8    take into account the additional harm caused to

9    the plaintiff's feelings by the defendant's

10    outrageous and malicious conduct.

11        Justice Cory in Hill considered the factors

12    in that case which the Court believed made such

13    an award by the jury in that case a reasonable

14    one.

15        I conclude that the following factors in

16    this case call for such an award here.   The

17    original story was retracted by the Times-

18    Picayune in New Orleans, nevertheless Mr.

19    Handshoe continued to spread the defamation.   He

20    then came up with additional statements

21    concerning events in Nova Scotia which defamed

1    the defendants beyond the original defamation.
2    He commented on other business ventures of the
3    plaintiffs and other legal matters in which they
4    were involved misrepresenting facts and attacking
5    the reputations with statements that they were
6    dishonest, fraudsters and liars. The widespread
7    defamatory continued to the date of this hearing
8    in a meeting well suited to spreading the
9    defamation far and wide to a vast number of
10   internet users.

11          Furthermore there was conduct by the
12   defendant in trying to stop the plaintiffs from
13   continuing their action against him. He
14   threatened to release dossiers of information he
15   had about the plaintiffs and other unnamed people
16   unless the action was discontinued. All of this
17   is outrageous conduct in the face of true facts
18   about the plaintiffs.

19          Malice is an essential element of an award
20   of aggravated damages and in this case malice is
21   alleged in the statement of claim in Paragraph 93

1    and other places and is therefore deemed admitted

2    by virtue of the default judgment.

3         I therefore award an additional $50,000 to

4    each of Mr. Leary and Mr. Perret in aggravated

5    damages to express the indignation of the court.

6         As the Supreme Court of Canada said in Hill,

7    punitive damages are not compensatory in nature

8    but are meant to punish the defendant.   There

9    must be a rational purpose in awarding punitive

10   damages.   In Hill the Supreme Court of Canada

11   considered    the    actions    of    the    Church    of

12   Scientology and its officers during the course of

13   the litigation and focussed on its oppressive and

14   high handed conduct and the malice of which it

15   acted throughout.

16        The defendant in this case continued his

17   defamation    after    the    newspaper    printed    a

18   retraction of its story linking Trout Point

19   Lodge, Mr. Leary and Mr. Perret with Aaron

20   Broussard and the serious criminal allegations

21   against him.   He redoubled his efforts after

1    being sued and continued his defamation after

2    judgment had been entered against him.    He

3    repeated the original defamatory statements.

4        Just prior to the hearing about damages

5    there were further defamatory statements.

6        Mr. Handshoe has stated that because of

7    legislation in the United States it would be

8    impossible for the plaintiffs to recover judgment

9    against him.    This is a factor in awarding

10    punitive damages.

11        I conclude there is a rational reason for

12    awarding punitive damages in this case for the

13    defendant's egregious misconduct which offends

14    the court's sense of decency.    It is to act as a

15    deterrent not only to Mr. Handshoe but also to

16    others who might be inclined to defame someone in

17    this fashion.

18        With respect to Trout Point Lodge I conclude

19    that the defamation award itself is an

20    appropriate award to punish the defendant for his

21    defamation of the corporate plaintiff.    With

1    respect to Mr. Leary and Mr. Perret I conclude

2    that there is a need for additional punishment of

3    the defendant because the defamation of them goes

4    beyond what has been said about the company.

5        In my view the award of general and

6    aggravated damages to Charles Leary and Vaughn

7    Perret is insufficient to properly denounce the

8    actions of Mr. Handshoe and serve the goal of

9    deterrence.

10       I therefore conclude that there should be an

11   additional $25,000 awarded to each of Charles

12   Leary and Vaughn Perret as punitive damages

13   against Mr. Handshoe.

14       I'm satisfied that an injunction should

15   issue.    The principles for granting of

16   injunctions in defamation cases were set out in

17   Astley.    Barrick Gold made it clear that

18   injunctions are available in cases of defamation.

19   In Astley Justice Chapnik said in Paragraph 21,

20

21           "Permanent injunctions have
22           consistently been ordered after

```
 1                    findings of defamation where either:
 2                    (1) there is a likelihood that the
 3                    defendant will continue to publish
 4                    defamatory statements despite the
 5                    finding that he is liable to the
 6                    plaintiff for defamation; or (2)
 7                    there is a real possibility that the
 8                    plaintiff will not receive any
 9                    compensation, given that enforcement
10                    against the defendant of any damage
11                    award may not be possible."
12
```

13          Applying these factors to this case I look

14     at the conduct of the defendant which, from the

15     beginning, was defamatory and continued with more

16     fervor after a retraction was printed, was

17     published.  It became stronger and more malicious

18     and derogatory as the action was commenced and as

19     it proceeded to this assessment of damages.

