CANADA                                                    YAR No.  353654

PROVINCE OF NOVA SCOTIA


IN THE SUPREME COURT OF NOVA SCOTIA


TROUT POINT LODGE LIMITED, VAUGHN PERRET AND
CHARLES LEARY
                                              PLAINTIFFS


— VERSUS —

DOUG K. HANDSHOE AND JANE DOE
(ANNEMARIEBOUDREAUX@YAHOO.COM)


                                              DEFENDANTS


────────────────────────────────────────────

DECISION

────────────────────────────────────────────

HEARD BEFORE:    The Honourable Justice Suzanne
                 Hood

COUNSEL:         Dr. Charles Leary Self-Represented
                 as Agent and Officer of Trout
                 Point Lodge Limited

PLACE:           Yarmouth JC1, Yarmouth, N.S.

DATE HEARD:      February 1, 2012

## INDEX
## TROUT POINT LODGE V. HANDSHOE
## FEBRUARY 1, 2012

Oral Decision   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## EXHIBITS

EXHIBIT    DESCRIPTION --------------------------PAGE

None

1          <u>FEBRUARY 1, 2012 AT 10:23 A.M.</u>

2

3          <u>THE COURT:</u>     We begin by saying that
4     because I am giving this decision orally I
5     reserve the right, should it be required to be
6     reduced to writing, to edit but not of course
7     change the substance of it.

8          Trout Point Lodge, Charles Leary and Vaughn
9     Perret have obtained default judgment against
10    Doug Handshoe in an action filed in August 2011
11    and amended in September 2011 for defamation,
12    invasion of privacy, injurious falsehood,
13    intentional interference with contractual
14    relations, intentional interference with economic
15    relations, intentional infliction of emotional
16    and mental distress and assault.     Default
17    judgment was entered on December 12, 2011 with
18    damages to be assessed.

19         The plaintiffs move for an assessment of
20    damages on January 12th, 2012.    Mr. Handshoe was
21    given notice of a hearing for the assessment of
22    damages.

1          The plaintiffs have provided a copy of a

2     FedEx tracking slip showing delivery to Mr.

3     Handshoe's home in Mississippi.   It notes the

4     materials were left at the house.   Efforts were

5     also made according to the testimony of Mr. Leary

6     to fax the documents to Mr. Handshoe's fax number

7     but the transmission was not complete as the fax

8     appeared to have been disconnected.   These

9     materials appear also to have been sent by email

10    and these documents are at Tab 3 to the materials

11    presented in evidence by Mr. Leary at the

12    hearing.   It appears from Mr. Handshoe's blog

13    that he had knowledge of the hearing since he

14    referred to receiving, "nastygrams," from Mr.

15    Leary and Mr. Perret in a blog dated January

16    17th, 2012.   Mr. Handshoe did not appear or

17    participate in the assessment of damages.

18          Default judgment is conclusive of a claim

19    set out in the statement of claim and that's in

20    the authority for that, among others, is E. Sands

21    and Associates versus Dextras Engineering.   The

1    amended statement of claim sets out in detail the

2    claims against Mr. Handshoe which are now to be

3    treated by this court as proven.  The statement

4    of claim lists many examples of the defamatory

5    comments made by Mr. Handshoe, below is a brief

6    summary of them.  The defamatory comments

7    originated with a news story which was published

8    in the Times-Picayune newspaper in Louisiana

9    about Jefferson Parish President Aaron Broussard

10    being involved in a political corruption scandal.

11    The plaintiffs were erroneously identified as

12    being connected with Mr. Broussard in a business

13    venture and Mr. Broussard was named in error as

14    owning Trout Point Lodge.  The allegations

15    against him are kickback schemes, money

16    laundering and fraud while in his office as

17    Parish President.

18        The defamatory comments later included

19    claims that Trout Point Lodge, Mr. Leary and Mr.

20    Perret had misled ACOA and that Mr. Leary

21    committed perjury in litigation with ACOA.  The

1    defamation continued with statements that Trout

2    Point Lodge was losing business or going bankrupt

3    because of the investigation of Mr. Broussard and

4    his inability to continue to support it.   Also

5    there were claims that Charles Leary and Vaughn

6    Perret had been involved in a series of

7    businesses which failed and are con men.   The

8    statements also contained anti-gay rhetoric and

9    homophobic comments.

10        After the original story was retracted by

11    the Louisiana newspaper that published it Mr.

12    Handshoe made statements that Mr. Leary and Mr.

13    Perret had improperly influenced it to retract

14    the story.   He also said that Mr. Leary and Mr.

15    Perret were improperly using the legal system by

16    commencing the defamation action.   Individual

17    plaintiffs have filed affidavits and in his

18    affidavit Mr. Leary has related incidents

19    affecting him and Trout Point Lodge.   He said in

20    that affidavit in Paragraph 26,

21
22            "Due to the publications on

```
 1                    Slabbed and by Mr. Handshoe
 2                    elsewhere on the internet I
 3                    have a very real fear that
 4                    anyone     performing     due
 5                    diligence on us as business
 6                    people or innkeepers will
 7                    discover and       believe
 8                    Handshoe's publications."
 9
10        He also said in Paragraph 27,
11
12                    "I felt embarrassed in my
13                    local community. Mr. Perret
14                    and I have at times, changes
15                    our usual shopping patterns in
16                    Yarmouth in order to avoid
17                    persons we consider friends
18                    who may have read the Slabbed
19                    publications."
20
21        He also testified about the stress of the
22        defamation on him in Paragraph 30 of the
23        affidavit where he said,
24
25                    "In April 2011 at the time when
26                    Handshoe's publication about us
27                    became threatening and homophobic I
28                    experienced tightened shoulder and
29                    neck muscles, sleeplessness and
30                    developed a severe outbreak of fever
31                    blisters for which I had to take
32                    Zovirax, and antiviral medication.
33                    Previously I always slept very well
34                    never waking up early. Since April
35                    2011 I have experienced regular
36                    sleeplessness particularly waking up
```

1                early in the morning worrying about
2                Slabbed and its effect on our
3                business."
4

5    His affidavit concluded with Paragraph 39 where

6    Mr. Leary says,

7
8                "I'm seriously concerned about
9                Slabbed hurting the Lodge's business
10               which Mr. Perret and I rely on as
11               our primary source of income. In
12               2011 occupancy rates at Trout Point
13               were three percent lower than in
14               2010. This represents a value of at
15               least $15,000."
16

17    Mr. Leary testified in court as well and his

18    evidence was about since the Notice of Action was

19    served and about the effect of the words of the

20    defendant on him and Trout Point Lodge. Mr.

