CANADA                                          YAR No. 353654

PROVINCE OF NOVA SCOTIA


<u>IN THE SUPREME COURT OF NOVA SCOTIA</u>


**TROUT POINT LODGE LIMITED, VAUGHN PERRET AND
CHARLES LEARY**
**PLAINTIFFS**


**– VERSUS –**

**DOUG K. HANDSHOE AND JANE DOE
(ANNEMARIEBOUDREAUX@YAHOO.COM)**


**DEFENDANTS**


═══════════════════════════════════════════

<u>DECISION</u>

═══════════════════════════════════════════

| | |
|---|---|
| **HEARD BEFORE:** | The Honourable Justice Suzanne Hood |
| **COUNSEL:** | Dr. Charles Leary Self-Represented as Agent and Officer of Trout Point Lodge Limited |
| **PLACE:** | Yarmouth JC1, Yarmouth, N.S. |
| **DATE HEARD:** | February 1, 2012 |

**INDEX**
**TROUT POINT LODGE V. HANDSHOE**
**FEBRUARY 1, 2012**

Oral Decision    .....................................3

**EXHIBITS**

**EXHIBIT    DESCRIPTION ------------------------PAGE**

None

1 **FEBRUARY 1, 2012 AT 10:23 A.M.**

2

3 **THE COURT:**   We   begin   by   saying   that

4 because   I   am   giving   this   decision   orally   I

5 reserve   the   right,   should   it   be   required   to   be

6 reduced   to   writing,   to   edit   but   not   of   course

7 change the substance of it.

8 Trout   Point   Lodge,   Charles   Leary   and   Vaughn

9 Perret   have   obtained   default   judgment   against

10 Doug   Handshoe   in   an   action   filed   in   August   2011

11 and   amended   in   September   2011   for   defamation,

12 invasion   of   privacy,   injurious   falsehood,

13 intentional   interference   with   contractual

14 relations, intentional interference with economic

15 relations,   intentional   infliction   of   emotional

16 and   mental   distress   and   assault.     Default

17 judgment   was   entered   on   December   12,   2011   with

18 damages to be assessed.

19 The   plaintiffs   move   for   an   assessment   of

20 damages   on   January   12th,   2012.   Mr.   Handshoe   was

21 given   notice   of   a   hearing   for   the   assessment   of

22 damages.

```
 1              The plaintiffs have provided a copy of a
 2    FedEx tracking slip showing delivery to Mr.
 3    Handshoe's home in Mississippi.   It notes the
 4    materials were left at the house.   Efforts were
 5    also made according to the testimony of Mr. Leary
 6    to fax the documents to Mr. Handshoe's fax number
 7    but the transmission was not complete as the fax
 8    appeared to have been disconnected.    These
 9    materials appear also to have been sent by email
10    and these documents are at Tab 3 to the materials
11    presented in evidence by Mr. Leary at the
12    hearing.   It appears from Mr. Handshoe's blog
13    that he had knowledge of the hearing since he
14    referred to receiving, "nastygrams," from Mr.
15    Leary and Mr. Perret in a blog dated January
16    17th, 2012.   Mr. Handshoe did not appear or
17    participate in the assessment of damages.
18              Default judgment is conclusive of a claim
19    set out in the statement of claim and that's in
20    the authority for that, among others, **is E. Sands**
21    **and Associates versus Dextras Engineering.**   The
```

1       amended statement of claim sets out in detail the

2       claims against Mr. Handshoe which are now to be

3       treated by this court as proven.   The statement

4       of claim lists many examples of the defamatory

5       comments made by Mr. Handshoe, below is a brief

6       summary of them.     The defamatory comments

7       originated with a news story which was published

8       in the Times-Picayune newspaper in Louisiana

9       about Jefferson Parish President Aaron Broussard

10      being involved in a political corruption scandal.

11      The plaintiffs were erroneously identified as

12      being connected with Mr. Broussard in a business

13      venture and Mr. Broussard was named in error as

14      owning Trout Point Lodge.     The allegations

15      against him are kickback schemes, money

16      laundering and fraud while in his office as

17      Parish President.

18          The defamatory comments later included

19      claims that Trout Point Lodge, Mr. Leary and Mr.

20      Perret had misled ACOA and that Mr. Leary

21      committed perjury in litigation with ACOA.   The

1    defamation continued with statements that Trout

2    Point Lodge was losing business or going bankrupt

3    because of the investigation of Mr. Broussard and

4    his inability to continue to support it.   Also

5    there were claims that Charles Leary and Vaughn

6    Perret had been involved in a series of

7    businesses which failed and are con men.   The

8    statements also contained anti-gay rhetoric and

9    homophobic comments.

10    After the original story was retracted by

11    the Louisiana newspaper that published it Mr.

12    Handshoe made statements that Mr. Leary and Mr.

13    Perret had improperly influenced it to retract

14    the story.   He also said that Mr. Leary and Mr.