20     There's been no retraction or apology but a

21     continued campaign of defamation against these

22     plaintiffs and homophobic comments about their

23     sexual preference.

24          It is clear from the evidence before me that

25     Mr. Handshoe will continue to publish the

26     defamatory material.  He says he's protected from

27     foreign defamation judgments such as the default

1    judgment in this proceeding by legislation in the

2    United States.

3        It also may be difficult if not impossible

4    for the plaintiffs to recover on their judgment.

5    It's not known what assets Mr. Handshoe has or

6    whether enforcement in the U.S. on the monetary

7    judgment will be possible.

8        I therefore conclude that an injunction

9    should issue.  Mr. Handshoe is therefore enjoined

10   from  dissemination,  posting  on  the  internet,

11   distributing  or  publishing  in  any  manner

12   whatsoever,  directly or indirectly statements or

13   comments about Trout Point Lodge,  Charles Leary

14   and Vaughn Perret.  This includes statements or

15   comments which refer to the three plaintiffs by

16   name, depiction or description.  The mandatory

17   injunction shall  also  issue  requiring  Douglas

18   Handshoe  to  remove  the  defamatory  comments,

19   statements and depictions from any internet site

20   on which he has posted them and any links to

21   those sites.

1          The plaintiffs seek solicitor client costs
2     of these proceedings.   However they have not
3     retained the services of counsel but have
4     represented themselves throughout.   It is true
5     that Vaughn Perret is a law graduate and has
6     practised law.   However he has non-practising
7     status and has never been approved to practise
8     law in Nova Scotia.   I therefore cannot conclude
9     that solicitor client costs are warranted.   That
10    is not to say that self-represented parties are
11    not entitled to their costs.   In Nova Scotia it
12    has been said that costs can be awarded to self-
13    represented parties beginning with the decision
14    in MacBeth v. Dalhousie University and more
15    recently in the Court of Appeal decision in Crewe
16    v. Crewe.

17          I've awarded the costs in the modest amount
18    of $4,000 to self-represented parties in Salman
19    v. Al-Sheik Ali.   In that case the self-
20    represented parties took part in multi-party
21    litigation and were well prepared and did not

1      cause any delays of five and one half days.

2           I conclude that in the circumstances of this

3      case there should be a modest costs award to

4      reflect the time spent on this matter by the

5      individual plaintiffs.  They brought the matter

6      on to court and obtained a default judgment.

7      They were well prepared for the one half day

8      hearing to assess damages but it was unopposed.

9           I therefore award them costs in the total

10     amount of $2,000.

11          The self-represented parties of the Salman

12     matter were also entitled their disbursements as

13     are the plaintiffs in this case.   They however

14     have not provided me with their disbursements.

15     If they wish to provide that information I will

16     consider their out of pocket costs and render a

17     further brief decision.   I should note however

18     that the final order in this matter therefore

19     cannot be issued until that is done.

20          That concludes my oral decision and I guess

21     the only question I have for the parties is do

1   you wish to make a claim for the disbursements

2   which will mean that the order can't be issued in

3   this proceeding until that's done.

4        MALE VOICE:      No My Lady, we would forego

5   the out of pocket costs.

6        THE COURT:      Thank you, so the order can

7   be issued sooner rather than later.   Thank you,

8   that concludes the matter.

9

10        [END OF RECORDING 11:22 P.M.]

11

12

13

14

15

16

17

18

19

20

21

22

1

2

3

4                    <u>CERTIFICATE OF COURT TRANSCRIBER</u>
5

6   I, Rita Newton, Court Transcriber, hereby certify that

7   I have transcribed the foregoing and that it is a true

8   and accurate transcript of an oral decision given in

9   the matter of Trout Point Lodge versus Douglas

10  Handshoe, taken by way of electronic recording in

11  Halifax, Nova Scotia on February 1, 2012.

12

13                    _____

14                    Rita Newton, Certificate No. 2006-56

15                    CERTIFIED COURT TRANSCRIBER,
16                    PROVINCE OF NOVA SCOTIA
17

18                    Halifax, Nova Scotia

19                    February 20, 2012