21    Perret also filed an affidavit in which he stated

22    the effects of the defamation on him. He said in

23    his affidavit in Paragraphs 9 and 10,

24
25                "Mr. Handshoe's internet
26               publications have added a great deal
27               of stress to our lives including the
28               physical manifestations. I felt
29               genuinely afraid of his published
30               threats and of the existence of the
31               Slabbed Nation and members of that

1          group being in Nova Scotia.  I now
2          keep my doors locked at night
3          whereas previously I never feared
4          for my safety in my own home."
5

6    He says in his affidavit at Paragraph 11,

7

8          "I have told my personal physicians
9          in Spain and Nova Scotia about
10         stress and sleeplessness related to
11         the Handshoe publications.  My
12         physician Dr. Fernandez Negrara had
13         prescribed medication to help me
14         sleep after the Slabbed publications
15         commenced and to help control my
16         anxiety.  I have also experienced
17         embarrassment, humiliation and
18         irritability.  It was hard to get
19         through work in 2011 knowing that
20         nearly every day a new source of
21         embarrassment and business
22         disruption might be published by
23         Handshoe.  I've been embarrassed
24         that friends and acquaintances in
25         Yarmouth might confront me about the
26         Slabbed allegations.  I could never
27         be sure that members of the local
28         community might secretly harbour a
29         belief in the truth of the blogs
30         allegations."
31

32   In Paragraph 13 he says,

33

34         "Mr. Handshoe has also made
35         publications about my mother stating
36         that I "split" and left her with a
37         surrogate son in Louisiana.  I was
38         traumatized by his suggestions that

1       I had somewhat neglected or abused
2       my mother."
3

4   Mr. Perret also testified briefly, he said he had

5   lost his appetite in the last two weeks as a

6   result of the material which has been published

7   by Mr. Handshoe and the volume of it.   In

8   addition, materials were submitted to the court

9   which were testified to by Charles Leary.   These

10   included defamatory comments made after the

11   Louisiana newspaper printed a retraction of the

12   story.   They include references to a cover-up of

13   a crime and dirty secrets April 20th, 2011 that

14   Charles Leary and Vaughn Perret and others were

15   "bag holders" for Aaron Broussard and the

16   purported owners of Trout Point Lodge.   That same

17   blog referred to the fleecing of investors in

18   Trout Point Lodge by Mr. Broussard and his close

19   connection to Mr. Leary and Mr. Perret.   It also

20   refers to Charles Leary as a liar and a perjurer

21   in the litigation with ACOA.   And that blog was

22   April 26, 2011.

1        On August 15th, 2011 the blog refers to "a

2    Trout Point Lodge Jefferson Parish political

3    corruption scandal update" linking Trout Point

4    Lodge with the corruption scandal involving Aaron

5    Broussard. In that same blog he refers to Charles

6    Leary and Vaughn Perret in the context of "by

7    reporter, get a good story."

8        On August 16th his blog said that he was

9    meticulously laying down "the trail of scams and

10    political corruption that leads to Nova Scotia

11    and Trout Point Lodge."

12        After being served with a Notice of Action

13    further defamatory comments were made.  On August

14    18th he wrote,

15

16        "First class bitches, common thugs

17        or just plain old morons."

18

19    He also refers to the "elite fraternity of crooks

20    and miscreants" who have sued him.  On August

21    24th, 2011 he referred to "political wrongdoing

22    involving Leary and Perret in Canada and it had

23    nothing to do with Broussard per se."

1      He continues to make accusations of fraud

2    against them and in bilking local contractors.

3    He refers to "the chances Trout Point Lodge will

4    be bankrupt within a year" and he said that on

5    August 30th, 2011.  In the same blog he refers to

6    the "nefarious practices" of Charles Leary and

7    Vaughn Perret.  He refers to them being involved

8    in money laundering.  He calls them "grifters"

9    and "grafters."  He accuses them of fabricating

10   positive reviews of Trout Point Lodge.

11   Ultimately he links them with organized crime.

12      These types of comments continued throughout

13   2011 and further defamatory comments were made

14   earlier this month, January 2012, when the Notice

15   of Assessment of Damages was served on him.  I

16   mentioned a few additional postings as follows.

17   There's a posting from September 14th, 2011,

18
19               "I'll add here, in case it is not
20          self-evident that I bill complete
21          dossiers on all the players in this
22          social group and I intend through
23          time to roll out each and every one
24          in excruciating detail as long as
25          the lawsuit in Canada is an

1    outstanding issue for Slabbed.   The
2    reason for this is that this band of
3    gay men act as a unit that will also
4    scatter like cockroaches when the
5    heat is applied."
6

7   In January of 2012 the blog says,

8
9    "Some of those names of the property
10   owners at Trout Point have well
11   documented connections to organized
12   crime here in the U.S.   From my
13   standpoint flushing all this out
14   only gets better from here."
15

16   Another blog from September 14th, 2011, sorry,

17   no, that's the same one.   A blog from January

18   29th of 2012,

19
20   "When I'm done even Perret's niece
21   who filed an affidavit in that Fox 8
22   case will understand her uncle is a
23   grifting scumbag pussy."
24

25   And on January 26, 2012 the blog says, "He,"

26   meaning Daquila (sp), "also has enough stroke to

27   tell Charles and Vaughn what to do at Broussard's

28   request."

29        There are many, many more blogs which

30   contained defamatory materials such as this which

1    are included in the materials filed with the

2    Court on January 30th.

3        Turning to the hearing, a comprehensive

4    brief was filed with the Court with many case

5    authorities.  Mr. Leary made an oral submissions

6    to the Court outlining the principles the Court

7    should consider in deciding the quantum of

8    damages for defamation, aggravated damages and

9    punitive damages.  In addition he referred to a

10    recent Ontario Court of Appeal decision with

11    respect to invasion of privacy which is also

12    claimed by the individual plaintiffs.

13        In questioning by the Court, Mr. Leary said

14    that the plaintiffs' other claims are subsumed in

15    the Claim of Defamation, that is the claims were

16    intentional interference with economic relations

17    for intentional interference with contractual

18    relations and injurious falsehood.

19        Mr. Leary submits that the invasion of

20    privacy, assault and intentional infliction of

21    emotional and mental distress stand alone and

1    individual  plaintiffs  seek  damages  for  these

2    separate from the defamation in related claims.

3         The  plaintiffs  seek  damages  of  $250,000  for

4    each of  the  three  plaintiffs.   Aggravated damages

5    for  each individual plaintiff as well as punitive

6    damages.   They  say  that  their  original  demand  of

7    aggravated  damages  of  $300,000  each  should  be

8    increased because  the  amount  was  requested before

9    the   recent   defamatory   remarks   which   have

10   continued since default judgment was entered and

11   in particular since Mr. Handshoe was given notice

12   of the assessment of damages.   He said they would

13   seek special  damages for loss of business but it

14   is  too  difficult  to  prove  although  he  believes

15   they   have   lost   business   because   of   the

16   defamation.

17        In  addition,  the  individual  plaintiffs,  as

18   I've said,  seek damages for invasion of privacy.

19   In the Jones Decision the Ontario Court of Appeal

20   said  that  the  range  for  such  damages  is  up  to

21   $20,000.    In   that   case   the   Court   of   Appeal

1    awarded damages in the amount of $10,000. The

2    plaintiffs here say that the extent of the

3    invasion of privacy in that case was less than is

4    the case here. plaintiffs also seek an

5    injunction preventing further defamatory comments

6    and a mandatory injunction seeking to have the

7    existing comments removed.