15    Perret were improperly using the legal system by

16    commencing the defamation action.   Individual

17    plaintiffs have filed affidavits and in his

18    affidavit Mr. Leary has related incidents

19    affecting him and Trout Point Lodge.   He said in

20    that affidavit in Paragraph 26,

21
22    "Due to the publications on

```
 1              Slabbed  and  by  Mr.  Handshoe
 2              elsewhere  on  the  internet  I
 3              have  a  very  real  fear  that
 4              anyone     performing     due
 5              diligence  on  us  as  business
 6              people   or   innkeepers   will
 7              discover     and     believe
 8              Handshoe's publications."
 9
10     He also said in Paragraph 27,

11
12              "I  felt  embarrassed  in  my
13              local  community.   Mr.  Perret
14              and  I  have  at  times,  changes
15              our  usual  shopping  patterns  in
16              Yarmouth  in  order  to  avoid
17              persons  we  consider  friends
18              who  may  have  read  the  Slabbed
19              publications."
20

21     He   also   testified   about   the   stress   of   the

22     defamation   on   him   in   Paragraph   30   of   the

23     affidavit where he said,

24
25              "In  April  2011  at  the  time  when
26              Handshoe's  publication  about  us
27              became  threatening  and  homophobic  I
28              experienced  tightened  shoulder  and
29              neck  muscles,  sleeplessness  and
30              developed a  severe  outbreak of  fever
31              blisters  for  which  I  had  to  take
32              Zovirax,  and  antiviral  medication.
33              Previously  I  always  slept  very  well
34              never  waking  up  early.   Since  April
35              2011  I  have  experienced  regular
36              sleeplessness particularly  waking  up
```

```
 1                    early in the morning worrying about
 2                    Slabbed  and  its  effect  on  our
 3                    business."
 4

 5        His  affidavit  concluded  with  Paragraph  39  where

 6        Mr. Leary says,

 7
 8                    "I'm   seriously   concerned   about
 9                    Slabbed hurting the Lodge's business
10                    which  Mr.  Perret  and  I  rely  on  as
11                    our  primary  source  of  income.   In
12                    2011 occupancy rates at Trout Point
13                    were  three  percent  lower  than  in
14                    2010.  This represents a value of at
15                    least $15,000."
16

17         Mr.  Leary  testified  in  court  as  well  and  his

18        evidence was about since the Notice of Action was

19        served  and  about  the  effect  of  the  words  of  the

20        defendant  on  him  and  Trout  Point  Lodge.    Mr.

21        Perret  also  filed  an  affidavit  in  which  he  stated

22        the effects of the defamation on him.  He said in

23        his affidavit in Paragraphs 9 and 10,

24
25                    "Mr.       Handshoe's       internet
26                    publications have added a great deal
27                    of stress to our lives including the
28                    physical  manifestations.    I  felt
29                    genuinely  afraid  of  his  published
30                    threats and of the existence of the
31                    Slabbed  Nation  and  members  of  that
```

```
1              group being in Nova Scotia.  I now
2              keep my doors locked at night
3              whereas previously I never feared
4              for my safety in my own home."
5

6    He says in his affidavit at Paragraph 11,

7

8              "I have told my personal physicians
9              in Spain and Nova Scotia about
10             stress and sleeplessness related to
11             the Handshoe publications.  My
12             physician Dr. Fernandez Negrara had
13             prescribed medication to help me
14             sleep after the Slabbed publications
15             commenced and to help control my
16             anxiety.  I have also experienced
17             embarrassment, humiliation and
18             irritability.  It was hard to get
19             through work in 2011 knowing that
20             nearly every day a new source of
21             embarrassment and business
22             disruption might be published by
23             Handshoe.  I've been embarrassed
24             that friends and acquaintances in
25             Yarmouth might confront me about the
26             Slabbed allegations.  I could never
27             be sure that members of the local
28             community might secretly harbour a
29             belief in the truth of the blogs
30             allegations."
31

32   In Paragraph 13 he says,

33
34             "Mr. Handshoe has also made
35             publications about my mother stating
36             that I "split" and left her with a
37             surrogate son in Louisiana.  I was
38             traumatized by his suggestions that
```

```
1                    I had somewhat neglected or abused
2               my mother."
3

4          Mr. Perret also testified briefly, he said he had
5          lost his appetite in the last two weeks as a
6          result of the material which has been published
7          by Mr. Handshoe and the volume of it.    In
8          addition, materials were submitted to the court
9          which were testified to by Charles Leary.   These
10         included defamatory comments made after the
11         Louisiana newspaper printed a retraction of the
12         story.   They include references to a cover-up of
13         a crime and dirty secrets April 20th, 2011 that
14         Charles Leary and Vaughn Perret and others were
15         "bag holders" for Aaron Broussard and the
16         purported owners of Trout Point Lodge.   That same
17         blog referred to the fleecing of investors in
18         Trout Point Lodge by Mr. Broussard and his close
19         connection to Mr. Leary and Mr. Perret.   It also
20         refers to Charles Leary as a liar and a perjurer
21         in the litigation with ACOA.   And that blog was
22         April 26, 2011.
```

1          On August 15th, 2011 the blog refers to "a

2     Trout Point Lodge Jefferson Parish political

3     corruption scandal update" linking Trout Point

4     Lodge with the corruption scandal involving Aaron

5     Broussard. In that same blog he refers to Charles

6     Leary and Vaughn Perret in the context of "by

7     reporter, get a good story."

8          On August 16th his blog said that he was

9     meticulously laying down "the trail of scams and

10    political corruption that leads to Nova Scotia

11    and Trout Point Lodge."

12         After being served with a Notice of Action

13    further defamatory comments were made.  On August

14    18th he wrote,

15
16              "First class bitches, common thugs
17              or just plain old morons."
18

19    He also refers to the "elite fraternity of crooks

20    and miscreants" who have sued him.  On August

21    24th, 2011 he referred to "political wrongdoing

22    involving Leary and Perret in Canada and it had

23    nothing to do with Broussard *per se*."

1           He  continues  to  make  accusations  of  fraud

2      against  them  and  in  bilking  local  contractors.

3      He refers to "the chances Trout Point Lodge will

4      be  bankrupt  within  a  year"  and  he  said  that  on

5      August 30th, 2011.  In the same blog he refers to

6      the  "nefarious  practices"  of  Charles  Leary  and

7      Vaughn Perret.  He refers to them being involved

8      in  money  laundering.   He  calls  them  "grifters"

9      and  "grafters."   He  accuses  them  of  fabricating

10     positive    reviews    of    Trout    Point    Lodge.

11     Ultimately he links them with organized crime.

12          These types of comments continued throughout

13     2011  and  further  defamatory  comments  were  made

14     earlier this month, January 2012, when the Notice

15     of Assessment of Damages was  served  on  him.   I

16     mentioned  a  few  additional  postings  as  follows.

17     There's a posting from September 14th, 2011,

18
19                "I'll  add  here,  in  case  it  is  not
20                self-evident  that  I  bill  complete
21                dossiers  on  all  the  players  in  this
22                social  group  and  I  intend  through
23                time  to  roll  out  each  and  every  one
24                in  excruciating  detail  as  long  as
25                the    lawsuit    in    Canada    is    an

```
1                    outstanding issue for Slabbed.  The
2                    reason for this is that this band of
3                    gay men act as a unit that will also
4                    scatter like cockroaches when the
5                    heat is applied."
6

7          In January of 2012 the blog says,

8
9                    "Some of those names of the property
10                   owners at Trout Point have well
11                   documented connections to organized
12                   crime here in the U.S.  From my
13                   standpoint flushing all this out
14                   only gets better from here."
15

16         Another blog from September 14th, 2011, sorry,

17         no, that's the same one.  A blog from January

18         29th of 2012,

19
20                   "When I'm done even Perret's niece
21                   who filed an affidavit in that **Fox 8**
22                   case will understand her uncle is a
23                   grifting scumbag pussy."
24

25         And on January 26, 2012 the blog says, "He,"

26         meaning Daquila (sp), "also has enough stroke to

27         tell Charles and Vaughn what to do at Broussard's

28         request."

29             There are many, many more blogs which

30         contained defamatory materials such as this which
```

1    are  included  in  the  materials  filed  with  the

2    Court on January 30th.

3         Turning  to  the  hearing,  a  comprehensive

4    brief  was  filed  with  the  Court  with  many  case

5    authorities.   Mr. Leary made an oral submissions

6    to the  Court outlining the principles the Court

7    should  consider  in  deciding  the  quantum  of

8    damages  for  defamation,  aggravated  damages  and

9    punitive damages.  In addition he referred to a

10   recent  Ontario  Court  of  Appeal  decision  with

11   respect  to  invasion  of  privacy  which  is  also

12   claimed by the individual plaintiffs.

13        In questioning by the Court, Mr. Leary said

14   that the plaintiffs' other claims are subsumed in

15   the Claim of Defamation, that is the claims were

16   intentional  interference  with  economic  relations

17   for  intentional  interference  with  contractual

18   relations and injurious falsehood.

19        Mr.  Leary  submits  that  the  invasion  of

20   privacy,  assault  and  intentional  infliction  of

21   emotional  and  mental  distress  stand  alone  and

1     individual  plaintiffs  seek  damages  for  these

2     separate from the defamation in related claims.

3          The plaintiffs seek damages of $250,000 for

4     each of the three plaintiffs.  Aggravated damages

5     for each individual plaintiff as well as punitive

6     damages.  They say that their original demand of

7     aggravated  damages  of  $300,000  each  should  be

8     increased because the amount was requested before

9     the   recent   defamatory   remarks   which   have

10    continued since default judgment was entered and

11    in particular since Mr. Handshoe was given notice

12    of the assessment of damages.  He said they would

13    seek special damages for loss of business but it

14    is  too  difficult  to  prove  although  he  believes

15    they   have   lost   business   because   of   the

16    defamation.