8        The leading case on defamation in Canada is

9    the Supreme Court of Canada Decision is Hill v.

10    Church of Scientology of Toronto. In that case

11    Justice Cory writing for the majority referred to

12    the fact that the defamatory comments were

13    published on the local television news, reported

14    in the Globe and Mail and reported on by CBC. He

15    referred to the audience numbers of those media

16    outlets and said that the audience for the local

17    T.V. station was approximately 132,000. The

18    Globe circulation that day was 108,000 and the

19    CBC broadcast was seen by approximately 118,000.

20    He refers to that in Paragraph 26 of the

21    decision.

1    He said in Paragraph 108, and I quote,

2

3    "False allegations can so very
4    quickly and completely destroy a
5    good reputation. A reputation
6    tarnished by libel can seldom regain
7    its former lustre."

8

9    And he said with respect to defamatory statements

10   in Paragraph 166,

11

12   "A defamatory statement can seep
13   into the crevices of the
14   subconscious and lurk there, ever
15   ready to spring forth and spread its
16   cancerous evil. The unfortunate
17   impression left by a libel may last
18   a lifetime. Seldom does a defamed
19   person have the opportunity of
20   replying and correcting the record
21   in a manner that will truly remedy
22   the situation."

23

24   Justice Cory later said in Paragraph 178 with

25   respect to Mr. Hill,

26

27   "He would never know who, as a
28   result of the libellous statement,
29   had some lingering suspicion that he
30   was guilty of misconduct which was
31   criminal in nature. He would never
32   know who might have believed that he
33   was a person without integrity who
34   would act criminally in the
35   performance of his duties as a Crown

1       counsel.  He would never be certain
2       who would accept the allegation that
3       he was guilty of a criminal breach
4       of trust which was the essential
5       thrust of the libel."
6

7       In considering whether the jury award of damages

8       was appropriate, the Court quote from Gatley on

9       libel and slander in Paragraph 182.  In that text

10      the author states,

11
12      "The amount of damages is peculiarly
13      the province of the jury who in
14      assessing them will naturally be
15      governed by all the circumstances of
16      the particular case.  They're
17      entitled to take into their
18      consideration the conduct of the
19      plaintiff, his position in standing,
20      the nature of the libel, the mode
21      and extent of publication, the
22      absence or refusal of any retraction
23      or apology and 'the whole conduct of
24      the defendant from the time the
25      libel was published down to the very
26      moment of their verdict.  They may
27      take into consideration the conduct
28      of the defendant before action,
29      after action and in court on the
30      trial of the action.'  And also it
31      is submitted that the conduct of his
32      counsel who cannot shelter his
33      client by taking responsibility for
34      the conduct of the case.  They
35      should also allow 'for the sad truth
36      that no apology, retraction or
37      withdrawal can ever be guaranteed

1      completely to undo the harm it has
2      done or the hurt it has caused.'
3      They should also take into account
4      the evidence led in aggravation or
5      litigation of the damages."
6

7  The Court then said in Paragraph 184,

8
9      "In considering and applying the
10     factors pertaining to general
11     damages in this case it will be
12     remembered that the reports in the
13     press were widely circulated and the
14     television broadcast had a wide
15     coverage. The setting and the
16     persons involved gave the coverage
17     an air of credibility and
18     significance that must have
19     influenced all who saw and read the
20     accounts. The insidious harm of the
21     orchestrated libel was indeed spread
22     widely throughout the community."
23

24  In considering the issue of aggravated damages

25  Justice Cory again quoted from Gatley in

26  Paragraph 183.

27
28     "The conduct of the defendant, his
29     conduct of the case and his state of
30     mind are thus all matters which the
31     plaintiff may rely on his
32     aggravating the damages."
33

34     "Moreover it is very well
35     established that in cases where the

1      damages are at large the jury or the
2      judge, if the award is left to him,
3      can take into account the motives
4      and conduct of the defendant where
5      they aggravate the injury done to
6      the plaintiff. There may
7      malevolence or spite or the manner
8      of committing the wrong may be such
9      as to injure the plaintiffs' proper
10     feelings of dignity and pride.
11     These are matters which the jury can
12     take into account in assessing the
13     appropriate compensation."
14

15     "In awarding aggravated damages the
16     natural indignation of the Court at
17     the injury inflicted on the
18     plaintiff is a perfectly legitimate
19     motive in making it generous rather
20     than a more moderate award to
21     provide an adequate solution. That
22     is because the injury to the
23     plaintiff is actually greater and as
24     a result of the conduct, exciting
25     the indignation, demands a more
26     generous solatium."
27

28     The Court then referred to the aggravating

29     circumstances in that case at Paragraph 185.

30
31     "The misconduct of the Appellants
32     continued after the first
33     publication. Prior to the
34     commencement of the hearing of the
35     contempt motion before Justice
36     Cromarty, Scientology was aware that
37     the allegations it was making
38     against Casey Hill were false. Yet

1         it persisted with the contempt
2         hearings as did Morris Manning.  At
3         the conclusion of the contempt
4         hearing both appellants were aware
5         of the falsity of the allegations.
6         Nevertheless when the libel action
7         was instituted the defensive
8         justification was put forward by
9         both of them.  The statement of
10        defense alleging justification or
11        truth of the allegation was open for
12        all the public to see.  Despite
13        their knowledge of its falsity the
14        appellants continued to publish the
15        libel."
16

17     Finally the manner in which Hill was crossed

18  examined by the Appellant coupled with the manner

19  in which they presented their position to the

20  jury in light of their knowledge of the falsity

21  of their allegations are further aggravating

22  factors to be taken into account.

23         Justice Cory dealt with the issue of

24  aggravated damages in Paragraphs 188 and 189.

25
26         "Aggravated damages may be awarded
27         in circumstances where the
28         defendant's conduct has been
29         particularly high handed or
30         oppressive thereby increasing the
31         plaintiffs' humiliation and anxiety
32         arising from the libellous
33         statement."