17         In  addition,  the  individual  plaintiffs,  as

18    I've said, seek damages for invasion of privacy.

19    In the **Jones** Decision the Ontario Court of Appeal

20    said  that  the  range  for  such  damages  is  up  to

21    $20,000.    In   that   case   the   Court   of   Appeal

1       awarded  damages  in  the  amount  of  $10,000.    The
2       plaintiffs  here  say  that  the  extent  of  the
3       invasion of privacy in that case was less than is
4       the  case  here.    plaintiffs  also  seek  an
5       injunction preventing further defamatory comments
6       and  a  mandatory  injunction  seeking  to  have  the
7       existing comments removed.

8               The  leading  case  on  defamation  in  Canada  is
9       the  Supreme  Court  of  Canada  Decision  is  **Hill  v.**
10      **Church  of  Scientology  of  Toronto.**    In  that  case
11      Justice  Cory  writing  for  the  majority  referred  to
12      the  fact  that  the  defamatory  comments  were
13      published  on  the  local  television  news,  reported
14      in the Globe and Mail and reported on by CBC.  He
15      referred  to  the  audience  numbers  of  those  media
16      outlets  and  said  that  the  audience  for  the  local
17      T.V.  station  was  approximately  132,000.    The
18      Globe  circulation  that  day  was  108,000  and  the
19      CBC broadcast was seen by approximately 118,000.
20      He  refers  to  that  in  Paragraph  26  of  the
21      decision.

1           He said in Paragraph 108, and I quote,

2

3                "False allegations can so very

4                quickly and completely destroy a

5                good reputation. A reputation

6                tarnished by libel can seldom regain

7                its former lustre."

8

9      And he said with respect to defamatory statements

10     in Paragraph 166,

11

12               "A defamatory statement can seep

13               into the crevices of the

14               subconscious and lurk there, ever

15               ready to spring forth and spread its

16               cancerous evil. The unfortunate

17               impression left by a libel may last

18               a lifetime. Seldom does a defamed

19               person have the opportunity of

20               replying and correcting the record

21               in a manner that will truly remedy

22               the situation."

23

24     Justice Cory later said in Paragraph 178 with

25     respect to Mr. Hill,

26

27               "He would never know who, as a

28               result of the libellous statement,

29               had some lingering suspicion that he

30               was guilty of misconduct which was

31               criminal in nature. He would never

32               know who might have believed that he

33               was a person without integrity who

34               would act criminally in the

35               performance of his duties as a Crown

```
 1                    counsel.  He would never be certain
 2                    who would accept the allegation that
 3                    he was guilty of a criminal breach
 4                    of  trust  which  was  the  essential
 5                    thrust of the libel."
 6
```

 7       In considering whether the jury award of damages

 8       was appropriate, the Court quote from **Gatley** on

 9       libel and slander in Paragraph 182.  In that text

10       the author states,

```
11
12                    "The amount of damages is peculiarly
13                    the  province  of  the  jury  who  in
14                    assessing  them  will  naturally  be
15                    governed by all the circumstances of
16                    the   particular   case.    They're
17                    entitled   to   take   into   their
18                    consideration  the  conduct  of  the
19                    plaintiff, his position in standing,
20                    the nature of the libel, the mode
21                    and  extent  of  publication,  the
22                    absence or refusal of any retraction
23                    or apology and 'the whole conduct of
24                    the  defendant  from  the  time  the
25                    libel was published down to the very
26                    moment of their verdict.  They may
27                    take into consideration the conduct
28                    of  the  defendant  before  action,
29                    after  action  and  in  court  on  the
30                    trial of the action.'  And also it
31                    is submitted that the conduct of his
32                    counsel  who  cannot  shelter  his
33                    client by taking responsibility for
34                    the  conduct  of  the  case.   They
35                    should also allow 'for the sad truth
36                    that  no  apology,  retraction  or
37                    withdrawal  can  ever  be  guaranteed
```

```
1              completely to undo the harm it has
2              done or the hurt it has caused.'
3              They should also take into account
4              the evidence led in aggravation or
5              litigation of the damages."
6

7     The Court then said in Paragraph 184,

8
9              "In considering and applying the
10             factors pertaining to general
11             damages in this case it will be
12             remembered that the reports in the
13             press were widely circulated and the
14             television broadcast had a wide
15             coverage.  The setting and the
16             persons involved gave the coverage
17             an air of credibility and
18             significance that must have
19             influenced all who saw and read the
20             accounts.  The insidious harm of the
21             orchestrated libel was indeed spread
22             widely throughout the community."
23

24     In considering the issue of aggravated damages

25   Justice Cory again quoted from **Gatley** in

26   Paragraph 183.

27
28             "The conduct of the defendant, his
29             conduct of the case and his state of
30             mind are thus all matters which the
31             plaintiff may rely on his
32             aggravating the damages."
33

34             "Moreover it is very well
35             established that in cases where the
```

```
1                    damages are at large the jury or the
2                    judge, if the award is left to him,
3                    can take into account the motives
4                    and conduct of the defendant where
5                    they aggravate the injury done to
6                    the   plaintiff.    There    may
7                    malevolence or spite or the manner
8                    of committing the wrong may be such
9                    as to injure the plaintiffs' proper
10                   feelings  of  dignity  and  pride.
11                   These are matters which the jury can
12                   take into account in assessing the
13                   appropriate compensation."
14

15                   "In awarding aggravated damages the
16                   natural indignation of the Court at
17                   the   injury   inflicted   on   the
18                   plaintiff is a perfectly legitimate
19                   motive in making it generous rather
20                   than  a  more  moderate  award  to
21                   provide an adequate solution.  That
22                   is  because  the  injury  to  the
23                   plaintiff is actually greater and as
24                   a  result of the conduct, exciting
25                   the  indignation,  demands  a  more
26                   generous solatium."
27

28         The  Court  then  referred  to  the  aggravating

29      circumstances in that case at Paragraph 185.

30
31                   "The  misconduct  of  the  Appellants
32                   continued     after     the     first
33                   publication.     Prior    to    the
34                   commencement of the hearing of the
35                   contempt  motion  before  Justice
36                   Cromarty, Scientology was aware that
37                   the  allegations  it  was  making
38                   against Casey Hill were false.  Yet
```

1            it persisted with the contempt
2            hearings as did Morris Manning. At
3            the conclusion of the contempt
4            hearing both appellants were aware
5            of the falsity of the allegations.
6            Nevertheless when the libel action
7            was instituted the defensive
8            justification was put forward by
9            both of them. The statement of
10           defense alleging justification or
11           truth of the allegation was open for
12           all the public to see. Despite
13           their knowledge of its falsity the
14           appellants continued to publish the
15           libel."
16

17      Finally the manner in which Hill was crossed

18    examined by the Appellant coupled with the manner

19    in which they presented their position to the

20    jury in light of their knowledge of the falsity

21    of their allegations are further aggravating

22    factors to be taken into account.

23        Justice Cory dealt with the issue of

24    aggravated damages in Paragraphs 188 and 189.

25
26           "Aggravated damages may be awarded
27           in circumstances where the
28           defendant's conduct has been
29           particularly high handed or
30           oppressive thereby increasing the
31           plaintiffs' humiliation and anxiety
32           arising from the libellous
33           statement."