1

2      The nature of these damages was aptly

3   described by Justice Robins in Walker v. CFTO

4   Limited in these words,

5

6            "Where the defendant is guilty of
7            insulting, high handed, spiteful,
8            malicious or oppressive conduct
9            which increase the mental distress
10           the humiliation and indignation,
11           anxiety, grief, fear and the like,
12           suffered by the plaintiff as a
13           result of being defamed, the
14           plaintiff may be entitled to what
15           has come to be known as aggravated
16           damages.  These damages take into
17           account the additional harm caused
18           to the plaintiffs' feeling by the
19           defendant's outrageous and malicious
20           conduct.  Like general or special
21           damages they are compensatory in
22           nature.  Their assessment requires
23           consideration by the jury of the
24           entire conduct of the defendant part
25           of the publication of the libel and
26           continuing through to the conclusion
27           of the trial.  They represent the
28           expression of natural indignation of
29           right-thinking people arising from
30           the malicious conduct of the
31           defendant."
32

33   In Paragraph 191 Justice Cory considered the

34   factors in that case that warranted an award of

35   aggravated damages.    There are a number of

1    factors that a jury may properly take into

2    account in assessing aggravated damages.   For

3    example, was there a withdrawal of the libellous

4    statement made by the defendants and an apology

5    tendered.   If there was this may go far to

6    establishing that there was no malicious conduct

7    on the part of the defendant warranting an award

8    of aggravated damages.   The jury may also

9    consider whether there was a repetition of the

10   libel, conduct that was calculated to deter the

11   plaintiff from proceeding with the libel action,

12   a prolonged and hostile examination of the

13   plaintiff or plea of justification which the

14   defendant knew was bound to fail.   The general

15   manner in which the defendant presented its case

16   is also relevant.   Further it is appropriate for

17   a jury to consider the conduct of the defendant

18   at the time of the publication of the libel.   For

19   example was it clearly aimed at obtaining the

20   widest possible publicity in circumstances that

21   were the most adverse possible to the plaintiff.

1        The Supreme Court of Canada also considered

2    the issue of punitive damages beginning at

3    Paragraph 196 where the Court said,

4
5            "Punitive damages may be awarded in
6            the situation where the defendant's
7            conduct is so malicious, oppressive
8            and high handed that it offends…"
9

10    — missing a page.  Can we just, we'll just go

11    off the record for a moment, I have to find the

12    rest of that quote.

13
14            [RECESS 10:47 – 10:48 A.M.]
15

16    THE COURT:      The Supreme Court of Canada

17    dealt with the issue of punitive damages

18    beginning at Paragraph 196, where the Court said,

19

20            "Punitive damages may be awarded in
21            situations where the defendant's
22            misconduct is so malicious,
23            oppressive and high handed that it
24            offends the Court's sense of
25            decency."
26

27        Punitive damages bear no relation to what

28    the plaintiff should receive by way of

1    compensation.  Their aim is not to compensate the

2    plaintiff but rather to punish the defendant.  It

3    is the means by which the jury or Judge expresses

4    its  outrage  at  the  egregious  conduct  of  the

5    defendant.  They  are  in  the  nature  of  a  fine

6    which is  meant  to  act  as  a  deterrent  to  the

7    defendant  and  to  others  from  acting  in  this

8    manner.  It  is  important  to  emphasize  that

9    punitive damages should only be awarded in those

10    circumstances where the combined award of general

11    and aggravated damages would be insufficient to

12    achieve the goal of punishment and deterrents.

13         One of the important factors for the Court

14    was set out in Paragraph 202,

15

16               "During the appeal it was conceded
17               and  the  evidence  and  events
18               confirmed that in all likelihood no
19               amount  of  general  or  aggravated
20               damages  would  have  deterred
21               Scientology.  Clearly then this was
22               an  appropriate  case  for  an  award  of
23               punitive damages."
24

25               It  is  important  that  each  case  of

1    defamation must be looked at on its own facts and
2    the awards given in other decisions are therefore
3    not of much assistance.

4         The Supreme Court of Canada acknowledged
5    this in the Hill Decision in Paragraph 187.
6    Barrick Gold is a decision of the Ontario Court
7    of Appeal dealing with defamation in the internet
8    context.   Justice Blair said in Paragraph 28
9    about internet defamation,

10
11        "Is there something about defamation
12        on the internet, cyber libel as it's
13        sometimes called, that distinguishes
14        it for purposes of damages from
15        defamation in another medium?   My
16        response to that question is yes."
17

18   He referred to the principles set out in Hill and
19   then in Paragraph 30 quoted from an Australian
20   decision the quote, "Ambiguity, universality and
21   utility," of the internet.   He continued in
22   Paragraph 31,

23
24        "Thus of the criteria mentioned
25        above, the mode and extent of
26        publication is particularly relevant
27        in the internet context, and must be

1   considered carefully.  Communication
2   via the internet is instantaneous,
3   seamless,      interactive,      blunt,
4   borderless and far reaching.  It is
5   also impersonal  and  the  anonymous
6   nature  of  such  communication  has
7   made  itself  create  a  greater  risk
8   that  the  defamatory  remarks  are
9   believed."
10

11   He then said in Paragraph 34,

12
13   "Internet        defamation        is
14   distinguished     from     its     less
15   pervasive  cousins  in  terms  of  its
16   potential  to  damage  the  reputation
17   of  individuals  in  corporations  by
18   the    features    described    above
19   especially  its  interactive  nature,
20   its  potential  for  being  taken  at
21   face  value  and  its  absolute  and
22   immediate  worldwide  ubiquity  and
23   accessibility.  The  mode  and  extent
24   of    publication    is    therefore
25   particularly          significant
26   consideration  in  assessing  damages
27   in internet defamation cases."
28

29   In  Barrick  Gold  an  injunction  was  issued.

30   Justice Blair said in Paragraph 75,

31
32   "A  highly  transmissible  nature  of
33   the  tortious  misconduct  at  issue
34   here  is  a  factor  to  be  addressed  in
35   considering  whether  a  permanent
36   injunction  should  be  granted.  The
37   courts  are  faced  with  a  dilemma.  On

1          the one hand they can throw up their
2          collective hands in despair taking
3          the view that enforcement against
4          such (inaudible due to mumbling…)
5          transmissions around the world is
6          ineffective and concluding therefore
7          that only the jurisdiction where the
8          originator of the communication may
9          happen to be found can enjoin the
10         offending conduct.  On the other
11         hand they can at least protect
12         against the impugned conduct in
13         their own jurisdiction."
14

15   In this respect I agree with the following

16   observation of Justice Kirby in Dow Jones,

17
18         "Any suggestion that there can be no
19         effective remedy for the tort of
20         defamation or other civil wrongs
21         committed by the use of the internet
22         or such wrongs must simply be
23         tolerated as the price to be paid
24         for the advantages of the medium is
25         self-evidently unacceptable."
26

27   A permanent injunction was granted and the Court

28   said in Paragraph 78,

29         "I would set aside the decision of
30         the motions judge in this regard and
31         grant a permanent injunction as
32         requested restraining the defendants
33         from disseminating, posting on the
34         internet or publishing further
35         defamatory statements concerning
36         Barrick or its officers, directors

1    or employees."
2

3        In Astley v. Verdun The Ontario Supreme

4    Court of Justice, Superior Court of Justice cited

5    Barrick Gold and ordered an injunction and a

6    mandatory injunction against the defendant.   In

7    that case the defendant stated that in spite of

8    jury verdict against him he would continue to

9    "disparage and discredit the reputation of the

10   plaintiff," quoting from Paragraph 16.