1

2         The   nature   of   these   damages   was   aptly

3    described  by  Justice  Robins  in  **Walker  v.  CFTO**

4    **Limited** in these words,

5

6              "Where  the  defendant  is  guilty  of
7              insulting,  high  handed,  spiteful,
8              malicious   or   oppressive   conduct
9              which  increase  the  mental  distress
10             the   humiliation   and   indignation,
11             anxiety,  grief,  fear  and  the  like,
12             suffered   by   the   plaintiff   as   a
13             result   of   being   defamed,   the
14             plaintiff  may  be  entitled  to  what
15             has  come  to  be  known  as  aggravated
16             damages.    These  damages  take  into
17             account  the  additional  harm  caused
18             to  the  plaintiffs'  feeling  by  the
19             defendant's  outrageous  and  malicious
20             conduct.    Like  general  or  special
21             damages  they  are  compensatory  in
22             nature.    Their  assessment  requires
23             consideration  by  the  jury  of  the
24             entire  conduct  of  the  defendant  part
25             of  the  publication  of  the  libel  and
26             continuing  through  to  the  conclusion
27             of  the  trial.    They  represent  the
28             expression  of  natural  indignation  of
29             right-thinking  people  arising  from
30             the   malicious   conduct   of   the
31             defendant."
32

33    In  Paragraph  191  Justice  Cory  considered  the

34    factors  in  that  case  that  warranted  an  award  of

35    aggravated   damages.    There   are   a   number   of

1    factors that a jury may properly take into

2    account in assessing aggravated damages.   For

3    example, was there a withdrawal of the libellous

4    statement made by the defendants and an apology

5    tendered.   If there was this may go far to

6    establishing that there was no malicious conduct

7    on the part of the defendant warranting an award

8    of aggravated damages.   The jury may also

9    consider whether there was a repetition of the

10   libel, conduct that was calculated to deter the

11   plaintiff from proceeding with the libel action,

12   a prolonged and hostile examination of the

13   plaintiff or plea of justification which the

14   defendant knew was bound to fail.   The general

15   manner in which the defendant presented its case

16   is also relevant.   Further it is appropriate for

17   a jury to consider the conduct of the defendant

18   at the time of the publication of the libel.   For

19   example was it clearly aimed at obtaining the

20   widest possible publicity in circumstances that

21   were the most adverse possible to the plaintiff.

1        The Supreme Court of Canada also considered

2    the issue of punitive damages beginning at

3    Paragraph 196 where the Court said,

4
5            "Punitive damages may be awarded in
6            the situation where the defendant's
7            conduct is so malicious, oppressive
8            and high handed that it offends…"
9

10    – missing a page.  Can we just, we'll just go

11    off the record for a moment, I have to find the

12    rest of that quote.

13
14                    **[RECESS 10:47 – 10:48 A.M.]**
15

16    **THE COURT:**    The Supreme Court of Canada

17    dealt with the issue of punitive damages

18    beginning at Paragraph 196, where the Court said,

19

20            "Punitive damages may be awarded in
21            situations where the defendant's
22            misconduct is so malicious,
23            oppressive and high handed that it
24            offends the Court's sense of
25            decency."
26

27        Punitive damages bear no relation to what

28    the plaintiff should receive by way of

1      compensation.  Their aim is not to compensate the

2      plaintiff but rather to punish the defendant.  It

3      is the means by which the jury or Judge expresses

4      its  outrage  at  the  egregious  conduct  of  the

5      defendant.  They  are  in  the  nature  of  a  fine

6      which  is  meant  to  act  as  a  deterrent  to  the

7      defendant  and  to  others  from  acting  in  this

8      manner.   It  is  important  to  emphasize  that

9      punitive damages should only be awarded in those

10     circumstances where the combined award of general

11     and aggravated damages would be insufficient to

12     achieve the goal of punishment and deterrents.

13         One of the important factors for the Court

14     was set out in Paragraph 202,

15

16              "During the appeal it was conceded
17              and  the  evidence  and  events
18              confirmed that in all likelihood no
19              amount  of  general  or  aggravated
20              damages  would  have  deterred
21              Scientology.  Clearly then this was
22              an appropriate case for an award of
23              punitive damages."
24

25         It  is  important  that  each  case  of

1       defamation must be looked at on its own facts and

2       the awards given in other decisions are therefore

3       not of much assistance.

4            The Supreme Court of Canada acknowledged

5       this in the Hill Decision in Paragraph 187.

6       **Barrick Gold** is a decision of the Ontario Court

7       of Appeal dealing with defamation in the internet

8       context.   Justice Blair said in Paragraph 28

9       about internet defamation,

10
11                 "Is there something about defamation
12                 on the internet, cyber libel as it's
13                 sometimes called, that distinguishes
14                 it for purposes of damages from
15                 defamation in another medium?   My
16                 response to that question is yes."
17

18       He referred to the principles set out in **Hill** and

19       then in Paragraph 30 quoted from an Australian

20       decision the quote, "Ambiguity, universality and

21       utility," of the internet.   He continued in

22       Paragraph 31,

23
24                 "Thus of the criteria mentioned
25                 above, the mode and extent of
26                 publication is particularly relevant
27                 in the internet context, and must be

```
 1                         considered carefully.  Communication
 2                         via the internet is instantaneous,
 3                         seamless,     interactive,     blunt,
 4                         borderless and far reaching.  It is
 5                         also impersonal  and  the  anonymous
 6                         nature of such communication has
 7                         made itself create a greater risk
 8                         that the defamatory remarks are
 9                         believed."
10
11       He then said in Paragraph 34,
12
13                         "Internet       defamation       is
14                         distinguished    from    its    less
15                         pervasive cousins in terms of its
16                         potential to damage the reputation
17                         of individuals in corporations by
18                         the  features  described  above
19                         especially its interactive nature,
20                         its potential for being taken at
21                         face value and its absolute and
22                         immediate  worldwide  ubiquity  and
23                         accessibility.  The mode and extent
24                         of   publication   is   therefore
25                         particularly          significant
26                         consideration in assessing damages
27                         in internet defamation cases."
28
29             In  **Barrick  Gold**  an  injunction  was  issued.
30       Justice Blair said in Paragraph 75,
31
32                         "A  highly  transmissible  nature  of
33                         the  tortious  misconduct  at  issue
34                         here is a factor to be addressed in
35                         considering  whether  a  permanent
36                         injunction should be granted.  The
37                         courts are faced with a dilemma.  On
```

```
 1                    the one hand they can throw up their
 2                    collective hands in despair taking
 3                    the view that enforcement against
 4                    such (inaudible due to mumbling…)
 5                    transmissions around the world is
 6                    ineffective and concluding therefore
 7                    that only the jurisdiction where the
 8                    originator of the communication may
 9                    happen to be found can enjoin the
10                    offending conduct.  On the other
11                    hand they can at least protect
12                    against the impugned conduct in
13                    their own jurisdiction."
14
15     In this respect I agree with the following
16     observation of Justice Kirby in **Dow Jones,**
17
18                    "Any suggestion that there can be no
19                    effective remedy for the tort of
20                    defamation or other civil wrongs
21                    committed by the use of the internet
22                    or such wrongs must simply be
23                    tolerated as the price to be paid
24                    for the advantages of the medium is
25                    self-evidently unacceptable."
26
27     A permanent injunction was granted and the Court
28     said in Paragraph 78,
29                    "I would set aside the decision of
30                    the motions judge in this regard and
31                    grant a permanent injunction as
32                    requested restraining the defendants
33                    from disseminating, posting on the
34                    internet or publishing further
35                    defamatory statements concerning
36                    Barrick or its officers, directors
```

1          or employees."
2

3          In **Astley v. Verdun** The Ontario Supreme
4      Court of Justice, Superior Court of Justice cited
5      **Barrick Gold** and ordered an injunction and a
6      mandatory injunction against the defendant.   In
7      that case the defendant stated that in spite of
8      jury verdict against him he would continue to
9      "disparage and discredit the reputation of the
10     plaintiff," quoting from Paragraph 16.