11       Justice Chapnik in that case said in

12   Paragraph 33,

13
14               "Injunctive relief is an exceptional
15               remedy that will not be imposed by
16               the Courts lightly.   I certainly
17               agree with the defendant when he
18               states that any form of prior
19               restraint on freedom of speech is
20               extremely serious and can only be
21               imposed in the clearest and rarest
22               of cases.   This however is one of
23               those cases."
24

25   He then outlined in Paragraph 34 the

26   circumstances of the case which caused him to

27   grant in injunction.   He said,

1
2          "This is so given the plaintiffs'
3          high reputation and position in the
4          business community and the wide
5          circulation of the defamatory
6          statements calculated to destroy
7          that reputation as well as the
8          strong likelihood that the
9          publishing of defamatory statements
10         against the plaintiff will continue
11         and the real possibility that the
12         plaintiff will not actually be
13         compensated by the payment of
14         damages."
15

16    A prudent injunction was granted and the Court

17    said in Paragraph 35,

18
19         "Accordingly I order a permanent
20         injunction to issue against the
21         defendant, J. Robert Verdun
22         restraining him from disseminating,
23         posting on the internet or
24         publishing in any manner whatsoever,
25         directly or indirectly, any
26         statements or comments about the
27         plaintiff Robert M. Astley."
28

29    He also granted a mandatory injunction.  He said

30    in Paragraph 36,

31

32         "There will also be a mandatory
33         injunction requiring the defendant
34         to forthwith remove his blog
35         postings dated April 29, 2011 and

1                May 2nd, 2011 from the internet and
2                any similar postings that refer to
3                the plaintiff directly or
4                indirectly."
5

6        In Mina Mar Group v. Divine Justice Perell

7    also quoted Barrick Gold.  He granted an

8    injunction issuing out of an Ontario Court

9    against the defendant in New Jersey.  He simply

10   said in Paragraph 28,

11
12                "In accordance with the above
13                authorities, I also grant a
14                permanent injunction restraining the
15                defendants from disseminating,
16                posting on the internet or
17                publishing further defamatory
18                statements concerning the
19                plaintiffs."
20

21        On the issue of invasion of privacy Mr.

22   Leary provided to the Court the recent decision

23   dated January 18th of 2012 of the Ontario Court

24   of Appeal in Jones v. Tsige in which the Court

25   concluded there is, at least in Ontario, a tort

26   of invasion, intrusion into seclusion otherwise

27   called invasion of privacy which is claimed by

28   the individual plaintiffs in this matter.  The

1    facts in that case are very different from those
2    in this case.    The defendant had accused, had
3    accessed   the   plaintiff's   personal   banking
4    information on 174 occasions over a period of
5    four years.    However she did not publish or
6    distribute it but used it for her own purposes in
7    a   dispute   with   the   plaintiff's   partner,   the
8    former husband of the defendant.   She apologized
9    for her actions and the Court concluded she was
10   embarrassed and contrite.    The plaintiff claimed
11   $70,000 in damages for invasion of privacy and
12   exemplary damages of $20,000.   The Court said the
13   range of damages for this claim is up to $20,000
14   and awarded $10,000.

15       I am satisfied that in an appropriate case
16   in Nova Scotia there can be an award for invasion
17   of privacy or as the Ontario Court of Appeal
18   called it, the intrusion upon seclusion.   I must
19   determine   if   in   this   case   it   is   warranted
20   considering the principles set out in Jones.   In
21   Jones   there   was   no   accompanying   claim   for

1      defamation   as   there   was   no   publication   of

2      defamatory statements about the plaintiff.

3          In  Nitsopoulos  v.  Wong  the  action  was  for

4      deceit   and   invasion  of  privacy.   The   action

5      concerned  gaining  entry  to  the  plaintiff's  home

6      and  publishing  information  gained  while  there.

7      The  action  was  brought  outside  the  limits,  the

8      time limits for a defamation action.

9          The   facts   in   this   case   are   that   Mr.

10     Handshoe,   on   his   blog,   disclosed   Mr.   Leary's

11     business  and  home  address  and  his  location  when

12     he   was   visiting   Spain.    With   respect   to   Mr.

13     Perret,  he  said  that  he  had  abandoned  his  mother

14     when  he  left  Louisiana  for  Canada  and  Mr.  Perret

15     said he was traumatized by this statement.

16         Mr.  Handshoe  made  extremely  derogatory  and

17     homophobic  comments  of  the  most  outrageous  kind

18     about  Mr.  Leary  and  Mr.  Perret  and  their  sexual

19     orientation  including  and  posting  as  what  I  will

20     refer  to  as  doctored  photographs  of  a  sexual

21     nature depicting them.

1          Invasion of privacy in the Jones case was
2     private and personal banking information having
3     been looked at many, many times.   That sort of
4     financial and banking information is not usually
5     disclosed by people even to their closest friends
6     yet another bank employee who was not known to
7     the plaintiff looked at her private bank
8     information on numerous occasions.

9          In Nitsopoulos the defendant posed as a maid
10    for a Toronto cleaning service so she could write
11    a series of articles for the Globe and Mail
12    entitled "Maid for a Month."   She gained access
13    to the plaintiff's home and her experiences are
14    profiled in the second of these articles.   The
15    article published private details about the life
16    of the plaintiffs that she gained while in their
17    home.   The plaintiffs alleged that they would not
18    have permitted the reporter into their home had
19    she not fraudulently misrepresented herself to
20    them.   They claimed that they suffered harm to
21    their dignity, interests and personal autonomy,

1    their personal and home security and their mental

2    wellbeing.   The Court refused to grant summary

3    judgment to the defendants which they had sought

4    on the basis that there was no cause of action

5    for invasion of privacy.

6         In the Jones case the Ontario Court of

7    Appeal dealt with the issue of whether Ontario

8    law recognized a cause of action for invasion of

9    privacy.   Justice Sharpe writing for the Court

10   said in Paragraph 15,

12            "Aspects of privacy have long been
13            protected by causes of action such
14            as breach of confidence, defamation,
15            breach of copyright, nuisance, and
16            various property rights.  Although
17            the individual's privacy interest is
18            a fundamental value underlying such
19            claims, the recognition of a
20            distinct right of action for breach
21            of privacy remains uncertain."

23        Justice Sharpe referred to an article by

24   William L. Prosser entitled Privacy which was

25   published in the California Law Review 383.   He

26   said there were four torts which were quoted in

27   Paragraph 18;

1

2         1.      Intrusion upon the plaintiff's

3      seclusion or solitude, or into his private

4      affairs;

5         2.      Public disclosure of embarrassing

6      private facts about the plaintiff;

7         3.      Publicity which places the plaintiff

8      in a false light in the public eye;

9         4.      Appropriation, for the defendant's

10     advantage, of the plaintiff's name or likeness.