11         Justice Chapnik in that case said in
12     Paragraph 33,

13
14              "Injunctive relief is an exceptional
15              remedy that will not be imposed by
16              the Courts lightly.   I certainly
17              agree with the defendant when he
18              states that any form of prior
19              restraint on freedom of speech is
20              extremely serious and can only be
21              imposed in the clearest and rarest
22              of cases.   This however is one of
23              those cases."
24

25     He then outlined in Paragraph 34 the
26     circumstances of the case which caused him to
27     grant in injunction.  He said,

1
2          "This is so given the plaintiffs'
3          high reputation and position in the
4          business community and the wide
5          circulation of the defamatory
6          statements calculated to destroy
7          that reputation as well as the
8          strong likelihood that the
9          publishing of defamatory statements
10         against the plaintiff will continue
11         and the real possibility that the
12         plaintiff will not actually be
13         compensated by the payment of
14         damages."
15

16   A prudent injunction was granted and the Court

17   said in Paragraph 35,

18
19         "Accordingly I order a permanent
20         injunction to issue against the
21         defendant, J. Robert Verdun
22         restraining him from disseminating,
23         posting on the internet or
24         publishing in any manner whatsoever,
25         directly or indirectly, any
26         statements or comments about the
27         plaintiff Robert M. Astley."
28

29   He also granted a mandatory injunction.  He said

30   in Paragraph 36,

31

32         "There will also be a mandatory
33         injunction requiring the defendant
34         to forthwith remove his blog
35         postings dated April 29, 2011 and

1                  May 2nd, 2011 from the internet and
2                  any similar postings that refer to
3                  the plaintiff directly or
4                  indirectly."
5

6        In **Mina Mar Group v. Divine** Justice Perell

7    also quoted **Barrick Gold.** He granted an

8    injunction issuing out of an Ontario Court

9    against the defendant in New Jersey. He simply

10   said in Paragraph 28,

11
12                  "In accordance with the above
13                  authorities, I also grant a
14                  permanent injunction restraining the
15                  defendants from disseminating,
16                  posting on the internet or
17                  publishing further defamatory
18                  statements concerning the
19                  plaintiffs."
20

21        On the issue of invasion of privacy Mr.

22   Leary provided to the Court the recent decision

23   dated January 18th of 2012 of the Ontario Court

24   of Appeal in **Jones v. Tsige** in which the Court

25   concluded there is, at least in Ontario, a tort

26   of invasion, intrusion into seclusion otherwise

27   called invasion of privacy which is claimed by

28   the individual plaintiffs in this matter. The

1      facts in that case are very different from those

2      in this case.   The defendant had accused, had

3      accessed   the   plaintiff's   personal   banking

4      information on 174 occasions over a period of

5      four years.   However she did not publish or

6      distribute it but used it for her own purposes in

7      a  dispute  with  the  plaintiff's  partner,  the

8      former husband of the defendant.   She apologized

9      for her actions and the Court concluded she was

10     embarrassed and contrite.   The plaintiff claimed

11     $70,000 in damages for invasion of privacy and

12     exemplary damages of $20,000. The Court said the

13     range of damages for this claim is up to $20,000

14     and awarded $10,000.

15        I am satisfied that in an appropriate case

16     in Nova Scotia there can be an award for invasion

17     of privacy or as the Ontario Court of Appeal

18     called it, the intrusion upon seclusion.   I must

19     determine  if  in  this  case  it  is  warranted

20     considering the principles set out in **Jones**.   In

21     **Jones**  there  was  no  accompanying  claim  for

1    defamation as there was no publication of

2    defamatory statements about the plaintiff.

3        In **Nitsopoulos v. Wong** the action was for

4    deceit and invasion of privacy.  The action

5    concerned gaining entry to the plaintiff's home

6    and publishing information gained while there.

7    The action was brought outside the limits, the

8    time limits for a defamation action.

9        The facts in this case are that Mr.

10   Handshoe, on his blog, disclosed Mr. Leary's

11   business and home address and his location when

12   he was visiting Spain.  With respect to Mr.

13   Perret, he said that he had abandoned his mother

14   when he left Louisiana for Canada and Mr. Perret

15   said he was traumatized by this statement.

16       Mr. Handshoe made extremely derogatory and

17   homophobic comments of the most outrageous kind

18   about Mr. Leary and Mr. Perret and their sexual

19   orientation including and posting as what I will

20   refer to as doctored photographs of a sexual

21   nature depicting them.

1          Invasion of privacy in the **Jones** case was
2      private and personal banking information having
3      been looked at many, many times.  That sort of
4      financial and banking information is not usually
5      disclosed by people even to their closest friends
6      yet another bank employee who was not known to
7      the plaintiff looked at her private bank
8      information on numerous occasions.

9          In **Nitsopoulos** the defendant posed as a maid
10     for a Toronto cleaning service so she could write
11     a series of articles for the Globe and Mail
12     entitled "Maid for a Month."  She gained access
13     to the plaintiff's home and her experiences are
14     profiled in the second of these articles.  The
15     article published private details about the life
16     of the plaintiffs that she gained while in their
17     home.  The plaintiffs alleged that they would not
18     have permitted the reporter into their home had
19     she not fraudulently misrepresented herself to
20     them.  They claimed that they suffered harm to
21     their dignity, interests and personal autonomy,

1    their personal and home security and their mental

2    wellbeing.   The Court refused to grant summary

3    judgment to the defendants which they had sought

4    on the basis that there was no cause of action

5    for invasion of privacy.

6         In the **Jones** case the Ontario Court of

7    Appeal dealt with the issue of whether Ontario

8    law recognized a cause of action for invasion of

9    privacy.   Justice Sharpe writing for the Court

10   said in Paragraph 15,

11
12             "Aspects of privacy have long been
13             protected by causes of action such
14             as breach of confidence, defamation,
15             breach of copyright, nuisance, and
16             various property rights.  Although
17             the individual's privacy interest is
18             a fundamental value underlying such
19             claims, the recognition of a
20             distinct right of action for breach
21             of privacy remains uncertain."
22

23        Justice Sharpe referred to an article by

24   William L. Prosser entitled *Privacy* which was

25   published in the California Law Review 383.   He

26   said there were four torts which were quoted in

27   Paragraph 18;

1

2          1.          Intrusion    upon    the    plaintiff's

3     seclusion   or   solitude,   or   into   his   private

4     affairs;

5          2.          Public   disclosure   of   embarrassing

6     private facts about the plaintiff;

7          3.          Publicity which places the plaintiff

8     in a false light in the public eye;

9          4.          Appropriation,  for  the  defendant's

10    advantage, of the plaintiff's name or likeness.