11

12        He said the most relevant of these is the

13    intrusion upon seclusion and he quoted in

14    Paragraph 19 its definition from Restatement,

15    second restatement of torts as follows,

16
17               "One who intentionally intrudes,
18               physically or otherwise, upon the
19               seclusion of another or his private
20               affairs or concerns, is subject to
21               liability to the other for invasion
22               of his privacy, if the invasion
23               would be highly offensive to a
24               reasonable person."
25

26        He continued in Paragraph 20,

1
2      "The comment section of the
3      Restatement elaborates this
4      proposition and explains that the
5      tort includes physical intrusions
6      into private places as well as
7      listening or looking, with or
8      without mechanical aids, into the
9      plaintiff's private affairs. Of
10     particular relevance to this appeal,
11     is the observation that other non-
12     physical forms of investigation or
13     examination into private concerns
14     may be actionable. These include
15     opening private and personal mail or
16     examining a private bank account,
17     even though there is no publication
18     or other use of any kind of the
19     information obtained."
20
21     The decisions he then (inaudible due to

22     mumbling...)dealt largely with the collection of

23     personal data.   Chartered jurisprudence dealing

24     with privacy has focussed on search and seizure

25     in the criminal law context.

26     Justice Sharpe said in Paragraph 41 that

27     there are three distinct privacy interests, the

28     third being a relevant one in Jones.   That is the

29     informational privacy.   He quoted from the

30     Decision of the Queen v. Tessling in Paragraph 41

31     where the Supreme Court of Canada said,

1

2          "Beyond our bodies and the places
3          where we live and work, however,
4          lies the thorny question of how much
5          information about ourselves and
6          activities we are entitled to shield
7          from the curious eyes of the state.
8          This includes commercial information
9          locked in a safe kept in a
10         restaurant owned by the accused.
11         Informational privacy has been
12         defined as 'the claim of
13         individuals, groups, or institutions
14         to determine for themselves when,
15         how, and to what extent information
16         about them is communicated to
17         others.' Its protection is
18         predicated on the assumption that
19         all information about a person is,
20         in a fundamental way, his own for
21         him to communicate or retain as he
22         sees fit."
23

24  In Paragraph 44 he referred to the Universal

25  Declaration of Human Rights which provides,

26
27         "No one shall be subjected to
28         arbitrary interference with his
29         privacy, home or correspondence and
30         proclaims that everyone has the
31         right to the protection of the law
32         against such interference or
33         attacks."
34

35  Justice Sharpe said in Paragraph 45,

36

1    "While the Charter does not apply to
2    common law disputes between private
3    individuals, the Supreme Court has
4    acted on several occasions to
5    develop the common law in a manner
6    consistent with Charter values."
7
8
9    Justice Sharpe then reviewed privacy legislation

10   in Canada and the development of privacy law in

11   other jurisdictions.   He then said in Paragraph

12   67,

13
14   "For over one hundred years,
15   technological change has motivated
16   the legal protection of the
17   individual's right to privacy. In
18   modern times, the pace of
19   technological change has accelerated
20   exponentially. Legal scholars such
21   as Peter Burns have written of 'the
22   pressing need to preserve privacy
23   which is being threatened by science
24   and technology to the point of
25   surrender.' The internet and digital
26   technology have brought an enormous
27   change in the way we communicate and
28   in our capacity to capture, store
29   and retrieve information. As the
30   facts of this case indicate,
31   routinely kept electronic data bases
32   render our most personal financial
33   information vulnerable. Sensitive
34   information as to our health is
35   similarly available, as are records
36   of the books we have borrowed or
37   bought, the movies we have rented or
38   downloaded, where we have shopped,

1    where we have travelled, and the
2    nature of our communications by cell
3    phone, e-mail or text message".
4

5        He then deals with law as it applied to the

6    case before the Court.  He said in Paragraph 71,

7

8        "The key features of this cause of
9        action are, first, that the
10       defendant's conduct must be
11       intentional, within which I would
12       include reckless; second that the
13       defendant must have invaded, without
14       lawful justification, the
15       plaintiff's private affairs or
16       concerns; and third, that a
17       reasonable person would regard the
18       invasion as highly offensive causing
19       distress, humiliation or anguish.
20       However, proof of harm to a
21       recognized economic interest is not
22       an element of the cause of action. I
23       return below to the question of
24       damages, but state here that I
25       believe it important to emphasize
26       that given the intangible nature of
27       the interest protected, damages for
28       intrusion upon seclusion will
29       ordinarily be measured by a modest
30       conventional sum."
31

32   He continued in Paragraph 72,

33

34       "These elements make it clear that
35       recognizing this cause of action
36       will not open the floodgates. A

```
1      claim for intrusion upon seclusion
2      will arise only for deliberate and
3      significant invasions of personal
4      privacy. Claims from individuals who
5      are sensitive or unusually concerned
6      about their privacy are excluded: it
7      is only intrusions into matters such
8      as    one's    financial    or    health
9      records,    sexual    practices    and
10     orientation,    employment,    diary    or
11     private correspondence that, viewed
12     objectively on the reasonable person
13     standard, can be described as highly
14     offensive."
15
```

16      He then referred to the competing claims of

17      freedom of expression and freedom of the press.

18      He said in Paragraph 73,

```
19
20     "Suffice it to say, no right to
21     privacy can be absolute and many
22     claims for the protection of privacy
23     will have to be reconciled with, or
24     even yield to, such competing
25     claims."
26
```

27      In Paragraph 87 Justice Sharpe set out the

28      considerations in determining damages where an

29      intrusion on seclusion has been found to exist.

30      In Jones there was no issue about freedom of

31      expression or freedom of the press.   The Ontario

32      Court of Appeal therefore did not have to

1    consider the balance to be struck between those

2    rights and privacy rights.

3        Justice Sharpe specifically mentioned

4    intrusion into matters involving a person's

5    sexual practices and orientation as being

6    possible subjects for a claim of intrusion upon

7    seclusion.  However he said these intrusions must

8    be viewed objectively and be viewed as highly

9    offensive.  Weight against this is freedom of

10   persons to express their opinions.

11       Certainly the comments made by Mr. Handshoe

12   deal with Mr. Leary's and Mr. Perret's sexual

13   orientation.  They're anti-gay and homophobic,

14   they were very upsetting to both as were the

15   doctored up photographs, they're highly

16   offensive.  However the issue of weighing the

17   effect of the intrusion on seclusion against the

18   issue of freedom of expression was not argued

19   before me.  In such circumstances I conclude this

20   is not an appropriate case for the award of

21   damages for intrusion of seclusion.

---

1          In this regard I note as well the comments

2      of Justice Cory in Hill where he said with

3      respect to defamation,

4

5              "Reputation is intimately related to

6              the right to privacy which has been

7              accorded constitutional protection."

8

9          This passage was also quoted by Justice

10     Sharpe in Paragraph 43 of the Jones decision.

11         Because this is also a defamation action I

12     conclude this is a further reason to leave the

13     issue of a cause of action for intrusion on

14     seclusion for another day in another proceeding.

15         Now turning to the damage award with respect

16     to Trout Point Lodge.   With respect to the

17     corporate plaintiff it is clear that a

18     corporation can be defamed.   Damages were awarded

19     to the Barrick Gold Corporation and to Dover

20     Investments Limited.   In the latter decision the

21     Court set out the principles in awarding damages

22     to a corporate plaintiff.