11

12          He  said  the  most  relevant  of  these  is  the

13    intrusion   upon   seclusion   and   he   quoted   in

14    Paragraph  19  its  definition  from  *Restatement*,

15    *second restatement of torts* as follows,

16
17                    "One   who   intentionally   intrudes,
18                    physically  or  otherwise,  upon  the
19                    seclusion of another or his private
20                    affairs  or  concerns,  is  subject  to
21                    liability  to  the  other  for  invasion
22                    of  his  privacy,  if  the  invasion
23                    would  be  highly  offensive  to  a
24                    reasonable person."
25

26          He continued in Paragraph 20,

1
2   "The comment section of the
3   *Restatement* elaborates this
4   proposition and explains that the
5   tort includes physical intrusions
6   into private places as well as
7   listening or looking, with or
8   without mechanical aids, into the
9   plaintiff's private affairs. Of
10   particular relevance to this appeal,
11   is the observation that other non-
12   physical forms of investigation or
13   examination into private concerns
14   may be actionable. These include
15   opening private and personal mail or
16   examining a private bank account,
17   even though there is no publication
18   or other use of any kind of the
19   information obtained."
20
21  The decisions he then (inaudible due to
22 mumbling…)dealt largely with the collection of
23 personal data.  Chartered jurisprudence dealing
24 with privacy has focussed on search and seizure
25 in the criminal law context.
26  Justice Sharpe said in Paragraph 41 that
27 there are three distinct privacy interests, the
28 third being a relevant one in **Jones.**  That is the
29 informational privacy.   He quoted from the
30 Decision of the **Queen v. Tessling** in Paragraph 41
31 where the Supreme Court of Canada said,

1

2       "Beyond our bodies and the places
3       where we live and work, however,
4       lies the thorny question of how much
5       information about ourselves and
6       activities we are entitled to shield
7       from the curious eyes of the state.
8       This includes commercial information
9       locked in a safe kept in a
10      restaurant owned by the accused.
11      Informational privacy has been
12      defined as 'the claim of
13      individuals, groups, or institutions
14      to determine for themselves when,
15      how, and to what extent information
16      about them is communicated to
17      others.' Its protection is
18      predicated on the assumption that
19      all information about a person is,
20      in a fundamental way, his own for
21      him to communicate or retain as he
22      sees fit."
23

24      In Paragraph 44 he referred to the *Universal*

25      *Declaration of Human Rights* which provides,

26
27      "No one shall be subjected to
28      arbitrary interference with his
29      privacy, home or correspondence and
30      proclaims that everyone has the
31      right to the protection of the law
32      against such interference or
33      attacks."
34

35      Justice Sharpe said in Paragraph 45,

36

1    "While the *Charter* does not apply to
2    common law disputes between private
3    individuals, the Supreme Court has
4    acted on several occasions to
5    develop the common law in a manner
6    consistent with *Charter* values."
7
8
9    Justice Sharpe then reviewed privacy legislation

10   in Canada and the development of privacy law in

11   other jurisdictions. He then said in Paragraph

12   67,

13
14   "For over one hundred years,
15   technological change has motivated
16   the legal protection of the
17   individual's right to privacy. In
18   modern times, the pace of
19   technological change has accelerated
20   exponentially. Legal scholars such
21   as Peter Burns have written of 'the
22   pressing need to preserve privacy
23   which is being threatened by science
24   and technology to the point of
25   surrender.' The internet and digital
26   technology have brought an enormous
27   change in the way we communicate and
28   in our capacity to capture, store
29   and retrieve information. As the
30   facts of this case indicate,
31   routinely kept electronic data bases
32   render our most personal financial
33   information vulnerable. Sensitive
34   information as to our health is
35   similarly available, as are records
36   of the books we have borrowed or
37   bought, the movies we have rented or
38   downloaded, where we have shopped,

```
 1                    where  we  have  travelled,  and  the
 2                    nature of our communications by cell
 3                    phone, e-mail or text message".
 4

 5          He then deals with law as it applied to the

 6      case before the Court.  He said in Paragraph 71,

 7

 8                    "The  key  features  of  this  cause  of
 9                    action    are,    first,    that    the
10                    defendant's    conduct    must    be
11                    intentional,  within  which  I  would
12                    include  reckless;  second  that  the
13                    defendant must have invaded, without
14                    lawful      justification,      the
15                    plaintiff's   private   affairs   or
16                    concerns;   and   third,   that   a
17                    reasonable  person  would  regard  the
18                    invasion as highly offensive causing
19                    distress,  humiliation  or  anguish.
20                    However,   proof   of   harm   to   a
21                    recognized economic interest is not
22                    an element of the cause of action. I
23                    return  below  to  the  question  of
24                    damages,  but  state  here  that  I
25                    believe  it  important  to  emphasize
26                    that given the intangible nature of
27                    the interest protected, damages for
28                    intrusion    upon    seclusion    will
29                    ordinarily be measured by a modest
30                    conventional sum."
31

32      He continued in Paragraph 72,

33
34                    "These  elements  make  it  clear  that
35                    recognizing  this  cause  of  action
36                    will  not  open  the  floodgates.  A
```

```
 1                    claim for intrusion upon seclusion
 2                    will arise only for deliberate and
 3                    significant invasions of personal
 4                    privacy. Claims from individuals who
 5                    are sensitive or unusually concerned
 6                    about their privacy are excluded: it
 7                    is only intrusions into matters such
 8                    as one's financial or health
 9                    records, sexual practices and
10                    orientation, employment, diary or
11                    private correspondence that, viewed
12                    objectively on the reasonable person
13                    standard, can be described as highly
14                    offensive."
15
```

16        He then referred to the competing claims of

17   freedom of expression and freedom of the press.

18   He said in Paragraph 73,

```
19
20                    "Suffice it to say, no right to
21                    privacy can be absolute and many
22                    claims for the protection of privacy
23                    will have to be reconciled with, or
24                    even yield to, such competing
25                    claims."
26
```

27        In Paragraph 87 Justice Sharpe set out the

28   considerations in determining damages where an

29   intrusion on seclusion has been found to exist.

30        In **Jones** there was no issue about freedom of

31   expression or freedom of the press.  The Ontario

32   Court of Appeal therefore did not have to

1    consider the balance to be struck between those
2    rights and privacy rights.

3         Justice Sharpe specifically mentioned
4    intrusion into matters involving a person's
5    sexual practices and orientation as being
6    possible subjects for a claim of intrusion upon
7    seclusion. However he said these intrusions must
8    be viewed objectively and be viewed as highly
9    offensive. Weight against this is freedom of
10   persons to express their opinions.

11        Certainly the comments made by Mr. Handshoe
12   deal with Mr. Leary's and Mr. Perret's sexual
13   orientation. They're anti-gay and homophobic,
14   they were very upsetting to both as were the
15   doctored up photographs, they're highly
16   offensive. However the issue of weighing the
17   effect of the intrusion on seclusion against the
18   issue of freedom of expression was not argued
19   before me. In such circumstances I conclude this
20   is not an appropriate case for the award of
21   damages for intrusion of seclusion.

1    In this regard I note as well the comments

2    of Justice Cory in **Hill** where he said with

3    respect to defamation,

5    "Reputation is intimately related to
6    the right to privacy which has been
7    accorded constitutional protection."

9    This passage was also quoted by Justice

10   Sharpe in Paragraph 43 of the **Jones** decision.

11   Because this is also a defamation action I

12   conclude this is a further reason to leave the

13   issue of a cause of action for intrusion on

14   seclusion for another day in another proceeding.