23         The Court said in Paragraph 19,

1
2            "Damages for a corporate plaintiff
3            are to compensate for the harm to
4            its goodwill and business
5            reputation. The factors to be
6            considered in assessing damages
7            include the defendant's conduct, his
8            position and standing, the nature of
9            the defamation, the absence of an
10           apology or refusal to apologize and
11           his conduct throughout up to and
12           including at trial. In addition to
13           general damages for defamation a
14           corporate plaintiff may be entitled
15           to special damages for specific
16           economic loss. In addition general
17           damages for defamation in
18           exceptional cases a corporate
19           plaintiff may be entitled to an
20           award of punitive damages for
21           malicious, oppressive and high-
22           handed conduct. Punitive damages
23           are intended to punish a defendant
24           rather than compensate a plaintiff.
25           Compensatory damages of substantial
26           may also be considered punishment
27           and should be taken into account
28           when determining whether an award of
29           punitive damages is warranted."
30

31  Trout Point Lodge has been stated to have been

32  funded by money illegally obtained through Mr.

33  Broussard and through the dishonest actions of

34  Mr. Leary and Mr. Perret and getting money from

35  ACOA and other investors.  It has been said to be

36  on the verge of bankruptcy.  These are things

---

1    which would cause potential guests to decide not
2    to come to Trout Point Lodge.

3        The defamation in my view has harmed the
4    goodwill of the business and its business
5    reputation. It casts an unfavorable light on the
6    business which has otherwise received extremely
7    positive reviews in the Globe and Mail, the
8    National Post, US Today and the National
9    Geographic Traveler to mention just a few.

10       It has also been commended by well-known
11   publications such as Four Doors Guide to Atlantic
12   Canada and Forbes Traveller to name a few.

13       It has also been recognized as a Top 10
14   finalist in the National Geographic Society's
15   2009 Geo-tourism challenge. Some of this
16   information is included at Tab 5 of the evidence
17   submitted at the hearing.

18               Mr. Leary points out in Paragraph 8
19               of his affidavit, "In addition to
20               its membership and prestigious hotel
21               and restaurant association Relais
22               and Chateaux Trout Point has always
23               maintained a four and one half star
24               rating from Canada Select. It's the
25               only hotel in Atlantic Canada

1              inspected and recommended by Conde
2              Nast Johansens Guide and earned a
3              five green key rating from the hotel
4              association of Canada."
5

6        The defendant is persistent in his

7    statements that Trout Point Lodge is somehow

8    connected to the Jefferson Parish corruption

9    scandal and has benefitted financially from funds

10   illegally obtained.  The defendant knows that the

11   original story linking Mr. Broussard with Trout

12   Point Lodge has been retracted and an apology

13   published.  In the face of this the defamatory

14   comments continued.

15       Mr. Handshoe had refused to apologize or

16   retract and in fact has republished the original

17   statements and says they are true.  In addition

18   he has alleged that the business is on the verge

19   of bankruptcy and has received funds improperly.

20       All this has been done through the internet

21   which has the potential to reach untold numbers

22   of potential guests of Trout Point Lodge

23   throughout the world.

1        The defamation has gone on now for two years
2    and there is no indication that the defendant
3    intends to stop.    The defendant's conduct
4    throughout has been to attempt to destroy the
5    reputation of the business.
6        In my view it may be very difficult to
7    change the perception of Trout Point Lodge caused
8    by the defamation and its reputation as a world
9    class resort has been damaged.
10        I conclude that the appropriate award of
11    damages for the defamation of Trout Point Lodge
12    is $75,000.
13        The individual plaintiffs have been called
14    dishonest, part of money laundering scheme
15    involving Mr. Broussard and part of a political
16    corruption scandal involving Mr. Broussard which
17    is now the subject of FBI investigation.
18        They are said to have lied and misled ACOA
19    and the Court in the ACOA action. Mr. Leary has
20    said to have perjured himself in that litigation.
21    They are said to have misused the justice system

1       in Nova Scotia for their own purposes.  They are

2       referred to as participating in nefarious schemes

3       being bag holders for Mr. Broussard, being

4       unsuccessful businessmen who have had a series of

5       failed businesses and being conmen.

6           Mr. Leary has said they have changed their

7       patterns of running errands to avoid running into

8       people who may ask them about the internet

9       information published about them.  They are

10      embarrassed and stressed by the defamation.

11          To paraphrase the Supreme Court of Canada

12      decision in Hill,

13

14               "They will never know who, as a

15               result of the defamation, still has

16               a lingering suspicion that they are

17               dishonest, schemers and con men and

18               were involved with Aaron Broussard

19               in the political corruption of which

20               he is accused.  They will never know

21               who might believe that they are

22               without integrity and were involved

23               in criminal activity."

24

25          These unfounded statements about the

26      character, business dealings and financial acumen

27      of these businessmen merit an award of damages

1    for each in the amount of $100,000.

2        Aggravated damages are beyond the damages

3    already awarded which are given when the injury

4    to a plaintiff are aggravated.   As Gatley on

5    libel and slander described it, they reflect a

6    natural indignation of the Court of the injury

7    inflicted.   As Justice Cory said in Hill they

8    take into account the additional harm caused to

9    the plaintiff's feelings by the defendant's

10   outrageous and malicious conduct.

11       Justice Cory in Hill considered the factors

12   in that case which the Court believed made such

13   an award by the jury in that case a reasonable

14   one.

15       I conclude that the following factors in

16   this case call for such an award here.   The

17   original story was retracted by the Times-

18   Picayune in New Orleans, nevertheless Mr.

19   Handshoe continued to spread the defamation.   He

20   then came up with additional statements

21   concerning events in Nova Scotia which defamed

1    the defendants beyond the original defamation.

2    He commented on other business ventures of the

3    plaintiffs and other legal matters in which they

4    were involved misrepresenting facts and attacking

5    the reputations with statements that they were

6    dishonest, fraudsters and liars.   The widespread

7    defamatory continued to the date of this hearing

8    in a meeting well suited to spreading the

9    defamation far and wide to a vast number of

10   internet users.

11   Furthermore there was conduct by the

12   defendant in trying to stop the plaintiffs from

13   continuing their action against him.   He

14   threatened to release dossiers of information he

15   had about the plaintiffs and other unnamed people

16   unless the action was discontinued.   All of this

17   is outrageous conduct in the face of true facts

18   about the plaintiffs.

19   Malice is an essential element of an award

20   of aggravated damages and in this case malice is

21   alleged in the statement of claim in Paragraph 93

1   and other places and is therefore deemed admitted

2   by virtue of the default judgment.

3       I therefore award an additional $50,000 to

4   each of Mr. Leary and Mr. Perret in aggravated

5   damages to express the indignation of the court.