15   Now turning to the damage award with respect

16   to Trout Point Lodge. With respect to the

17   corporate plaintiff it is clear that a

18   corporation can be defamed. Damages were awarded

19   to the Barrick Gold Corporation and to Dover

20   Investments Limited. In the latter decision the

21   Court set out the principles in awarding damages

22   to a corporate plaintiff.

23   The Court said in Paragraph 19,

1
2          "Damages for a corporate plaintiff
3          are to compensate for the harm to
4          its    goodwill    and    business
5          reputation.   The factors to be
6          considered in assessing damages
7          include the defendant's conduct, his
8          position and standing, the nature of
9          the defamation, the absence of an
10         apology or refusal to apologize and
11         his conduct throughout up to and
12         including at trial.  In addition to
13         general damages for defamation a
14         corporate plaintiff may be entitled
15         to   special   damages   for   specific
16         economic loss.  In addition general
17         damages    for    defamation    in
18         exceptional cases a corporate
19         plaintiff may be entitled to an
20         award of punitive damages for
21         malicious, oppressive and high-
22         handed conduct.  Punitive damages
23         are intended to punish a defendant
24         rather than compensate a plaintiff.
25         Compensatory damages of substantial
26         may also be considered punishment
27         and should be taken into account
28         when determining whether an award of
29         punitive damages is warranted."
30
31    Trout Point Lodge has been stated to have been
32    funded by money illegally obtained through Mr.
33    Broussard and through the dishonest actions of
34    Mr. Leary and Mr. Perret and getting money from
35    ACOA and other investors.  It has been said to be
36    on the verge of bankruptcy.  These are things

---

1      which would cause potential guests to decide not

2      to come to Trout Point Lodge.

3          The defamation in my view has harmed the

4      goodwill of the business and its business

5      reputation.  It casts an unfavorable light on the

6      business which has otherwise received extremely

7      positive reviews in the Globe and Mail, the

8      National Post, US Today and the National

9      Geographic Traveler to mention just a few.

10         It has also been commended by well-known

11     publications such as Four Doors Guide to Atlantic

12     Canada and Forbes Traveller to name a few.

13         It has also been recognized as a Top 10

14     finalist in the National Geographic Society's

15     2009 Geo-tourism challenge.   Some of this

16     information is included at Tab 5 of the evidence

17     submitted at the hearing.

18              Mr. Leary points out in Paragraph 8
19              of his affidavit, "In addition to
20              its membership and prestigious hotel
21              and restaurant association Relais
22              and Chateaux Trout Point has always
23              maintained a four and one half star
24              rating from Canada Select.  It's the
25              only hotel in Atlantic Canada

1      inspected and recommended by Conde
2      Nast Johansens Guide and earned a
3      five green key rating from the hotel
4      association of Canada."
5

6          The   defendant   is   persistent   in   his

7      statements  that  Trout  Point  Lodge  is  somehow

8      connected   to   the   Jefferson   Parish   corruption

9      scandal and has benefitted financially from funds

10     illegally obtained.   The defendant knows that the

11     original story linking Mr. Broussard with Trout

12     Point  Lodge  has  been  retracted  and  an  apology

13     published.   In the face of this the defamatory

14     comments continued.

15         Mr.  Handshoe  had  refused  to  apologize  or

16     retract and in fact has republished the original

17     statements and says they are true.   In addition

18     he has alleged that the business is on the verge

19     of bankruptcy and has received funds improperly.

20         All this has been done through the internet

21     which  has  the  potential  to  reach  untold  numbers

22     of   potential   guests   of   Trout   Point   Lodge

23     throughout the world.

1         The defamation has gone on now for two years

2    and there is no indication that the defendant

3    intends to stop.   The defendant's conduct

4    throughout has been to attempt to destroy the

5    reputation of the business.

6         In my view it may be very difficult to

7    change the perception of Trout Point Lodge caused

8    by the defamation and its reputation as a world

9    class resort has been damaged.

10         I conclude that the appropriate award of

11    damages for the defamation of Trout Point Lodge

12    is $75,000.

13         The individual plaintiffs have been called

14    dishonest, part of money laundering scheme

15    involving Mr. Broussard and part of a political

16    corruption scandal involving Mr. Broussard which

17    is now the subject of FBI investigation.

18         They are said to have lied and misled ACOA

19    and the Court in the ACOA action. Mr. Leary has

20    said to have perjured himself in that litigation.

21    They are said to have misused the justice system

1          in Nova Scotia for their own purposes.  They are

2          referred to as participating in nefarious schemes

3          being  bag  holders  for  Mr.  Broussard,  being

4          unsuccessful businessmen who have had a series of

5          failed businesses and being conmen.

6               Mr. Leary has said they have changed their

7          patterns of running errands to avoid running into

8          people  who  may  ask  them  about  the  internet

9          information  published  about  them.    They  are

10         embarrassed and stressed by the defamation.

11              To  paraphrase  the  Supreme  Court  of  Canada

12         decision in **Hill**,

13
14                  "They  will  never  know  who,  as  a
15                  result  of  the  defamation,  still  has
16                  a  lingering  suspicion  that  they  are
17                  dishonest,  schemers  and  con  men  and
18                  were  involved  with  Aaron  Broussard
19                  in  the  political  corruption  of  which
20                  he  is  accused.   They  will  never  know
21                  who  might  believe  that  they  are
22                  without  integrity  and  were  involved
23                  in  criminal  activity."
24

25              These   unfounded   statements   about   the

26         character, business dealings and financial acumen

27         of  these  businessmen  merit  an  award  of  damages

1        for each in the amount of $100,000.

2              Aggravated damages are beyond the damages

3        already awarded which are given when the injury

4        to a plaintiff are aggravated.   As Gatley on

5        libel and slander described it, they reflect a

6        natural indignation of the Court of the injury

7        inflicted.   As Justice Cory said in **Hill** they

8        take into account the additional harm caused to

9        the plaintiff's feelings by the defendant's

10       outrageous and malicious conduct.

11             Justice Cory in **Hill** considered the factors

12       in that case which the Court believed made such

13       an award by the jury in that case a reasonable

14       one.

15             I conclude that the following factors in

16       this case call for such an award here.   The

17       original story was retracted by the Times-

18       Picayune in New Orleans, nevertheless Mr.

19       Handshoe continued to spread the defamation.   He

20       then came up with additional statements

21       concerning events in Nova Scotia which defamed

1    the defendants beyond the original defamation.

2    He commented on other business ventures of the

3    plaintiffs and other legal matters in which they

4    were involved misrepresenting facts and attacking

5    the reputations with statements that they were

6    dishonest, fraudsters and liars.  The widespread

7    defamatory continued to the date of this hearing

8    in a meeting well suited to spreading the

9    defamation far and wide to a vast number of

10   internet users.

11       Furthermore there was conduct by the

12   defendant in trying to stop the plaintiffs from

13   continuing their action against him.   He

14   threatened to release dossiers of information he

15   had about the plaintiffs and other unnamed people

16   unless the action was discontinued.  All of this

17   is outrageous conduct in the face of true facts

18   about the plaintiffs.

19       Malice is an essential element of an award

20   of aggravated damages and in this case malice is

21   alleged in the statement of claim in Paragraph 93

1    and other places and is therefore deemed admitted

2    by virtue of the default judgment.

3         I therefore award an additional $50,000 to

4    each of Mr. Leary and Mr. Perret in aggravated

5    damages to express the indignation of the court.