6       As the Supreme Court of Canada said in Hill,

7   punitive damages are not compensatory in nature

8   but are meant to punish the defendant.    There

9   must be a rational purpose in awarding punitive

10   damages.    In Hill the Supreme Court of Canada

11   considered the actions of the Church of

12   Scientology and its officers during the course of

13   the litigation and focussed on its oppressive and

14   high handed conduct and the malice of which it

15   acted throughout.

16       The defendant in this case continued his

17   defamation after the newspaper printed a

18   retraction of its story linking Trout Point

19   Lodge, Mr. Leary and Mr. Perret with Aaron

20   Broussard and the serious criminal allegations

21   against him.    He redoubled his efforts after

1    being sued and continued his defamation after
2    judgment had been entered against him.    He
3    repeated the original defamatory statements.

4        Just prior to the hearing about damages
5    there were further defamatory statements.

6        Mr. Handshoe has stated that because of
7    legislation in the United States it would be
8    impossible for the plaintiffs to recover judgment
9    against him.    This is a factor in awarding
10    punitive damages.

11        I conclude there is a rational reason for
12    awarding punitive damages in this case for the
13    defendant's egregious misconduct which offends
14    the court's sense of decency.    It is to act as a
15    deterrent not only to Mr. Handshoe but also to
16    others who might be inclined to defame someone in
17    this fashion.

18        With respect to Trout Point Lodge I conclude
19    that the defamation award itself is an
20    appropriate award to punish the defendant for his
21    defamation of the corporate plaintiff.    With

1    respect to Mr. Leary and Mr. Perret I conclude
2    that there is a need for additional punishment of
3    the defendant because the defamation of them goes
4    beyond what has been said about the company.

5         In my view the award of general and
6    aggravated damages to Charles Leary and Vaughn
7    Perret is insufficient to properly denounce the
8    actions of Mr. Handshoe and serve the goal of
9    deterrence.

10        I therefore conclude that there should be an
11   additional $25,000 awarded to each of Charles
12   Leary and Vaughn Perret as punitive damages
13   against Mr. Handshoe.

14        I'm satisfied that an injunction should
15   issue.    The principles for granting of
16   injunctions in defamation cases were set out in
17   Astley.    Barrick Gold made it clear that
18   injunctions are available in cases of defamation.
19   In Astley Justice Chapnik said in Paragraph 21,

20

21             "Permanent    injunctions    have
22             consistently  been  ordered  after

1                        findings of defamation where either:
2                        (1) there is a likelihood that the
3                        defendant will continue to publish
4                        defamatory statements despite the
5                        finding that he is liable to the
6                        plaintiff for defamation; or (2)
7                        there is a real possibility that the
8                        plaintiff will not receive any
9                        compensation, given that enforcement
10                     against the defendant of any damage
11                     award may not be possible."
12

13        Applying these factors to this case I look

14  at the conduct of the defendant which, from the

15  beginning, was defamatory and continued with more

16  fervor after a retraction was printed, was

17  published.  It became stronger and more malicious

18  and derogatory as the action was commenced and as

19  it proceeded to this assessment of damages.

20  There's been no retraction or apology but a

21  continued campaign of defamation against these

22  plaintiffs and homophobic comments about their

23  sexual preference.

24        It is clear from the evidence before me that

25  Mr. Handshoe will continue to publish the

26  defamatory material.  He says he's protected from

27  foreign defamation judgments such as the default

1    judgment in this proceeding by legislation in the
2    United States.

3         It also may be difficult if not impossible
4    for the plaintiffs to recover on their judgment.
5    It's not known what assets Mr. Handshoe has or
6    whether enforcement in the U.S. on the monetary
7    judgment will be possible.

8         I therefore conclude that an injunction
9    should issue.  Mr. Handshoe is therefore enjoined
10   from  dissemination,  posting  on  the  internet,
11   distributing   or   publishing   in   any   manner
12   whatsoever, directly or indirectly statements or
13   comments about Trout Point Lodge, Charles Leary
14   and Vaughn Perret.  This includes statements or
15   comments which refer to the three plaintiffs by
16   name, depiction or description.  The mandatory
17   injunction shall also issue requiring Douglas
18   Handshoe  to  remove  the  defamatory  comments,
19   statements and depictions from any internet site
20   on which he has posted them and any links to
21   those sites.

1    The plaintiffs seek solicitor client costs
2    of these proceedings. However they have not
3    retained the services of counsel but have
4    represented themselves throughout. It is true
5    that Vaughn Perret is a law graduate and has
6    practised law. However he has non-practising
7    status and has never been approved to practise
8    law in Nova Scotia. I therefore cannot conclude
9    that solicitor client costs are warranted. That
10   is not to say that self-represented parties are
11   not entitled to their costs. In Nova Scotia it
12   has been said that costs can be awarded to self-
13   represented parties beginning with the decision
14   in MacBeth v. Dalhousie University and more
15   recently in the Court of Appeal decision in Crewe
16   v. Crewe.

17   I've awarded the costs in the modest amount
18   of $4,000 to self-represented parties in Salman
19   v. Al-Sheik Ali. In that case the self-
20   represented parties took part in multi-party
21   litigation and were well prepared and did not

1    cause any delays of five and one half days.

2         I conclude that in the circumstances of this
3    case there should be a modest costs award to
4    reflect the time spent on this matter by the
5    individual plaintiffs.  They brought the matter
6    on to court and obtained a default judgment.
7    They were well prepared for the one half day
8    hearing to assess damages but it was unopposed.

9         I therefore award them costs in the total
10   amount of $2,000.

11        The self-represented parties of the Salman
12   matter were also entitled their disbursements as
13   are the plaintiffs in this case.  They however
14   have not provided me with their disbursements.
15   If they wish to provide that information I will
16   consider their out of pocket costs and render a
17   further brief decision.  I should note however
18   that the final order in this matter therefore
19   cannot be issued until that is done.

20        That concludes my oral decision and I guess
21   the only question I have for the parties is do

1    you wish to make a claim for the disbursements

2    which will mean that the order can't be issued in

3    this proceeding until that's done.

4         <u>MALE VOICE:</u>    No My Lady, we would forego

5    the out of pocket costs.

6         <u>THE COURT:</u>    Thank you, so the order can

7    be issued sooner rather than later.    Thank you,

8    that concludes the matter.

9

10                    <u>[END OF RECORDING 11:22 P.M.]</u>
11
12

13

14

15

16

17

18

19

20

21

22

1

2

3

4                    <u>CERTIFICATE OF COURT TRANSCRIBER</u>
5

6   I, Rita Newton, Court Transcriber, hereby certify that

7   I have transcribed the foregoing and that it is a true

8   and accurate transcript of an oral decision given in

9   the matter of Trout Point Lodge versus Douglas

10  Handshoe, taken by way of electronic recording in

11  Halifax, Nova Scotia on February 1, 2012.

12

13                    _____

14                    Rita Newton, Certificate No. 2006-56

15                    CERTIFIED COURT TRANSCRIBER,
16                    PROVINCE OF NOVA SCOTIA
17

18                    Halifax, Nova Scotia

19                    February 20, 2012