6         As the Supreme Court of Canada said in **Hill,**

7    punitive damages are not compensatory in nature

8    but are meant to punish the defendant.    There

9    must be a rational purpose in awarding punitive

10   damages.    In **Hill** the Supreme Court of Canada

11   considered  the  actions  of  the  Church  of

12   Scientology and its officers during the course of

13   the litigation and focussed on its oppressive and

14   high handed conduct and the malice of which it

15   acted throughout.

16        The  defendant  in  this  case  continued  his

17   defamation  after  the  newspaper  printed  a

18   retraction  of  its  story  linking  Trout  Point

19   Lodge,  Mr.  Leary  and  Mr.  Perret  with  Aaron

20   Broussard  and  the  serious  criminal  allegations

21   against  him.    He  redoubled  his  efforts  after

1      being  sued  and  continued  his  defamation  after

2      judgment  had  been  entered  against  him.     He

3      repeated the original defamatory statements.

4           Just  prior  to  the  hearing  about  damages

5      there were further defamatory statements.

6           Mr.  Handshoe  has  stated  that  because  of

7      legislation  in  the  United  States  it  would  be

8      impossible for the plaintiffs to recover judgment

9      against  him.     This  is  a  factor  in  awarding

10     punitive damages.

11          I  conclude  there  is  a  rational  reason  for

12     awarding  punitive  damages  in  this  case  for  the

13     defendant's  egregious  misconduct  which  offends

14     the court's sense of decency.    It is to act as a

15     deterrent  not  only  to  Mr.  Handshoe  but  also  to

16     others who might be inclined to defame someone in

17     this fashion.

18          With  respect to Trout Point Lodge I conclude

19     that   the   defamation   award   itself   is   an

20     appropriate award to punish the defendant for his

21     defamation  of  the  corporate  plaintiff.     With

1    respect to Mr. Leary and Mr. Perret I conclude

2    that there is a need for additional punishment of

3    the defendant because the defamation of them goes

4    beyond what has been said about the company.

5         In my view the award of general and

6    aggravated damages to Charles Leary and Vaughn

7    Perret is insufficient to properly denounce the

8    actions of Mr. Handshoe and serve the goal of

9    deterrence.

10        I therefore conclude that there should be an

11   additional $25,000 awarded to each of Charles

12   Leary and Vaughn Perret as punitive damages

13   against Mr. Handshoe.

14        I'm satisfied that an injunction should

15   issue.    The principles for granting of

16   injunctions in defamation cases were set out in

17   **Astley.    Barrick Gold** made it clear that

18   injunctions are available in cases of defamation.

19   In **Astley** Justice Chapnik said in Paragraph 21,

20

21             "Permanent    injunctions    have
22             consistently  been  ordered  after

```
 1                    findings of defamation where either:
 2                    (1) there is a likelihood that the
 3                    defendant will continue to publish
 4                    defamatory statements despite the
 5                    finding that he is liable to the
 6                    plaintiff for defamation; or (2)
 7                    there is a real possibility that the
 8                    plaintiff will not receive any
 9                    compensation, given that enforcement
10                    against the defendant of any damage
11                    award may not be possible."
12
```

13            Applying these factors to this case I look

14       at the conduct of the defendant which, from the

15       beginning, was defamatory and continued with more

16       fervor after a retraction was printed, was

17       published.  It became stronger and more malicious

18       and derogatory as the action was commenced and as

19       it proceeded to this assessment of damages.

20       There's been no retraction or apology but a

21       continued campaign of defamation against these

22       plaintiffs and homophobic comments about their

23       sexual preference.

24            It is clear from the evidence before me that

25       Mr. Handshoe will continue to publish the

26       defamatory material.  He says he's protected from

27       foreign defamation judgments such as the default

1    judgment in this proceeding by legislation in the

2    United States.

3        It also may be difficult if not impossible

4    for the plaintiffs to recover on their judgment.

5    It's not known what assets Mr. Handshoe has or

6    whether enforcement in the U.S. on the monetary

7    judgment will be possible.

8        I therefore conclude that an injunction

9    should issue.  Mr. Handshoe is therefore enjoined

10   from dissemination, posting on the internet,

11   distributing or publishing in any manner

12   whatsoever, directly or indirectly statements or

13   comments about Trout Point Lodge, Charles Leary

14   and Vaughn Perret.  This includes statements or

15   comments which refer to the three plaintiffs by

16   name, depiction or description.  The mandatory

17   injunction shall also issue requiring Douglas

18   Handshoe to remove the defamatory comments,

19   statements and depictions from any internet site

20   on which he has posted them and any links to

21   those sites.

1          The plaintiffs seek solicitor client costs

2      of these proceedings.   However they have not

3      retained the services of counsel but have

4      represented themselves throughout.   It is true

5      that Vaughn Perret is a law graduate and has

6      practised law.   However he has non-practising

7      status and has never been approved to practise

8      law in Nova Scotia.   I therefore cannot conclude

9      that solicitor client costs are warranted.   That

10     is not to say that self-represented parties are

11     not entitled to their costs.   In Nova Scotia it

12     has been said that costs can be awarded to self-

13     represented parties beginning with the decision

14     in **MacBeth v. Dalhousie University** and more

15     recently in the Court of Appeal decision in **Crewe**

16     **v. Crewe.**

17          I've awarded the costs in the modest amount

18     of $4,000 to self-represented parties in **Salman**

19     **v. Al-Sheik Ali.**   In that case the self-

20     represented parties took part in multi-party

21     litigation and were well prepared and did not

1     cause any delays of five and one half days.

2         I conclude that in the circumstances of this

3     case there should be a modest costs award to

4     reflect the time spent on this matter by the

5     individual plaintiffs.  They brought the matter

6     on to court and obtained a default judgment.

7     They were well prepared for the one half day

8     hearing to assess damages but it was unopposed.

9         I therefore award them costs in the total

10    amount of $2,000.

11        The self-represented parties of the **Salman**

12    matter were also entitled their disbursements as

13    are the plaintiffs in this case.  They however

14    have not provided me with their disbursements.

15    If they wish to provide that information I will

16    consider their out of pocket costs and render a

17    further brief decision.  I should note however

18    that the final order in this matter therefore

19    cannot be issued until that is done.

20        That concludes my oral decision and I guess

21    the only question I have for the parties is do

1       you wish to make a claim for the disbursements

2       which will mean that the order can't be issued in

3       this proceeding until that's done.

4           **MALE VOICE:**     No My Lady, we would forego

5       the out of pocket costs.

6           **THE COURT:**     Thank you, so the order can

7       be issued sooner rather than later.  Thank you,

8       that concludes the matter.

9

10              **[END OF RECORDING 11:22 P.M.]**
11
12

13

14

15

16

17

18

19

20

21

22

1

2

3

4                    **CERTIFICATE OF COURT TRANSCRIBER**
5

6   I, Rita Newton, Court Transcriber, hereby certify that

7   I have transcribed the foregoing and that it is a true

8   and accurate transcript of an oral decision given in

9   the matter of **Trout Point Lodge versus Douglas**

10  **Handshoe,** taken by way of electronic recording in

11  Halifax, Nova Scotia on February 1, 2012.

12

13                    _____

14                    **Rita Newton, Certificate No. 2006-56**

15                    **CERTIFIED COURT TRANSCRIBER,**
16                    **PROVINCE OF NOVA SCOTIA**
17

18                    Halifax, Nova Scotia

19                    February 20, 2012